# 12-2479-cv

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

JOSHUA MARSHALL,

 Plaintiff-Appellee,

-against-

P.O. SALIM RANDALL, Shield No. 15331, Individually and in His Official Capacity, P.O. MICHAEL BURBRIDGE, Shield No. 15488, Individually and in His Official Capacity,

 Defendants-Appellants,

-and-

THE CITY OF NEW YORK, JOHN DOE, P.O.'s # 1-10 Individually and in Their Official Capacities (the name John Doe being fictitious, as the true names are presently unknown),

 Defendants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

### JOINT APPENDIX
### Volume IV of V (pp. A903-1203)

MICHAEL A. CARDOZO,
Corporation Counsel of the
  City of New York,
Attorney for Defendant-Appellant,
100 Church Street,
New York, New York 10007.
(212) 788-1010

COHEN & FITCH LLP,
Attorneys for Plaintiff-Appellee,
233 Broadway, Suite 1800,
New York, NY 10279.
(212) 374-9115

LAW OFFICES OF JON L. NORINSBERG
225 Broadway, Suite 2700
New York, New York 10007
(212) 791-5396

Reproduced On Recycled Paper

## INDEX TO VOLUMES

<u>**Page**</u>

Volume I ..........................................................................................................................A1-A300

Volume II.........................................................................................................................A301-A601

Volume III ......................................................................................................................A602-A902

Volume IV .......................................................................................................................A903-A1203

Volume V.........................................................................................................................A1204-A1485

# TABLE OF CONTENTS

**Page**

Docket Entries ..................................................................................................... A1

Complaint, Dated June 8, 2010.............................................................................. A16

Defendants City of New York, Randall and Burbridge's
Answer, Dated October 8, 2010 ............................................................................ A28

Defendants' Notice of Motion for Summary Judgment,
Dated September 9, 2011........................................................................................ A39

Declaration of Steve Stavridis, Dated September 9, 2011,
Read in Support of Defendants' Motion for Summary
Judgment, with Annexed Exhibits........................................................................ A42

    Exhibit A -    Complaint, Dated June 8, 2010.............................................. A46

    Exhibit B -    Defendants City of New York,
                   Randall and Burbridge 's Answer, Dated October 8, 2010 .................... A59

    Exhibit C -    ECF Civil Docket Sheet........................................................ A71

    Exhibit D -    Order, Dated June 29, 2011 ................................................. A78

    Exhibit E -    Complaint and Arrest Reports .............................................. A83

    Exhibit F -    Property Clerk's Invoice, Dated May 15, 2008...................... A90

    Exhibit G -    Finest Message Switching System Printout, Dated May 15, 2008......... A93

    Exhibit H -    NYPD Police Firearm Laboratory Report, Dated May 19, 2008 .......... A97

    Exhibit I -    Stop, Search and Frisk Report for Demetrius Meade ............................ A99

    Exhibit J -    Criminal Court Complaint, Dated May 15, 2008,
                   in People of the State of New York v Marshall.................................... A102

    Exhibit K -    Grand Jury Indictment, Dated May 20, 2008,
                   in People of the State of New York v Marshall.................................... A105

    Exhibit L -    Decision and Order, Dated May 27, 2009
                   in The People of the State of New York
                   v. Marshall ...................................................................... A110

    Exhibit M -    Document Related to the Dismissal of Charges
                   against Plaintiff................................................................. A113

ii

Exhibit N -   Excerpt of Grand Jury Minutes, Dated May 19, 2008,
in The People of the State of New York
v. Marshall ................................................................................. A117

Exhibit O -   Excerpt of Grand Jury Minutes, Dated May 19, 2008,
in The People of the State of New York
v. Marshall ................................................................................. A156

Exhibit P -   Excerpt of Deposition Transcript of Michael
Burbridge, Dated May 26, 2011 ........................................... A195

Exhibit Q -   Order, Dated April 8, 2011, in Marshall v. City of New York ............. A247

Defendants' Statement of Undisputed Facts Pursuant
to Local Civil Rule 56.1, Dated September 9, 2011 ................................ A250

Declaration of Steve Stavridis, Dated September 14, 2011,
Read in Support of Defendants' Motion for Summary Judgment .......................... A256

Exhibit O -   Examination Before Trial Transcript
of Joshua Marshall, Dated April 26, 2011 ........................... A259

Letter, Dated September 21, 2011,
from Jon L. Norinsberg to the Honorable Jack B. Weinstein .................................. A465

Letter, Dated September 22, 2011,
from Steve Stavridis to the Honorable Jack B. Weinstein,
with Attachment ............................................................................................. A468

Attachment -   Defendants' Memorandum of Law,
Dated September 22, 2011, Read in Support
of Their Motion for Summary Judgment ............................... A470

Order Granted Extension, Dated September 26, 2011 ............................................. A490

Order Granting Leave, Dated September 28, 2011 ................................................. A493

Defendants' Memorandum of Law, Dated September 22, 2011,
Read in Their Support of Motion for Summary Judgment ....................................... A495

iii

Declaration of Jon L. Norinsberg, Dated October 28, 2011,
Read in Opposition to Defendants' Motion for Summary Judgment,
with Annexed Exhibits..................................................................................................A515

    Exhibit A -    Excerpt of Examination Before Trial Transcript
               of Joshua Marshall, Dated April 26, 2011 ............................................A518

    Exhibit B -    Excerpt of Deposition Transcript of Michael
               Burbridge, Dated May 26, 2011 ..........................................................A535

    Exhibit C -    Excerpt of Deposition Transcript of  Salim
               Randall ..................................................................................................A561

    Exhibit D -    Excerpt of Grand Jury Transcript Testimony of
               Michael Burbridge ...............................................................................A581

    Exhibit E -    Excerpt of Grand Jury Transcript Testimony of
               Salim Randall........................................................................................A587

    Exhibit F -    NYPD Complaint Report Worksheet,
               Dated May 15, 2008..............................................................................A597

    Exhibit G -    NYPD Request of Laboratory
               Examination Report, Dated May 15, 2008 ...........................................A603

    Exhibit H -    NYPD Evidence Collection Team Report,
               Dated May 15, 2008..............................................................................A606

    Exhibit I -    Arrest Report.........................................................................................A609

    Exhibit J -    NYPD Complaint Follow Up
               Information Report, Dated May 15, 2008..............................................A614

    Exhibit K -    Civilian Complaint Review Board's
               Case Closing Form, with Additional Documents .................................A617

    Exhibit L -    Complaint Room Screening Sheet.........................................................A638

    Exhibit M -    Arrest and Complaint Reports ..............................................................A641

Plaintiff's Memorandum of Law, Dated October 28, 2011,
Read in Opposition to Defendants' Motion for Summary Judgment .......................A648

iv

**Page**

Plaintiff's Local Rule 56.1(b) Statement, Dated October 28, 2011 ..........................................A683

Plaintiff's Response to Defendants' Local Rule 56.1(b)
Statement, Dated October 28, 2011 ..............................................................................................A686

Defendants' Reply Memorandum of Law, Dated November 15, 2011,
Read in Further Support of Defendants' Motion for Summary Judgment ..............................A691

Transcript, Dated November 28, 2011 ........................................................................................A707

Memorandum Order and Judgment, Dated November 29, 2011..............................................A737

Plaintiff's Memorandum of Law, Dated April 9, 2012,
Read in Support of Plaintiff's Motion in Limine......................................................................A741

Plaintiff's Request to Charge, Dated April 9, 2012...................................................................A771

Defendants' Motion in Limine, Dated April 12, 2012,
with Annexed Exhibits ..................................................................................................................A802

      Exhibit A -   Excerpt of Examination Before Trial Transcript
                   of Joshua Marshall, Dated April 26, 2011 ............................................A830

      Exhibit B -   Office of Chief Medical Examiner's
                   Laboratory Report, Dated June 10, 2008 .............................................A841

Trial Transcript, Dated April 16, 2012 .......................................................................................A843

Letter, Dated April 18, 2012, from Gerald Cohen and
Jon L. Norinsberg to the Honorable Jack B. Weinstein ..........................................................A887

Defendants' Objections to Proposed Jury Charge,
Filed April 20, 2012.......................................................................................................................A893

Defendants' Motion for Reconsideration of the Court's Ruling
Regarding Defendants' Motion in Limine, Dated April 20, 2012...........................................A905

Trial Transcript, Dated April 23, 2012 .......................................................................................A913

Trial Transcript, Dated April 24, 2012 .......................................................................................A945

Trial Transcript, Dated April 25, 2012 .....................................................................................A1187

v

**Page**

Defendants' Brief, Dated April 25, 2012, Read in Support
of Multiple Trial Motions, with Annexed Exhibits ...............................................A1245

    Exhibit A -   Excerpt of Trial Transcript, Dated April 23, 2012.............................A1257

    Exhibit B -   Excerpt of Examination Before Trial Transcript
               of Joshua Marshall, Dated April 26, 2011 .........................................A1263

    Exhibit C -   Excerpt of Trial Transcript, Dated April 24, 2012.............................A1267

Defendants' Motion for a Mistrial/Memorandum of Law,
Dated April 26, 2012, with Annexed Exhibits.......................................................A1274

    Exhibit A -   Excerpt of Special Interrogatories ......................................................A1286

    Exhibit B -   Excerpt of Trial Transcript, Dated April 25, 2012.............................A1289

Trial Transcript, Dated April 26, 2012 ................................................................A1300

Plaintiff's Exhibits ..............................................................................................A1326

Defendants' Exhibits............................................................................................A1350

Court's Exhibits ..................................................................................................A1354

Verdict Sheet......................................................................................................A1478

Order, Dated April 27, 2012 ................................................................................A1482

Notice of Appeal, Dated June 15, 2012 ...............................................................A1484

vi

## INDEX TO EXHIBITS

| **PLAINTIFF'S** | | **REPRODUCED** |
|---|---|---|
| 1. | Excerpt of Memobook | A1327 |
| 2. | NYPD Complaint Report Worksheet, Dated May 15, 2008 | A1330 |
| 3. | Redacted NYPD Evidence Collection Team Report, Dated May 15, 2008 | A1335 |
| 6. | Arrest Report | A1337 |
| 11. | Stop, Search and Frisk Report | A1341 |
| 16. | Complaint Report | A1344 |
| 17. | Statement of Charges | A1347 |
| 18. | Certificate of Disposition Dismissal | A1349 |

| **DEFENDANTS'** | | **REPRODUCED** |
|---|---|---|
| E. | Photograph | A1351 |
| G. | Photograph | A1353 |

vii

## INDEX TO EXHIBITS (CONTINUED)

**COURT'S**                                                              **REPRODUCED**

| | | |
|---|---|---|
| 1. | Criminalist Report (Entered April 24, 2012) | A1355 |
| 1. | Defendants' Brief (Entered April 25, 2012) | A1358 |
| 1. | Defendants' Motion for a Mistrial (Entered April 26, 2012) | A1383 |
| 2. | Jury Charge (Entered April 25, 2012) | A1406 |
| 2. | Jury Note (Entered April 26, 2012) | A1421 |
| 3. | Superseded Jury Charge | A1423 |
| 4. | Proposed Jury Charge, Dated April 20, 2012 | A1438 |
| 5. | Proposed Jury Charge, Dated April 17, 2012 | A1453 |
| 6. | List of Witnesses | A1467 |
| 7. | List of Exhibits | A1469 |
| 8. | Jury Note | A1471 |
| 9. | Jury Note | A1473 |
| 10. | Jury Note | A1475 |
| 11. | Jury Note | A1477 |

## [REVISED] VERDICT SHEET

1A.  Has plaintiff proven by a preponderance of the evidence that Officer Randall falsely arrested the plaintiff on May 15, 2008?

Yes_____                          No_____

1B.  Has plaintiff proven by a preponderance of the evidence that Officer Burbridge falsely arrested the plaintiff on May 15, 2008?

Yes_____                          No_____

2A.  Has plaintiff proven by a preponderance of the evidence that Officer Randall maliciously prosecuted the plaintiff?

Yes_____                          No_____

2B.  Has plaintiff proven by a preponderance of the evidence that Officer Burbridge maliciously prosecuted the plaintiff?

Yes_____                          No_____

3A.  Has plaintiff proven by a preponderance of the evidence that Officer Randall violated plaintiff's constitutional right to a fair trial by knowingly presenting false evidence to the prosecutor?

Yes_____                          No_____

3B.  Has plaintiff proven by a preponderance of the evidence that Officer Burbridge violated plaintiff's constitutional right to a fair trial by knowingly presenting false evidence to the prosecutor?

Yes_____                          No_____

If you answered No to Questions 1A to 3B STOP, your deliberations are over.  The Foreperson should sign and date the verdict form and inform the marshal that you have completed your deliberations.

If you answered Yes to any of these questions, proceed to Question 4.

4.   With respect to any question that you answered Yes, has plaintiff proven by a preponderance of the evidence compensatory damages?

Yes_____                                    No_____

If you find that plaintiff has proven compensatory damages proceed to Question 5.

5.  Of the compensatory damages that plaintiff sustained indicate how much, if any, each defendant is liable for:

Defendant Randall          $_____

Defendant Burbridge        $_____

If you find that plaintiff has not proven compensatory damages, then award him nominal damages in an amount not to exceed $1.00.

We, the Jury empanelled and sworn in the above-entitled action, upon our oaths, do find the above verdict.

_____
Foreperson

Dated April_____, 2012

A905

## DEFENDANTS' MOTION FOR RECONSIDERATION OF THE COURT'S
RULING REGARDING DEFENDANTS' MOTION IN LIMINE, DATED APRIL 20, 2012
(pp. A905-A912)

REPRODUCED FOLLOWING

Case 1:10-cv-02714-JBW-VVP   Document 88   Filed 03/30/12   Page 1 of 7 PageID #: 1037

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

JOSHUA MARSHALL,

                                    Plaintiff,

                   -against-

THE CITY OF NEW YORK, P.O. SALIM                          10 Civ. 2714 (JBW)(VVP)
RANDALL, Shield No. 15331, Individually and in
His Official Capacity, P.O. MICHAEL
BURBRIDGE, Shield No. 15488, Individually and in
His Official Capacity, and P.O.s "JOHN DOE" #1-
10, Individually and in their Official Capacities, (the
name John Doe being fictitious, as the true names are
presently unknown),

                                    Defendants.

------------------------------------------------------------------ x

# DEFENDANTS' MOTION FOR RECONSIDERATION OF THE COURT'S RULING REGARDING DEFENDANTS' MOTION *IN LIMINE*

FELICIA GROSS
JOHANA CASTRO
MICHAEL A. CARDOZO
Office of the Corporation Counsel
  of the City of New York
100 Church Street
New York, New York 10007
(212) 788-0303
fgross@law.nyc.gov
jcastro@law.nyc.gov

Attorneys for Defendants

Case 1:10-cv-02714-JBW-VVP    Document 68    Filed 04/20/12    Page 2 of 7 PageID #: 1038

## PRELIMINARY STATEMENT

Plaintiff Joshua Marshall ("Marshall") brings this action against Police Officers Salim Randall and Michael Burbridge ("defendants"), pursuant to 42 U.S.C. § 1983, alleging violations of his federal civil rights pursuant to 42 U.S.C. § 1983. Specifically, plaintiff alleges that he was subjected to an unlawful arrest on May 15, 2008, by officers of the New York City Police Department ("NYPD").

Trial in this matter is scheduled to commence before the Honorable Jack B. Weinstein, United States District Judge, on April 23, 2012. On April 16, 2012, the Court heard argument on the parties' respective motions *in limine* and made its rulings.

Now come defendants seeking reconsideration of the Court's ruling with respect to point (IV) of their earlier *in limine* motion, namely, the Court's denial of defendants' motion to be permitted to inquire about plaintiff's March 15, 2008 arrest. Defendants now respectfully request that the Court permit them to elicit testimony from defendant Officer Burbridge to the effect that he had reviewed the NYPD database[1] before he went out on patrol that evening and recognized plaintiff from his photograph, which was a critical factor in the officers' decision to approach plaintiff. Defendants also seek reconsideration of the Court's prohibition on their cross-examination of plaintiff concerning his prior convictions, multiple detentions, and lengthy incarcerations, as such are highly relevant to the damages calculation.

---

[1] Officer Burbridge would testify at trial that he made it his regular practice upon arriving to work for his scheduled tour to review information contained in an electronic police department database relating to recent arrests (particularly gun arrests) in the precinct he would be covering that particular shift. (As a member of the Anti-Crime Unit, the precinct he would cover for his assigned tour would vary.) At his deposition, he testified that he recognized plaintiff from that database. See Ex. A, Burbridge Depo. at 17-19.

- 2 -

## A908

Case 1:10-cv-02414-JBW-VVP   Document 58   Filed 09/12/2012   Page 3 of 7 PageID #: 1039

### ARGUMENT

### POINT I

### DEFENDANTS SHOULD BE PERMITTED TO ELICIT TESTIMONY FROM OFFICER BURBRIDGE REGARDING THE FACT THAT THE OFFICERS FOCUSED ON, AND APPROACHED PLAINTIFF IN PART BECAUSE BURBRIDGE RECOGNIZED HIM FROM A POLICE DATABASE.

**A. Defendants Should Be Permitted to Elicit Testimony from Officer Burbridge Regarding the Fact that the Officers Focused on, and Approached Plaintiff in Part Because Burbridge Recognized Him from a Police Database.**

Defendants should be permitted to elicit testimony from Officer Burbridge regarding his recognition of plaintiff from the police database, as it forms a partial basis for the officers' focusing on, and approaching plaintiff. The fact that Officer Burbridge recognized plaintiff as having been previously involved in a gun arrest is crucial to understanding both the officers' state of mind that night when they observed plaintiff. Here, the officers focused on and approached plaintiff because he was in a high crime area late at night, made furtive gestures to a companion—and in no small measure because Officer Burbridge recognized him from having seen his photo in a police department database. The fact that Officer Burbridge recognized plaintiff is part of the *res gestae* leading up to the events at issue, as well as the total mix of factors leading them to approach plaintiff.

For example, at his deposition, Officer Burbridge testified that he approached plaintiff in part because he recognized him from the database:

> Q:    Why were you planning on stopping Joshua Marshall?
> A:    Because they were walking on Broadway. And when I got to the corner, I observed the individual. *I notified any [my] partners that I knew he had been arrested for a firearm.* At that point, he made the right down Park and signaled to his buddy, who kept walking straight on Broadway, like he was going past Park, to come with him, this way, this way.

- 3 -

Case: 1:10-cv-02714 JBW VVP   Document 66   Filed 07/29/12   Page 4 of 7 PageID #: 1046

Ex. A, Burbridge Depo. At 21, ll. 4-14 (emphasis added).

Similarly, Officer Randall testified that:

> Q: When you first observed Mr. Marshall did you say anything to your fellow officers?
> A: No.
> Q: Did your fellow officers say anything to you?
> A: Yes.
> Q: What did they say to you?
> A: *Officer Burbridge informed me that he recognized Mr. Marshall as being arrested for a gun before and told me he wanted to talk to him.*
> Q: Did he tell you when Mr. Marshall had been arrested for a gun before?
> A: No.
> Q: Did he tell you any details about the prior gun arrest?
> A: No.
> Q: Did you ask any questions?
> A: No.

Ex. A, Depo. of Randall, at 26, ll. 10-25; p. 27, ll. 2-6 (emphasis added).

Without such testimony, defendants will be prejudiced from fully explaining their version of events, and will instead be left with telling the jury a truncated version of what transpired prior to their encounter with plaintiff. This prejudice will infect the trial. Defendants will be unable to fully defend themselves against plaintiff's claims and the jury will be hearing testimony in a vacuum while being deprived of knowing what was in the officers' minds as they approached the plaintiff that night.

Moreover, this is an action for money damages and plaintiff is also seeking punitive damages against Officers Burbridge and Randall. The Court, by insulating plaintiff from any reference to his criminal history, is depriving the officers of the ability to defend themselves against a possible monetary judgment.[2] As an example, at his deposition Officer

---

[2] The Court has ruled that defendants cannot cross examine plaintiff concerning his prior convictions, multiple detentions or lengthy incarcerations in state prison for any purpose not even for purposes of veracity and damages. With respect to veracity, the Court has also precluded any mention of plaintiff's failure to pay taxes. At his deposition plaintiff testified that in 2006 (only two years before the incident at issue) he earned at least $40,000 but did not report or pay any taxes. He also conceded that he knew he owed the government taxes. See Marshall's

Case 1:10-cv-02714-JBW-VVP   Document 68   Filed 03/20/12   Page 5 of 7 PageID #: 1041

Burbridge testified that, apart from the database photo he looked at prior to going on patrol that day, he had never arrested plaintiff prior to May 15, 2008. (See Burbridge dep at p. 13 ). Officer Burbridge should be allowed to tell that to the jury for purposes of defending against allegations of animus or motivation. Officer Fox who was present at the scene (although not a defendant in this case) is in a similar position. Officers Randall and Burbridge would be hamstrung in their ability to defend themselves.

### B. If Defendants are not Permitted to Elicit Testimony from Officer Burbridge Regarding the Database, Plaintiff Should Be Precluded From Cross-Examining the Officers Regarding Statements Made During Their Deposition Related Thereto.

If the Court does not permit Officer Burbridge to testify that he recognized plaintiff from the police database, *a fortiori,* plaintiff should be precluded from cross-examining the officers regarding statements made during their deposition related thereto.

A great deal of the deposition testimony relates to, and is derived from, the fact that Burbridge recognized plaintiff from the police database. During the depositions of both Randall and Burbridge, plaintiff's counsel inquired about (1) the fact that Burbridge recognized plaintiff from having seen his information on a police database cataloguing earlier arrests (here, the 3/15/08 arrest, which was still pending on 5/15/08) and (2) statements made by Burbridge to Randall and Fox just prior to their approaching plaintiff to the effect that Burbridge recognized plaintiff from the database. Such testimony should not be admissible in light of the Court's exclusion of Burbridge's testimony regarding his recognition of plaintiff from the police database.

### POINT II

---

Depo. at 66-67. This clearly goes to plaintiff's veracity and defendants submit that they should be allowed to cross-examine plaintiff on his failure to file or pay income tax.

**DEFENDANTS SHOULD BE PERMITTED TO CROSS EXAMINE PLAINTIFF REGARDING HIS PRIOR CONVICTIONS, MULTIPLE DETENTIONS AND LENGTHY INCARCERATIONS, AS SUCH IS HIGHLY RELEVANT TO CALCULATION OF DAMAGES.**

Finally, the Court has ruled that defendants cannot cross-examine plaintiff concerning his prior convictions, multiple detentions or lengthy incarcerations in state prison for any purpose, not even for purposes of veracity and damages. With respect to veracity, the Court has also precluded any mention of plaintiff's failure to pay taxes. At his deposition, plaintiff testified that in 2006 (only two years before the incident at issue), he earned at least $40,000, but did not report or pay any taxes. He also conceded that he knew he owed the government taxes. See Marshall Depo. at 66-67. This clearly goes to plaintiff's veracity and defendants submit that they should be able to cross-examine plaintiff on his failure to file or pay income taxes.

## CONCLUSION

For the foregoing reasons, defendants Police Officers Salim Randall and Michael Burbridge respectfully request that the Court reconsider its earlier ruling excluding testimony regarding Burbridge's recognition of plaintiff from the database, and instead permit defendants to elicit testimony and inquire about that recognition. Moreover, Defendants should be permitted to cross-examine plaintiff concerning his prior convictions, multiple detentions, and lengthy incarcerations, and failure to pay income taxes, as such are highly relevant to the damages calculation.

Dated:      New York, New York
            April 20, 2012

- 6 -

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
Attorney for Defendants Police Officers Salim
Randall and Michael Burbridge
100 Church Street
New York, New York 10007
(212) 788-0303

By:        /s/
        Felicia Gross
        Assistant Corporation Counsel
        Special Federal Litigation Division


By:        /s/
        Johana V. Castro
        Senior Counsel
        Special Federal Litigation Division

A913

TRIAL TRANSCRIPT, DATED APRIL 23, 2012
(pp. A913-A944)

REPRODUCED FOLLOWING

# A914

```
                                                              1

 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   -----------------------------x
     JOSHUA MARSHALL,
 3          Plaintiff,

 4       versus          10-CV-02714 (JBW)

 5   THE CITY OF NEW YORK,
            Defendant.        United States Courthouse
 6                        Brooklyn, New York
     -----------------------------x
 7
                                    April 23, 2012
 8                                  9:30 A.M.

 9              TRANSCRIPT OF HEARING ON MOTIONS
                Before: HON. JACK B. WEINSTEIN,
10                UNITED STATES DISTRICT JUDGE

11
                    A P P E A R A N C E S:
12   FOR THE PLAINTIFF:

13
                             COHEN & FITCH, LLP
14                           Attorneys for the Plaintiff
                             Woolworth Building
15                           233 Broadway - Suite 1800
                             New York, New York 10279
16

17                           BY: GERALD M. COHEN, ESQ.
                                 JON NORINSBERG, ESQ.
18

19

20   For the Defendants:

21                           NEW YORK CITY LAW DEPARTMENT
                             Attorney for the Defendant
22                           100 Church Street
                             New York, New York 10007
23
                             BY: FELICIA GROSS, ESQ.
24             JOHANA CASTRO, ESQ.
                                 FRANCES SANDS, ESQ.
25
```

PROCEEDINGS                                              2

1    Court Reporter: Judi Johnson, RPR, CRR, CLR
     Official Court Reporter
2    Telephone: (718) 613-2582
     Facsimile: (718) 613-2480
3    E-mail: Judi_Johnson@nyed.uscourts.gov

4

5    Proceedings recorded by computerized stenography.  Transcript
     produced by Computer-aided Transcription.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        3
                           **PROCEEDINGS**

1            THE CLERK:  Civil part in motions -- for trial and

2    motion, Marshall versus City of New York, et al.

3            Counsel state your appearances, please, for the

4    plaintiff.

5            MR. COHEN:  Gerald Cohen for Plaintiff Joshua

6    Marshall.

7            MR. NORINSBERG:  Jon Norinsberg for Plaintiff Joshua

8    Marshall.

9            MS. GROSS:  Good morning, Your Honor.  Felicia Gross

10   for defendants Officers Burbridge and Randall.

11           MS. CASTRO:  Johana Castro from the Office of the

12   Corporation Counsel for the defendants.  Good morning, Your

13   Honor.

14           THE COURT:  Good morning.

15           MS. SANDS:  Frances Sands, also from the Office of

16   the Corporation Counsel.

17           Your Honor may I be heard?

18           THE COURT:  Yes, in a moment.

19           Yes.

20           MS. SANDS:  Your Honor, I just wanted to say that

21   I'm here in a supervisory capacity.  I will not be examining

22   any witnesses.  But I would hope that if I felt that I had

23   something worthwhile to say in the course of arguing legal

24   issues, that the Court will hear me.

25           THE COURT:  Yes, I will hear you.

**PROCEEDINGS**

1        Any motions?

2        MS. GROSS:  Yes, Your Honor.  I believe there's a

3  motion for reconsideration pending.  Yes.  Defendants would

4  ask that the court reconsider at least one perhaps and two of

5  its rulings on the motions in limine.

6        First, Your Honor, we would ask that you reconsider

7  the motion with respect to Officer Burbridge's testimony that

8  he knew Plaintiff Marshall from having seen his photo in a

9  police department database in connection with the 3-15 arrest.

10        Your Honor, we believe that's relevant both to his

11  state of mind and to his ability to explain fully what

12  happened on the date of incident.  It goes to his thought

13  process as he sees Marshall on the corner of Broadway and Park

14  Streets, and it goes to his ability to fully explain what

15  happened.  I mean, without that crucial piece of information,

16  the picture is incomplete as to why the officers stopped

17  plaintiff.

18        THE COURT:  The issue is not whether they stopped

19  him or not.  That's not of any relevance here.  The issue is

20  whether they saw an event, namely, taking the gun out of

21  waistband and throwing it onto the street.

22        MS. GROSS:  Right.  We agree, Your Honor.  But we

23  also think that that one piece of information is relevant to

24  the res gestae, the events that leading up to what led to

25  their attention being drawn to this plaintiff.  It's part of

```
                                                              5
                          PROCEEDINGS
```

1    the story they have to tell as to why their attention was

2    focused on plaintiff that particular night.

3          THE COURT:  Nobody's contesting that they weren't

4    doing their duty when they focused on him.  I don't understand

5    the problem.  It's a crime related neighborhood, and it's

6    early in the morning.  Two men are walking along the street.

7    Otherwise, I take it, deserted.

8          MS. GROSS:  That's correct, Your Honor.  And I

9    understand from our hearing last time that Your Honor has

10   ruled that the circumstances of the initial stop are not at

11   issue.  Nevertheless, I do believe that the fact that Officer

12   Burbridge recognized this plaintiff is relevant to his thought

13   process at the time.

14         THE COURT:  What thought process?  I don't

15   understand.

16         MS. GROSS:  It's part of -- it's part of the

17   totality of the circumstances, the totality of what made him

18   and the officers focus on and decide to stop --

19         THE COURT:  Would it have affected his ability to

20   see what he says he saw?  Is that the thought process you're

21   talking about?

22         MS. GROSS:  No.  It's an additional factor that led

23   him to focus in on that plaintiff and to approach him.

24         THE COURT:  Nobody's contesting that he was doing

25   his job when he focused on the defendant -- the plaintiff in

**PROCEEDINGS**

1   this case, rather.  Criminal defendant.  Plaintiff in the

2   civil case.  Have you looked at United States v. Scott?

3            MS. GROSS:  I have not, Your Honor.

4            THE COURT:  It's decided by the United States Court

5   of Appeals, decided April 16th, 2012.  You might want to look

6   at it because it bears fairly closely on this point.

7            MS. GROSS:  Very well, Your Honor.

8            THE COURT:  The motion to reconsider is denied.

9            MS. GROSS:  Okay.  Your Honor, if the testimony by

10  Officer Burbridge that he saw or he -- he saw the plaintiff in

11  a police database and therefore knew him is out, I would also

12  ask that much of the deposition testimony that relates to that

13  fact also be excluded.

14           THE COURT:  Yeah.

15           MR. NORINSBERG:  We're not planning on asking him

16  about reviewing the police database or any of the prior stops

17  based on the court's ruling.  We're not going to ask any of

18  those questions.

19           THE COURT:  Then take out the deposition dealing

20  with that.

21           MR. NORINSBERG:  We made massive edits to the

22  cross-examination based on the court's ruling last week.

23           THE COURT:  You made what?

24           MR. NORINSBERG:  I edited the cross-examination to

25  take out all of those sections that related to those

**PROCEEDINGS**

1    questions.

2              THE COURT:  Okay.  If you go across the line, you're

3    going to be opening doors.

4              MS. GROSS:  Okay.  Your Honor, if you could just

5    note the defendant's objection.

6              THE COURT:  Yes, noted.

7              MS. GROSS:  The second motion for reconsideration or

8    the second point that we'd like to be reconsidered is

9    admissibility of plaintiff's criminal history.  It's

10   admissible, or felonies are admissible under Federal Rule of

11   Evidence 609.  From the city's perspective, or from the

12   defendant's perspective, it goes to the plaintiff's veracity

13   as well as to damages, both for the reasons we discussed last

14   time, that a previously incarcerated person, their damages are

15   less for a subsequent incarceration.  And even more

16   relevant --

17             THE COURT:  They're not asking for lost wages.

18             MS. GROSS:  They are not.  But it is also relevant

19   in this respect:  Plaintiff is claiming that he was

20   incarcerated for four months as a result of this false arrest.

21   That four months, from defendant's perspective, was a result

22   of the fact that he was unable to make the $25,000 bail.  Bail

23   was set that high in part because he had multiple priors.

24             THE COURT:  $25,000 is minimum bail.  I take

25   judicial notice of it.

JUDI JOHNSON, RPR, CRR, CLR  Official Court Reporter

PROCEEDINGS                                                          8

1          MS. GROSS:  Your Honor, if you could note our

2    objection to that as well.

3          THE COURT:  Yes.  Noted.

4          MS. GROSS:  Finally, Your Honor, we'd like to also

5    ask you to reconsider our ability to cross-examine plaintiff

6    with respect to his failure to file income taxes in 2006.  In

7    his deposition testimony, he testified that he made $40,000 in

8    2006 and did not file income taxes.

9          THE COURT:  What have you got to say about that?

10          MR. COHEN:  Your Honor, as your ruling was at the

11    original conference, that this was too prejudicial, that my

12    client -- again, it's taking away -- the focus away on what

13    happened the night of the incident.  This is to focus on my

14    client as a bad -- has a bad character or has done something

15    that would make the jury be biased towards my client.  This

16    has nothing to do with what happened on March 15th, 2008.

17          THE COURT:  It certainly goes to veracity.

18          MR. NORINSBERG:  There's no lost earnings claim,

19    respectfully, Your Honor.  So, I mean, I think if there were a

20    lost earnings claim, it would be relevant to the extent that

21    it bears on that claim, but we don't have a lost earnings

22    claim.  So I think whatever minimal probative value it is is

23    really outweighed by a very significant prejudicial value.

24          Like the Court has been saying, we just want the

25    jury to focus on the simple factual dispute here of whether or

JUDI JOHNSON, RPR, CRR, CLR  Official Court Reporter

**PROCEEDINGS**

1    not he had a gun, without allowing these extraneous factors to

2    influence the jury's decision.

3         THE COURT:  I'm going to affirm my decision.  I've

4    tried to keep the case as hygienic as possible.  I may have

5    taken all the blood out of it.

6         MS. GROSS:  With due respect, Your Honor,

7    irrespective of the fact that the lost wages claim is out of

8    the case, it's defendant's position that nevertheless his

9    failure to file income taxes goes to his veracity.  So if you

10   would note the defendant's objection.

11        THE COURT:  Yes, it does bear on veracity to some

12   extent.  But given the circumstances under Rule 403, I'm

13   keeping it out.

14        What else?

15        MS. GROSS:  Your Honor, if you would note our

16   objection.

17        THE COURT:  Yes.

18        MS. GROSS:  Your Honor, defendants made several

19   motions in limine that were denied last time.  For the record,

20   if you don't mind, I'd like to renew them briefly.

21        One is that all evidence of DNA and fingerprint

22   evidence be out.  It's not relevant, and it's too prejudicial.

23        Another is that statements made --

24        THE COURT:  Well, what's your objection to that?  I

25   don't know what your point is.

JUDI JOHNSON, RPR, CRR, CLR  Official Court Reporter

PROCEEDINGS                                                                10

1          MS. GROSS:  Defendants believe that the DNA evidence

2    and fingerprint evidence should be excluded from the case.

3          THE COURT:  There is none.

4          MS. GROSS:  There is none, right.  But a mention of

5    it should be --

6          THE COURT:  Well, they're going to ask, and they're

7    going to argue --

8          MS. GROSS:  Right.

9          THE COURT:  -- there's no DNA evidence here.  And

10   half the jurors who watch these crime things on TV are going

11   to say in the jury room, where's the DNA evidence?  Where's

12   the fingerprint evidence?  And you're going to lose.  I just

13   had a case like that.  I explained that to you, and I

14   suggested that you meet it by explaining to the jury through a

15   witness that you never get DNA evidence, and that's the way

16   these cases are.  So I don't understand what you want me to

17   do.

18         MS. GROSS:  Right.  If you would just note our

19   objection and our view.

20         THE COURT:  Objections to what?  What would you like

21   me to do about DNA evidence?  I'll do anything you want.  What

22   would you like me to do about the lack of any DNA evidence and

23   the lack of fingerprint evidence that they are going to skewer

24   you on.

25         MS. GROSS:  We'll withdraw our objection to that.

JUDI JOHNSON, RPR, CRR, CLR  Official Court Reporter

PROCEEDINGS

11

1            THE COURT:  Well, are you going to do anything about

2    it?

3            MS. GROSS:  We are.

4            THE COURT:  What are you going to do?

5            MS. GROSS:  We intend to call two witnesses.

6            THE COURT:  All right.  They're going to object to

7    it.  What are you going to --

8            MR. COHEN:  In light of that -- I'm glad they

9    brought it up.  They did propose a witness that they intend to

10   call from the chief medical examiner's office but have not

11   provided us any of the disclosures pursuant to Federal

12   Rule 26.

13           THE COURT:  I told you to give them Rule 26

14   material.

15           MS. CASTRO:  We did, Your Honor.  We provided them

16   with a CV of the criminal list as well as informed them where

17   she's testified.  We did not give them a list of specific

18   cases, just noted that she's testified before grand juries in

19   supreme courts in the five boroughs, as well as informed them

20   that she is not being paid because she's an employee of the

21   Office of the Chief Medical Examiner.

22           MR. COHEN:  But there's no statement as to what she

23   is going to be testifying to.

24           THE COURT:  She's going to testify, I take it, that

25   normally they don't get any DNA or fingerprint evidence from

PROCEEDINGS

1    these guns.

2          MR. COHEN:  But we don't have a report on this

3    particular --

4          MS. CASTRO:  There is a report, Your Honor, that

5    specifically states there was no DNA available in this case.

6    We've provided that.

7          MR. NORINSBERG:  It actually doesn't say that, Your

8    Honor.

9          MR. COHEN:  And Your Honor --

10          THE COURT:  Well, let me see the report.  You know

11   what she's going to say.

12          MR. NORINSBERG:  It doesn't set forth the opinion.

13   In terms of cross-examining this witness, we would like to

14   know what the actual opinion is.

15          THE COURT:  Let me see the statement.

16          MS. SANDS:  Your Honor, can I add one thing?  This

17   witness actually was the supervisor who reviewed the report.

18   She is a fact witness.

19          THE COURT:  Let me see her statement under Rule 26,

20   is what I asked for.

21          MS. CASTRO:  (Handing.)

22          THE COURT:  Where is her statement under Rule 26?

23          MS. CASTRO:  It's that page, Your Honor.

24          THE COURT:  Which page?

25          MS. CASTRO:  The one I had it turned to.

JUDI JOHNSON, RPR, CRR, CLR  Official Court Reporter

**PROCEEDINGS**

13

1          THE COURT:  This page, the laboratory report?

2          MS. CASTRO:  Yes, Your Honor.

3          THE COURT:  That's not what Rule 26 requires.

4          MS. SANDS:  Your Honor, this witness --

5          THE COURT:  Excuse me.

6          MS. CASTRO:  Rule 26 requires that we turn over the

7    report setting forth the expert's opinion.

8          THE COURT:  What is she going to say?  There are two

9    problems.  Was there DNA and fingerprint evidence?  This says

10   there was not.

11         MS. CASTRO:  That's correct.

12         THE COURT:  The other part of it was we normally

13   don't get DNA and fingerprint evidence.  That's the crucial

14   part of the evidence.  Where is the report saying that she's

15   going to say that?

16         MS. CASTRO:  This witness is actually also a fact

17   witness because that is her report.  She was the supervisor at

18   the laboratory when this examination --

19         THE COURT:  Excuse me.

20         Is somebody going to say to say to this jury that in

21   these kinds of cases, we don't get DNA or fingerprint

22   evidence, which is the crucial evidence, I suggest, that you

23   must give to this jury, which will come to this case with

24   misconceptions.  What are you doing about that?

25         MS. CASTRO:  This fact witness is capable of

JUDI JOHNSON, RPR, CRR, CLR  Official Court Reporter

PROCEEDINGS

1    testifying to that in her experience as to why DNA is not --

2              THE COURT:  That is an opinion, not a fact witness.

3    The fact witness part is the laboratory report.

4              MS. CASTRO:  Right.

5              THE COURT:  When are you going to give us that

6    opinion and report?

7              MS. CASTRO:  She does not draft that report.

8              THE COURT:  You know, I was so explicit.  I tried to

9    help you, but you don't listen to me.  And I say that with due

10   respect because all three of you are wonderful lawyers, and I

11   respect you.  But I don't seem to be making myself clear, and

12   it's undoubtedly due to my own inadequacy.

13             Somebody has to come in from your side and say that

14   we do not get in these cases DNA or fingerprint evidence, and

15   that's why we didn't get it here.  Not because he didn't touch

16   the gun, but we never get it.  To overcome the prejudice that

17   the jurors will come into the court and discuss in their

18   decisions in trying to come to a verdict when they will say

19   there's no DNA evidence from this guy, so he wasn't guilty --

20   I just had a case, I explained to you, where an open-and-shut

21   case by the prosecutor was lost because the jurors had that

22   misconception.

23             Now, that is an opinion.  Where is the statement

24   about that opinion?  Not what you've given me.  That's

25   different.  What you've given me is going to help the

JUDI JOHNSON, RPR, CRR, CLR   Official Court Reporter

PROCEEDINGS                                                          15

1   plaintiffs.

2           MS. SANDS:  Your Honor, may I be heard?

3           THE COURT:  Do you understand the point I'm trying

4   to make?  I know I'm inarticulate.

5           MS. CASTRO:  Not at all, Your Honor.  I do

6   understand what you're saying, and this particular witness is

7   capable of stating that reason.

8           THE COURT:  I understand she's capable, but you have

9   to give that to the other side.  That's what Rule 26 says.

10  That's the opinion she's giving as an expert, not as a fact

11  witness.

12          MS. SANDS:  Your Honor, may I just have some

13  clarification?

14          Your Honor, I don't want to beat a dead horse here,

15  and you've been perfectly clear, but let me just explain a

16  little further our opinion.

17          This is a woman who works ME's office as a

18  supervisory criminologist.  She supervises the criminologists

19  who work under her.  She reviewed the report.  She's done in

20  her career hundreds of DNA analyses.  She can testify that in

21  her experience with these types of gun cases, that there isn't

22  typically fingerprints -- I mean, there isn't typically DNA.

23          THE COURT:  I'm reading from Rule 26 of the Rules of

24  Civil Procedure, which I respectfully brought to your

25  attention the last time you were here.  And Rule 26 --

```
                                                                     ⌐6
                        PROCEEDINGS

 1              MR. COHEN:  2(b(1).

 2              THE COURT:  -- (a)(2)(B):  "The report must contain

 3    a complete statement of all opinions the witness will express

 4    and the basis and reasons for them."

 5              Are you telling me she's going to express the

 6    opinion that normally we don't get DNA and fingerprints from

 7    these guns?

 8              MS. SANDS:  She's going to say that, in her

 9    experience doing these DNA analyses --

10              THE COURT:  Then why isn't it in the report, as

11    required by Rule 26?                                •

12              MS. SANDS:  This is really a hybrid witness, Your

13    Honor.  Because she has experience --

14              THE COURT:  Why isn't it in the report under

15    Rule 26?

16              MS. SANDS:  Because she's actually a fact witness.

17    I mean, she reviewed this report in the context --

18              THE COURT:  She is a fact witness and an opinion

19    witness.  I tried to explain that to you.

20              Rule 703 is the basis for the expert's opinion.

21    Rule 701 deals with opinion testimony by lay witnesses, and

22    702 deals with testimony by an expert witness.  Rule 702,

23    subdivision A, the expert's scientific, technical or other

24    specialized knowledge, and you're telling me it's the

25    specialized knowledge from hundreds of cases.  So she's
```

**PROCEEDINGS**

1    testifying as an expert witness and as a fact witness under

2    Rule 701.  Now, I don't understand what the reluctance of the

3    city is to provide what the rules, as I've tried and due to my

4    own defects, unsuccessfully, to explain to you is required in

5    this case.

6              MS. SANDS:  Your Honor, we can provide a brief

7    statement.

8              THE COURT:  I want you to provide what Rule 26

9    requires in this case and to do it promptly, and I don't

10   understand why there's what appears to be a flouting of the

11   rulings of the Court in this respect.

12             Now, what is the application?

13             MR. COHEN:  Your Honor, I ask that this witness be

14   precluded.

15             THE COURT:  Denied.

16             MR. COHEN:  We're on the day of trial.

17             THE COURT:  I'm not going to preclude.

18             MR. COHEN:  We haven't had a chance to look at this,

19   maybe call a witness of our own, explore this.

20             THE COURT:  I laid this out for you fully.  You

21   understood the problem.  If you want a continuance, I'll give

22   you a continuance.  I'll give it to you right now.  We will

23   hear openings this morning, and we will stop at 12:00.  And

24   the city can get its own Rule 26 material together, and you

25   can go out and get whatever witness you want.  You knew about

**PROCEEDINGS**                                                    18

1   this.  I laid it out for you.

2          Anything else?

3          MS. SANDS:  Your Honor, you also mentioned that

4   there would be a Daubert hearing.  So I think that, all things

5   considered, that would be sufficient.

6          THE COURT:  I don't need a Daubert hearing.  They

7   haven't applied for one.

8          MR. COHEN:  Yes, Your Honor, we did discuss that.

9          THE COURT:  You want a Daubert hearing of this

10  witness?  Where is the witness?

11         MS. CASTRO:  We will bring her in the day she will

12  testify, which we anticipate is tomorrow.

13         THE COURT:  Obviously she's going to be qualified.

14  But if you want to go through the motion, we'll go through the

15  motion.

16         MR. COHEN:  We'd would just like to make a record.

17  All the plaintiff is noting is that it's the day of trial.

18  Your Honor did direct us to have the Rule 26 disclosures to --

19  you directed the city to have it to plaintiff before the day

20  of trial.  Certainly the week we had.  And we haven't gotten

21  it.  We have no idea what this witness is going to testify to.

22  We have no idea what she's going to say.

23         THE COURT:  You have no idea?

24         MR. COHEN:  I have some idea.  But, you know, this

25  report that they have isn't clear.  It isn't clear as it is.

PROCEEDINGS

19

1          THE COURT:  I see.  I understand your position.

2          MR. COHEN:  If you look at the next page of the

3    report, they said that further DNA testing could be performed.

4          THE COURT:  I understand.

5          MR. COHEN:  So I don't know what --

6          THE COURT:  What is your application and what is

7    your --

8          MR. COHEN:  I made the application.  Your Honor

9    denied it.  So I'll leave it alone.

10          THE COURT:  All right.  We have that on the record.

11          Anything further that I can help you with?

12          MS. GROSS:  Your Honor, if I could just continue

13    noting my objections to the record with respect to Your

14    Honor's motions in limine, particularly with respect to

15    statements made or allegedly made by one of the officers to a

16    federal agent.  There's a document in the disclosure that I

17    believe plaintiff intends to use that contains double hearsay.

18    A statement the officer allegedly made to members of the U.S.

19    Attorney's Office in the Eastern District contains the

20    statement that he did not see plaintiff in possession of the

21    gun.  We ask that that be excluded because it is double

22    hearsay.

23          THE COURT:  Are you going to call in the agent?

24          MR. COHEN:  No.  I don't know why we're doing this

25    again, Your Honor.

JUDI JOHNSON, RPR, CRR, CLR  Official Court Reporter

PROCEEDINGS
20

1          THE COURT: I told you you can use it to refresh.

2          MR. COHEN: Yeah.

3          THE COURT: But not as evidence.

4          MR. COHEN: We're rehashing, I think, all of the --

5          THE COURT: We went over this.

6          MS. GROSS: If you could note the objection.

7          MR. COHEN: Objection to what? I don't understand.

8     What's the objection.

9          MS. GROSS: Use of it at all.

10          THE COURT: Don't talk to each other. Talk to me.

11          MS. GROSS: The defendant objects to the use of that

12    document whatsoever.

13          THE COURT: Even to refresh?

14          MS. GROSS: Yes. I mean, it contains double

15    hearsay.

16          THE COURT: Overruled.

17          MS. CASTRO: Your Honor, our next line of motions

18    pertains to the jury charge. I don't know if Your Honor wants

19    to discuss that now or at another point.

20          THE COURT: Yes. I tried to take care of

21    everybody's objections. Some of them were very good.

22          MR. COHEN: Plaintiff's position is it probably

23    would be more fruitful, once the evidence has been given to

24    the jury and how it plays out, to have a jury instruction

25    towards the end ever the trial.

```
                            PROCEEDINGS                         21

 1            THE COURT:  I'll hear you now.

 2            MS. CASTRO:  Yes, Your Honor.

 3            THE COURT:  Indicate the page.

 4            MS. CASTRO:  Well, I guess first, with respect to

 5    the first page, during our last conference, the city noted

 6    that it was no longer a party.  On Page 1, the caption, we

 7    would request that the City of New York be removed as it's no

 8    longer a party, as well as the John Doe defendants.

 9            THE COURT:  Okay.  You want the City of New York

10    out?

11            MS. CASTRO:  Yes, Your Honor.  As well as John Does.

12            MR. COHEN:  We have no objection to that, Your

13    Honor.

14            MS. CASTRO:  Then on Page 7, the second-to-last

15    paragraph, the last sentence was added in the April 20th

16    charge, the "however, you're permitted to consider the fact

17    that the charges against the plaintiff were later dismissed in

18    determining whether probable cause to arrest existed."

19            THE COURT:  Yes.

20            MS. CASTRO:  We would object to that last,

21    particularly in light of the Supreme Court's decision in

22    Pearson v. Ray, which particularly states:  "Under the

23    prevailing view in this country, a police officer who arrests

24    someone with probable cause is not liable for false arrest

25    simply because the innocence of the suspect is later proved."
```

22

**PROCEEDINGS**

1           MR. COHEN:  Your Honor, we're not saying because --

2           THE COURT:  Excuse me.

3           MS. CASTRO:  Your Honor, we were much more

4   comfortable with the language that Your Honor proposed in the

5   April 17th charge, which states "whether charges were dropped

6   or whether the plaintiff was acquitted or convicted of a crime

7   is irrelevant on this issue," and we ask that that language be

8   used instead of the language in the April 20th charge.

9           MR. COHEN:  May I be heard?

10          THE COURT:  Yes.

11          MR. COHEN:  Your Honor, that's not the law of the

12  Circuit, and the quote that was just read by Ms. Castro

13  doesn't -- it states simply because there was a dismissal, it

14  doesn't mean that you're falsely arrested, and that's not what

15  we're saying.  We're saying what the law of the Circuit

16  clearly states.  The fact of dismissal can be used as relevant

17  evidence to refute probable cause.  It's one piece of many

18  different parts of the puzzle to show that there was no

19  probable cause.  And that is clearly supported by the Second

20  Circuit case law in Wayne v. Oaks, which adopts the Court of

21  Appeals decision, New York Court of Appeals decision, states

22  specifically the fact of dismissal can be one piece of

23  evidence to refute the existence of probable cause.  That is

24  what the law states.

25          MS. CASTRO:  And if I may add and to distinguish

**PROCEEDINGS**

23

1    from the case here, the plaintiff there was taken to trial,

2    and he was found not guilty by the criminal jury.  In this

3    case, it was dismissed on speedy trial grounds.

4              MR. COHEN:  There is no claim in this case -- well,

5    there's no dispute there wasn't a favorable termination here.

6    There could be many reasons why this case went speedy trial

7    the way it went.  Your Honor, I'm a former prosecutor.  Cases

8    that -- especially serious cases like this that went speedy

9    trial, they went speedy trial not because officers -- not

10   because the D.A.'s office made a mistake or some technicality.

11   They did so because they didn't believe in the case because

12   they had some real questions about the case.  And we can make

13   that argument, but since we're not calling the D.A. here,

14   we're not challenging favorable termination here, we're not

15   going to -- we shouldn't get into that.

16             THE COURT:  All right.  I will amend it as follows.

17   It will read:  You may consider as one piece of evidence,

18   together with all the evidence in the case, the fact that" --

19             MR. COHEN:  That's fine.

20             THE COURT:  -- and go on.

21             MS. CASTRO:  Your Honor, we would still object to

22   that statement.

23             THE COURT:  Next?

24             MS. CASTRO:  The next issue that we would like to

25   address is including language that pertains to the collective

JUDI JOHNSON, RPR, CRR, CLR  Official Court Reporter

```
                                                            24
                          PROCEEDINGS

 1    knowledge doctrine.  It's still within the false arrest.
 2                THE COURT:  Would you direct me, please, to a page
 3    and line.
 4                MS. CASTRO:  I would still say it would be on
 5    Page 7.
 6                THE COURT:  Line?
 7                MS. CASTRO:  It's to add language, not any language
 8    that's already in there.  The language that we would propose
 9    specifically would be:  "An officer acts lawfully when he
10    reasonably relies upon the information received by other law
11    enforcement officials.  Thus if the collective knowledge of
12    the officers on the scene of the crime is of such weight and
13    persuasiveness as to convince an officer of ordinary
14    intelligence, judgment and experience that there is probable
15    cause to arrest, then the officer relying on that information
16    also has probable cause to arrest."
17                MR. COHEN:  Can I have a moment to respond to that
18    suggestion?
19                THE COURT:  Just a moment.
20                Yes.
21                MR. COHEN:  Your Honor, that suggestion doesn't
22    apply to the facts in this case.  Both defendants at, their
23    depositions, testified very clearly there was no mistaking.
24    They both saw my client throw this gun.  So this collective
25    knowledge doctrine isn't applicable here.  It wasn't that one
```

JUDI JOHNSON, RPR, CRR, CLR  Official Court Reporter

**PROCEEDINGS**

25

1    was relying on the another for that information.  It was very,

2    very clear in the deposition testimony.  In fact, you know, if

3    they had said, well, we may have been mistaken, we probably

4    wouldn't be here today, because then they would have the

5    defense of qualified immunity.  But they don't, because they

6    were very clear, we absolutely saw my client throw the gun,

7    and that can't exist with a charge like that.  It will confuse

8    the jury it.  It doesn't make any sense in this case.

9            THE COURT:  I think under these circumstances, one

10   officer may have been influenced by another in making

11   observations simultaneously.  So I'll add:  "An officer may

12   rely on information supplied to him by another officer who

13   made observations at the scene."  I think that's accurate.

14           What else?

15           MS. CASTRO:  The next page, on Page 8, with respect

16   to the malicious prosecution case -- I'm sorry malicious

17   prosecution claim, we would like an instruction concerning the

18   presumption of probable cause that would be a result of the

19   indictment by the grand jury.  So in the first paragraph after

20   the last sentence, which states that plaintiff was indicted by

21   a grand jury of three counts of criminal possession of a

22   weapon, we would just like to include a sentence stating that

23   the indictment creates a presumption of probable cause.

24           THE COURT:  I'm not giving it in this case.  They

25   either lied to the grand jury or they were telling the truth.

26

**PROCEEDINGS**

1    I'm not giving a presumption charge.

2            MS. CASTRO:  We just ask that that objection be

3    noted.

4            THE COURT:  Yes.

5            MS. CASTRO:  Next would be the third paragraph of

6    the malicious prosecution claim.  Previously Your Honor had

7    language stating that the criminal case against the plaintiff

8    was dismissed for failure to comply with speedy trial rules,

9    and that's in the April 17th charge.  It's been changed to

10   just simply state that the charges were dismissed in May of

11   2009.  We would request that Your Honor reconsider and include

12   the language that he previously charged.

13           THE COURT:  Charges were dismissed in May of 2009

14   for violations of speedy trial rule, you want?

15           MS. CASTRO:

16           MR. NORINSBERG:  Your Honor, can we be heard on

17   that?

18           THE COURT:  Yes.

19           MR. NORINSBERG:  The law in the -- the state of the

20   art, the Court of Appeals law is that if it's dismissed on

21   speedy trial grounds, that's sufficient to establish favorable

22   termination.  And the case we're relying on is Cantolino,

23   C-A-N-T-O-L-I-N-O.  The bottom line is it's irrelevant what

24   the reason is.  Once the courts have acknowledged that that is

25   favorable termination, it doesn't matter why.  And my concern

JUDI JOHNSON, RPR, CRR, CLR  Official Court Reporter

27

**PROCEEDINGS**

1 is that the jury hears it's on speedy trial grounds, and they

2 improperly conclude that it's some type of technicality, when

3 the Court of Appeals has said it's not a technicality, and

4 that an accused should not have to stretch out, you know, a

5 litigation and go to trial in order to preserve his malicious

6 prosecution claim.

7 MS. CASTRO: And, Your Honor, we would submit in

8 response to that that it would be highly unfair for the jury

9 to assume or be left to assume that the case was dismissed for

10 a reason attributable to the officers. And for that reason, I

11 think it is important to note the reason for the dismissal,

12 speedy trial grounds.

13 MS. SANDS: Your Honor, in this case, bail was set.

14 The plaintiff couldn't make bail. That's the reason why he

15 was in for four months. The officers are not responsible for

16 the amount of bail that was set. They weren't present at the

17 bail hearing. And the plaintiff here is clearly claiming that

18 the officers -- that he was in four months because of

19 something attributable to the officers, and that's not the

20 case.

21 MR. COHEN: Your Honor, the proximate cause of the

22 false arrest and the malicious prosecution, the false

23 statements made to the D.A.'s office to charge what they

24 charged is directly attributable to the officers. To now say

25 that the $25,000 bail can't be attributable to them, that's

JUDI JOHNSON, RPR, CRR, CLR Official Court Reporter

28
**PROCEEDINGS**

1    just completely against common sense.

2          MR. NORINSBERG:  And it's also against the law of

3    the Circuit under Poser, P-O-S-R, versus City of New York,

4    where the Second Circuit actually explicitly said that it's

5    reasonably foreseeable that if an officer charges somebody

6    with a higher charge, that could result in a more lengthy

7    detention.  So they are responsible.  It doesn't break the

8    causal link if there's a bail determination involved.

9          THE COURT:  I'm going to take that sentence out.

10   The only sentence we need is, "There is no dispute that

11   criminal proceedings were commenced and continued" by

12   defendant -- "and continued" --

13         MS. CASTRO:  Your Honor, we would actually

14   object to --

15         THE COURT:  Excuse me.  May I finish?

16         -- "and continued and that they ended in his favor."

17   That's what it will say.

18         MS. CASTRO:  Our objection is to the "continued."

19   We would dispute that the defendant continued the prosecution

20   against the plaintiff.

21         THE COURT:  I didn't say -- let me read it again.

22         "There is no dispute that criminal proceedings were

23   commenced and continued and that they ended in plaintiff's

24   favor."

25         What else do you have?

JUDI JOHNSON, RPR, CRR, CLR  Official Court Reporter

```
                                                              29
                           PROCEEDINGS

1             MS. CASTRO:  Your Honor, we would just note our

2    objection to the fact that the speedy trial language is not

3    included.

4             THE COURT:  Yes.

5             MS. SANDS:  Your Honor, one --

6             THE COURT:  Excuse me.

7             Did you have anything else for me?

8             MS. CASTRO:  Your Honor, just with respect to that,

9    we would also note that the way it reads sounds like plaintiff

10   was acquitted by a jury.

11            MS. SANDS:  Actually, that is what I was going to

12   say, Your Honor.  We know that the presumptions are different

13   at a criminal trial.  It's beyond a reasonable doubt.  And

14   probable cause arises at the time of arrest with respect to

15   the totality of the circumstances.

16            THE COURT:  Yeah.  This is for a different claim,

17   malicious prosecution.

18            Now, what do the plaintiffs any objections to the

19   charge?

20            MR. COHEN:  Your Honor, we were under the

21   impression that we were going to do a charge conference closer

22   to the end of the case.

23            THE COURT:  You are not prepared to discuss it?

24            MR. COHEN:  We would like to reserve our right to --

25            THE COURT:  We'll discuss it tomorrow at 9:30 a.m.
```

30

**PROCEEDINGS**

1   I'm owe told the magistrate was stuck in traffic and there are

2   problems on the Long Island Railroad and we're having trouble

3   getting jurors.

4            We should be able to get a jury selected today,

5   shouldn't we?

6            THE CLERK:  Yes.

7            THE COURT:  And we'll start with the actual trial

8   tomorrow, 10:00, and I'll see counsel at 9:30, when we can

9   continue this pleasant discussion.

10           MS. SANDS:  Thank you, Your Honor.

11           MR. NORINSBERG:  Your Honor, being that we're going

12  to have that schedule, would it be possible that the

13  defendants provide us with a report by the end of today on the

14  expert?

15           THE COURT:  Try to do that.

16           MS. SANDS:  We'll try to do that, Your Honor.

17           THE COURT:  Anything further this morning?

18           MS. CASTRO:  No, Your Honor.

19           (Continued on the next page.)

20

21

22

23

24

25

                                              31
                          **PROCEEDINGS**

1    (Whereupon, the matter was adjourned to April 24, 2012 at 9:30

2    a.m.)

3

4                          CERTIFICATE OF REPORTER.

5    I certify that the foregoing is a correct transcript of the

6    record of proceedings in the above-entitled matter.

7

8    _____

9    Judi Johnson, RPR, CRR, CLR
     Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A945

<u>TRIAL TRANSCRIPT, DATED APRIL 24, 2012</u>
(pp. A945-A1186)

REPRODUCED FOLLOWING

**A946**

1

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    ----------------------------x
     JOSHUA MARSHALL,
3              Plaintiff,

4        versus                          10-CV-02714 (JBW)

5    THE CITY OF NEW YORK,
               Defendant.      United States Courthouse
6                              Brooklyn, New York
     ----------------------------x
7
                                    April 23, 2012
8                                   9:30 A.M.

9                       TRANSCRIPT OF TRIAL
                 Before: HON. JACK B. WEINSTEIN,
10                 UNITED STATES DISTRICT JUDGE

11
                        A P P E A R A N C E S:
12   FOR THE PLAINTIFF:

13
                              COHEN & FITCH, LLP
14                            Attorneys for the Plaintiff
                              Woolworth Building
15                            233 Broadway - Suite 1800
                              New York, New York 10279
16

17                            BY: GERALD M. COHEN, ESQ.
                                  JON NORINSBERG, ESQ.
18

19

20   For the Defendants:

21                            NEW YORK CITY LAW DEPARTMENT
                              Attorney for the Defendant
22                            100 Church Street
                              New York, New York 10007
23
                              BY: FELICIA GROSS, ESQ.
24                                JOHANA CASTRO, ESQ.
                                  FRANCES SANDS, ESQ.
25

JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

2

### PROCEEDINGS

1   Court Reporter:  Judi Johnson, RPR, CRR, CLR
    Official Court Reporter
2   Telephone: (718) 613-2582
    Facsimile: (718) 613-2480
3   E-mail: Judi_Johnson@nyed.uscourts.gov

4

5   Proceedings recorded by computerized stenography.  Transcript
    produced by Computer-aided Transcription.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

PROCEEDINGS

1   (In open court.)

2           COURTROOM DEPUTY:   All rise.  The United States

3   District Court for the Eastern District of New York is now is

4   session.  The Honorable JACK B. WEINSTEIN is now presiding.

5           (Honorable JACK B. WEINSTEIN takes the bench.)

6           COURTROOM DEPUTY:   Calling civil trial proceedings

7   in Docket no. 10-CV-2714, Joshua Marshall against The City of

8   New York.

9           THE CLERK:  Counsel, please note your appearances

10  for the record.

11          MR. COHEN:  For the Plaintiff, Joshua Marshall,

12  Cohen & Fitch, LLP by Gerald Cohen.

13          Good morning, your Honor.

14          MS. GROSS:  For the defendant, The City of New York,

15  Corporation Counsel by Felicia Gross.  And with me is Frances

16  Sands and Johana Castro.

17          THE COURT:  Is there any application?

18          MR. COHEN:  Yes.  Your Honor, directed me to come up

19  with some objections that I had for the proposed jury

20  instructions.

21          THE COURT:  Yes.

22          MR. COHEN:  There's a few things, just minor

23  tweaking that I'd like to suggest to the Court.

24          THE COURT:  I'll hear them.

25          MR. COHEN:  On Page 7, under the false arrest

4
**PROCEEDINGS**

1   section.

2           THE COURT:  Yes.

3           MR. COHEN:  In the third paragraph.  I raised this

4   on my letter, and I'd like to just try one more time to

5   convince the Court that this is not a case where there is an

6   issue of objectively reasonable grounds for the officers to

7   believe that a crime had been committed.  That would suggest

8   that there was some sort of mistake.  It suggests the

9   qualified immunity defense.  Here, because the facts are what

10  they are in this case, that the officers clearly state that

11  they saw my client throw a gun, then there wouldn't be an

12  objectively reasonable grounds.  Either they saw it or didn't

13  see it.  So it's purely a subjective, in this particular case.

14          THE COURT:  They might have thought they saw it.

15          MR. COHEN:  Yeah, but that's not what they've

16  claimed.

17          THE COURT:  But they wouldn't know whether what they

18  thought they saw actually occurred.

19          MR. COHEN:  I understand.  Well, they made it very

20  clear they made no mistake.  They were absolutely certain.  I

21  just want to make it noted for the record, Your Honor.

22          THE COURT:  Yes, that's quite all right.  What else?

23          MR. COHEN:  There's one more, with respect to the

24  malicious prosecution claim.

25          THE COURT:  Yes.

5

**PROCEEDINGS**

1          MR. COHEN: That's at Page 8. Defendants raised an

2  issue at the first conference that we had, pretrial conference

3  that we had here regarding Rehberg, the recent Supreme Court

4  decision. And just for the sake of making sure we don't have

5  any appellate issues here in this case with respect to the

6  jury instruction.

7          I do think it may need some mention, not the

8  specific case, of course, but in the first paragraph of the

9  malicious prosecution claim, after -- Your Honor starts off

10  with that they were maliciously prosecuted by providing false

11  statements to the state prosecuting attorney. And then the

12  last sentence says the plaintiff was indicted of the charges.

13  A sentence to the effect of defendants cannot be solely liable

14  for solely making false statements in the grand jury.

15  However, to the extent you find that defendants made such

16  false statements in the grand jury, you can use this to judge

17  their credibility and to infer that they provided the same

18  false statements to prosecuting attorneys outside the grand

19  jury for purposes of this claim.

20          THE COURT: Well, are you relying upon what they

21  said in the grand jury for the malicious prosecution in that

22  claim?

23          MR. COHEN: We're not relying upon it to the extent

24  that we're saying that because they made those false

25  statements, that they should be liable. Rather, we are saying

6

**PROCEEDINGS**

1   and we are going to say that the fact that they made those

2   false statements is indicative of what they've also told the

3   district attorney what they -- and it's indicative of their

4   general credibility in this particular case. So just so the

5   record is clear and we don't have any appellate issues on

6   Rehberg, you know, we may -- if the Court believes it may be

7   correct, we may want to just have that in the jury

8   instructions so we don't raise an appellate issue.

9           MS. CASTRO: Your Honor, for the record, we do want

10  to object to counsel's request.

11          THE COURT: Thank you.

12          How does this sound to you, a second paragraph after

13  the first paragraph of the malicious prosecution section. "A

14  defendant cannot be held liable for what he said to the grand

15  jury. He may be held liable for what he said to the

16  prosecutor or district attorney."

17          Is that what you want? Then you can argue

18  credibility as you wish.

19          MR. COHEN: That's fine, Your Honor.

20          THE COURT: Do you object?

21          MS. CASTRO: Your Honor, we do object to the

22  statement, and particularly because what the officers said to

23  the district attorney could be truthful, and here the jury can

24  infer that what they said is truthful and yet still hold them

25  liable.

7

**PROCEEDINGS**

1          THE COURT: I don't understand you.

2          MS. CASTRO: The sentence itself, to us --

3          THE COURT: Is it accurate, what I just said?

4          MS. CASTRO: To the extent that Rehberg holds that

5    witnesses cannot be found liable for what's testified to at

6    the grand jury, yes. It's the second portion of the sentence.

7          THE COURT: Well, can't they be held liable for

8    lying to the district attorney, which causes the district

9    attorney to prosecute?

10         MS. CASTRO: If they're found to give false

11   statements, yes.

12         THE COURT: Yes. Well, that's what this is all

13   about.

14         MS. SANDS: Your Honor, wouldn't it be inconsistent

15   if they --

16         THE COURT: I can't hear you. You have to speak up.

17         MS. SANDS: Wouldn't it be if they --

18         THE COURT: I'm sorry?

19         MS. SANDS: It's not inconsistent if they did not

20   lie in the grand jury and they told the prosecutor the same

21   thing that the prosecutor used to put the case before the

22   grand jury.

23         THE COURT: I understand. Whether it was a lie or

24   not is what the jury is determining.

25         MS. SANDS: Right.

JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

8

**PROCEEDINGS**

1        THE COURT:  So I don't understand your objection,
2   with all due respect.
3        MS. SANDS:  I think the way the charge is written
4   now, it's that they may not have lied to the grand jury, but
5   they lied to the prosecutor.
6        THE COURT:  Where does the charge say they lied
7   to --
8        MS. SANDS:  It doesn't say it, Your Honor, but I
9   think there's an implication which our jury could misinterpret
10  it to be that.
11       THE COURT:  Excuse me.  That's why we're here in
12  court.  The plaintiffs say your clients lied to the
13  prosecutor.  They're going to have to prove it.  I don't
14  understand your objection, with due respect.
15       MR. COHEN:  Your Honor, can I make a suggestion?
16       THE COURT:  No.  One at a time.  I'll be delighted
17  to hear you, but I'm now listening to the corporation counsel.
18       MS. SANDS:  Thank you, Your Honor.
19       What I'm trying to explain to the Court is that I
20  think there is a disconnect between the officers telling the
21  grand jury whatever it is they told the grand jury and telling
22  the prosecutor, who presents the case to the grand jury -- or
23  allowing the jury to infer that they lied to the prosecutor
24  and not the grand jury.  The prosecutor uses what the officers
25  say to present the case to the grand jury.

9
**PROCEEDINGS**

1        THE COURT: I don't follow you. The Supreme Court

2    says, as I understand it, a lie to the grand jury is not the

3    basis for prosecution. Correct?

4        MS. SANDS: Correct.

5        THE COURT: A lie to the prosecutor presumably is a

6    basis, correct? Am I correct or not?

7        MS. SANDS: You are correct, Your Honor. But what

8    I'm saying is there's a disconnect between what they tell the

9    grand jury and what they tell the prosecutor.

10        THE COURT: I don't understand what the word

11    "disconnect" means.

12        MS. SANDS: There's no connection. In other words,

13    if they tell the truth to the grand jury, and that's what the

14    prosecutor uses to come forward with the case.

15        THE COURT: Excuse me. You're assuming they told

16    the truth to the grand jury. I don't know whether they told

17    the truth or not to anybody. We are here this morning because

18    the plaintiff says they lied to the prosecutors; is that

19    right?

20        MR. COHEN: That is correct, Your Honor.

21        THE COURT: Why shouldn't they be able to use that

22    if your client did lie to the prosecutor?

23        MS. SANDS: I understand, Your Honor, that we're

24    here to determine whether or not the officers lied.

25        THE COURT: Excuse me. Why don't you answer my

10
**PROCEEDINGS**

1   question?

2          MS. SANDS:   I'm trying to answer your question.

3          THE COURT:   Would you read my question back to

4   counsel, please.

5          (Whereupon, the referred to portion was read back by

6   the court reporter.)

7          MS. SANDS:   Your Honor, what I'm saying is the way

8   the charge is written now --

9          THE COURT:   Excuse me.   Would you answer my

10  question.

11         Read it again, please.

12         (Whereupon, the referred to portion was read back by

13  the court reporter.)

14         MS. SANDS:   To use what?

15         THE COURT:   To use the fact that they lied to the

16  prosecutor, that they told the prosecutor an untruth.   Why

17  cannot they use it?   That's their case.

18         MS. SANDS:   I'm not saying that they cannot use it.

19  I'm just saying, Your Honor, the way that the charge is

20  currently written it sounds as if, when I hear it, that they

21  told the truth to the grand jury, but they lied to the

22  prosecutor.   That's the way I'm interpreting it when I hear

23  it.

24         THE COURT:   Well, I don't agree.   I'm going to use

25  it.   I'm sorry.   Why don't you try to brief it.   Perhaps I'll

JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

11
**PROCEEDINGS**

1   be able to understand the argument better.

2         MS. SANDS:  Your Honor, can I say one more thing?

3   Can I say that can we offer our changes to the Court up until

4   the time the court is ready?  In other words, as the case

5   progresses, I would imagine there will be testimony companying

6   out --

7         THE COURT:  Yes, of course.

8         MS. SANDS:  -- and things will change, that we would

9   present any final edits or changes before the charge is read.

10        THE COURT:  It will always know my pleasure to read

11  anything you present and to hear any argument.

12        Are there any other applications?

13        MR. COHEN:  One more small change with respect to

14  the jury charge, Your Honor.

15        In the damages section, Your Honor's proposed charge

16  currently has you should award damage --

17        THE COURT:  What page?

18        MR. COHEN:  I'm sorry.  Number 10.  Page 10, sorry,

19  in the compensatory damages section.

20        THE COURT:  Yes.

21        MR. COHEN:  Plaintiff would like some statement as

22  to what the claim of injury is.  The plaintiff is claiming

23  essentially that the injury was he spent four and a half

24  months in jail on charges that were not warranted.  So to the

25  extent in the second paragraph of the compensatory damages

**PROCEEDINGS**

12

1  section, plaintiff claims his injury was that he spent four

2  and a half months wrongfully incarcerated as a result of the

3  defendant's actions. Just so the jury understands that that's

4  the injury, and Kurmin v. City of New York was a decision

5  basically that acknowledges loss of liberty as a specific

6  compensatory damage.

7       MS. CASTRO: Your Honor, note our objection to the

8  request. Plaintiff will have an opportunity to relay to the

9  jury what his injuries are, and to just sanitize it and put it

10  down in one sentence is improper.

11       THE COURT: After the third paragraph on Page 10,

12  would this cover the request of the plaintiff? "Plaintiff

13  claims as the injury that he spent four and a half months in

14  jail."

15       MR. COHEN: That's fine.

16       THE COURT: That will go in, subject again to

17  receiving a brief from defendant.

18       Any other applications this morning?

19       MR. COHEN: Yes. Your Honor, last night we -- as

20  Your Honor ordered defendants, we received the disclosures.

21       THE COURT: May I have a copy, please?

22       MR. COHEN: I have a copy for Your Honor. May I

23  approach?

24       THE COURT: Yes.

25       Mark this as Court Exhibit 1 of today's date.

JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

**PROCEEDINGS**

1       (A report from City of New York was marked as Court

2  Exhibit 1 in evidence, as of this date.)

3       THE COURT:  What's the objection?

4       MR. COHEN:  So, Your Honor, my objection to this

5  report is that the opinion that's expressed here, which is in

6  one sentence -- it's the third-to-last paragraph on Page 2 --

7  summarizes as follows:  In my experience at the office of the

8  Chief Medical Examiner, swabs of firearms submitted for DNA

9  analysis often yield an insufficient amount of DNA, and

10  therefore no further DNA testing can be done.  And then

11  Ms. Lamay-Smith goes on and says there may be many factors

12  that can contribute to this; you know, extreme heat, cold,

13  wet, damp or how the item was handled.

14       I'm having an issue with respect this opinion

15  doesn't follow Rule 26 because it doesn't list really the

16  basis and the reasons for it.  It just says there may be some

17  reasons.  It happens often, but doesn't have a quantified

18  number of how often it happens.  It doesn't explain in detail

19  what the particular reasons are.  You know, it seems to me

20  that it's just a general opinion that's not really specific,

21  which would meet the Rule 26 requirements.

22       THE COURT:  Overruled.  It's sufficiently explicit.

23  You can cross-examine, if you wish.  I see no reason for a

24  Daubert hearing in view of the experience of your witness.

25       Anything further?

14
**PROCEEDINGS**

1       MS. GROSS:  Two applications, Your Honor.  The first

2    is for the sake of clarity.  I recall yesterday that Your

3    Honor ruled that references to the fact that the grand jury

4    indictment or case was dismissed because of Speedy Trial --

5    for Speedy Trial reasons would not be in the jury charge.

6       Does that mean that defense counsel cannot reference

7    the fact that Speedy Trial grounds were the grounds for

8    dismissal in opening and cross-examination of plaintiff as

9    well?

10       THE COURT:  Well, what's your intention?  What's the

11   plaintiff's intention?

12       MR. COHEN:  Well, Your Honor, the request to

13   cross-examine our client on Speedy Trial grounds, my client is

14   not an attorney.  He's not the D.A.  He can't testify as to

15   whether the case was --

16       THE COURT:  As I understand it, the defendant wants

17   you not to reference the Speedy Trial; is that correct.

18       MS. GROSS:  I'm sorry.  The plaintiff wants to not

19   reference it.  Defense counsel does wish to reference it in

20   both opening and cross-examination.

21       THE COURT:  You want to reference it?

22       MS. GROSS:  Yes.

23       THE COURT:  What's your view?

24       MR. COHEN:  Our view is that it should not be

25   referenced.  It will confuse the jury.  It's a way to get in

JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

15

**PROCEEDINGS**

1   testimony about what the D.A. did without having the D.A.

2   here, and it's clear that the D.A. is not going to be here.

3          THE COURT:   You can subpoena him.

4          MR. COHEN:   In addition, it will suggest that this

5   case was dismissed on a technicality, but there are many

6   reasons why cases are dismissed on Speedy Trial grounds.  It's

7   because, you know, for the reasons I discussed yesterday, Your

8   Honor.   There were serious questions with this prosecution,

9   and the D.A.'s office, rather than outrightly dismiss it on

10  their own, just let it die with the Speedy Trial issue.

11  Asking my client, who's a layperson, to testify about how his

12  case got dismissed or the reason why the D.A.'s office decided

13  to let this case die 30-30 is very speculative, and it's not

14  fair because my client's not an attorney.

15         THE COURT:   Do you have a case on it, anybody?

16         MR. COHEN:   Whether the issue of Speedy Trial can be

17  raised?

18         THE COURT:   Yes.

19         MR. NORINSBERG:   Just, Your Honor, the case that we

20  referenced yesterday, the Cantolino case, Court of Appeals,

21  New York State Court of Appeals, which essentially establishes

22  clearly that the Speedy Trial dismissal is a dismissal on the

23  merits for purpose of a malicious prosecution claim, the

24  rationale being that they said in that --

25         THE COURT:   Let me see that case.

16

**PROCEEDINGS**

1          MS. GROSS:  Your Honor, if I might be heard?

2          THE COURT:  Yes.

3          MS. GROSS:  The defense's position is we concede and

4     we agree that the case law firmly establishes that a Speedy

5     Trial disposition is a favorable disposition for purposes of

6     malicious prosecution.

7          THE COURT:  Yes, I know.

8          MS. GROSS:  However, we'd simply like to inform the

9     jury that this case was dismissed on Speedy Trial grounds,

10    period, and to ask him if he knows why the case was dismissed.

11         THE COURT:  I know what you want to do.  But let me

12    see if there's -- if there's no other case discussing it,

13    that's the one I'll have to read.  Is there no other case

14    discussing this issue?  It's a tricky problem.

15         MS. SANDS:  Your Honor, can I add one thing?

16         THE COURT:  Yes.

17         MS. SANDS:  The plaintiff testified at his

18    deposition that the case was dismissed pursuant to Speedy

19    Trial.

20         THE COURT:  That's not helpful, with all due

21    respect.

22         MS. SANDS:  Well, in terms of counsel's remark that

23    the plaintiff is not a lawyer, he does know why the case was

24    dismissed.

25         THE COURT:  The trouble with cutting this out or

17
**PROCEEDINGS**

1   letting it in is that you have to tell the jury so much about

2   the way the criminal justice system operates for them to

3   understand it.

4          Well, unless the defendant can come up with a case

5   that's helpful, I'm going to keep it out, I think.  Let me

6   look at the New York case.  So I don't want any reference to

7   it in the opening.

8          MS. GROSS:  Your Honor, if I might be heard just

9   briefly.  The defendant's intention is to simply alert the

10  jury that it was a Speedy Trial dismissal and not an acquittal

11  after trial.

12         THE COURT:  I understand what your intention is.

13         MS. GROSS:  If I might be heard on a second point?

14         THE COURT:  Sure.

15         MS. GROSS:  Yesterday the Court reaffirmed its

16  denial of the defendant's motion in limine seeking to include

17  testimony by Officer Burbridge that he recognized Plaintiff

18  Marshall from a previous encounter.  The court referred

19  defense counsel to United States against Scott, a slip opinion

20  10-39-78, recently decided by the Second Circuit.  If the

21  Court could just note our objection that this is a criminal --

22  the Scott case is a criminal case where the defendant's

23  liberty was at stake, and this is a civil case, where liberty

24  is not at stake but monetary damages are.  We believe Scott

25  distinguishable, and we note our objection.

18

**PROCEEDINGS**

1       THE COURT:  Yes, I'm aware of it.  As a matter of

2   fact, I made my ruling before the case was handed down.

3       MS. GROSS:  That's right, Your Honor.  Thank you.

4       THE COURT:  Anything further?

5       MS. GROSS:  No, Your Honor.

6       THE COURT:  So there will be no reference to the

7   reason for the dismissal in the opening; and if you can come

8   up with some case or brief, I'll be happy to hear it so we can

9   introduce it during the course of the trial.  Thus far, I have

10  nothing.

11      MS. GROSS:  Thank you, Your Honor.

12      MR. NORINSBERG:  Your Honor, just to be clear,

13  because I don't want to run afoul of the court's ruling.  To

14  the extent that I'm giving my opening statement and one of the

15  elements is favorable termination, I mean, I will be

16  specifically referring to the fact that the case was

17  dismissed.  I'm not going to get into the grounds until the

18  court makes that ruling.

19      THE COURT:  Don't say anything about favorable or

20  unfavorable.  Just say it was dismissed.

21      MR. NORINSBERG:  Okay.

22      THE COURT:  We'll take a moment, and then we'll

23  bring in the jury.

24          (Whereupon, a break was taken.)

25      THE COURT:  I've read the Cantolino case.  It does

19
                                    **PROCEEDINGS**

1   not support the defendant's view, but I'll receive briefs on

2   the point.

3            MS. SANDS:  Your Honor, just one question.

4            THE COURT:  The jury's coming in.

5            (The jury entered.)

6            THE COURT:  Please be seated.

7            Good morning everybody.

8            THE JURY:  Good morning.

9            THE COURT:  Nice to see you all.  We appreciate the

10  service you're giving to the justice system.

11           We'll proceed generally as follows.  You'll start at

12  10:00.  And do try to be here on time because if anybody is

13  late, we have to hold everybody up.  The Court and the

14  attorneys meet earlier, at 9:30, so that the case can go more

15  smoothly.  We'll generally continue to about 4:30, but we may

16  go a little earlier or later, depending on how the witnesses

17  break.  We'll take a break in the morning, at least one break,

18  and a break or two in the afternoon, and we'll serve lunch

19  somewhere between 12:00 and 1:00.  Today it will be at 1:00

20  because I have a meeting.  Ms. Lowe will arrange to get lunch

21  for you, and you'll eat it in the jury room at the

22  government's expense.

23           Is there anybody who has any problems with that

24  schedule?

25           Has anything occurred to any of you that would make

20

**PROCEEDINGS**

1   you less desirable as a juror in this case that you can think

2   of?

3            All right.  We'll proceed.

4            Is the jury satisfactory, Counsel.

5            MR. NORINSBERG:  Satisfactory to plaintiff.

6            MS. GROSS:  Satisfactory to defendants.

7            THE COURT:  Swear the jury, please.

8            (The jury was sworn.)

9            THE COURT:  Now we'll proceed first with openings.

10   The attorneys for the plaintiff have the main burdens here --

11   I'll explain that at the end of the trial -- because they're

12   seeking something from the Court.  So they'll open and tell

13   you what they think the evidence will show, give you an

14   overview.  Then the defense counsel will do the same from the

15   defendant's point of view.  Then you'll hear witnesses called,

16   first by the plaintiff, cross-examined by the defense counsel.

17   When all of the witnesses for the plaintiff are in, the

18   defendant may offer witnesses, and there may be some rebuttal.

19   When we hear all the witnesses and see all the documents and

20   anything else that's going to be admitted, then we'll have

21   summations.  The attorneys will try to analyze the evidence

22   for you and explain why you should find in their favor.  Then

23   I'll give you a charge.  I'll tell you what the law is.  And

24   you'll go into the jury room with all of the exhibits and any

25   of the testimony you want to hear and try to decide the case.

21
**PROCEEDINGS**

1        You can take notes during the trial.  Ms. Lowe will

2    arrange for paper and pencils.

3        If you have any questions, see Ms. Lowe.  She will

4    take them in writing, if you want me to see them or present

5    them to the attorneys.  Then she'll give them to me.  Do you

6    understand?

7            THE JURY:  Yes.

8            THE COURT:  Any questions?

9            THE JURY:  No.

10            THE COURT:  Proceed with the openings, please.

11            MR. NORINSBERG:  Thank you, Your Honor.

12            Good morning, ladies and gentlemen.

13            THE JURY:  Good morning.

14            MR. NORINSBERG:  The case that you're about to hear

15    is an important case.  It's a case about a man who was falsely

16    imprisoned for four and a half months at Rikers Island.  It's

17    about a man who had to fight felony charges for over a year

18    until finally all of the charges that were brought against him

19    were dismissed.  And it's about the two police officers who

20    brought the false charges against him, Officer Burbridge and

21    Officer Randall, the defendants in this case.  And it's about

22    Mr. Marshall, the plaintiff, the man that they did this to.

23        Now, how did this all happen?  It goes back to the

24    night of May 15th, 2008.  That night started out like any

25    other night for Joshua Marshall.  He had not been feeling good

JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

22

**PROCEEDINGS**

1   that day.  He was under the weather and coming down with some

2   type of cold.  He was trying to rest it off.  But at night,

3   when he was trying to fall asleep, he could not get to sleep.

4   So something where he just needed to get some medication, some

5   cold medication, free up his breathing and allow him to go to

6   bed.

7           So sometime after midnight, Mr. Marshall got out of

8   his bed, went to the store.  There were two local bodegas open

9   24 hours just within two blocks or so of where he was staying

10  at the time.  He knew about them, so he went to these stores,

11  the plan being go to one store, get something light for the

12  stomach, some soup and ginger ale, and then he was going to go

13  to the second store to pick up some cold medicine.

14          So he made it to the first store about out a

15  problem.  Got what he needed.  And he went to the second

16  store, and he ran into somebody that he knew from the

17  neighborhood.  Not a close friend of his by any stretch,

18  but -- he didn't even know the guy's name, but he knew his

19  nickname in the neighborhood was Sip.  They exchanged

20  pleasantries.  They were walking back in the same general

21  direction when they left the second store.

22          So they leave the store together.  They're talking.

23  They part ways right around the intersection of Park Street

24  and Broadway in Brooklyn.  Mr. Marshall makes a right as he's

25  heading out Park Street.  Mr. Meade -- Demetrios Meade is his

JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

23

**PROCEEDINGS**

 1    name -- keeps going straight. But all of a sudden, within a

 2    few seconds -- Mr. Meade, instead of just continuing to walk

 3    in the direction he's going, all of a sudden he walks back to

 4    where Mr. Marshall is going and says the police are coming.

 5    So Mr. Marshall is like, well, so the police are coming. You

 6    know what's the big deal? I'm just carrying cold medicine and

 7    soup. So I'm going to continue walking on my way.

 8         But Mr. Meade -- Mr. Marshall had nothing to hide,

 9    but as it turns out, Mr. Meade did have something to hide. He

10    had a weapon on him. And what he decided to do -- he kind of

11    panicked when he saw the police coming. They were coming down

12    Park Street.

13         Now, Park Street, the traffic is actually coming in

14    this direction. It's a one-way street, and the police are

15    going the wrong way in the one-way street. So Mr. Meade sees

16    this, panics, and he kind of positions himself really close to

17    where Mr. Marshall is, and he throws his gun out into the

18    street, hoping that maybe the police wouldn't quite see where

19    the gun came from if they stop him.

20         So he does that, and it actually works very well,

21    because the police don't see where the gun came from. They

22    get out of the car, and the first thing that they do with

23    their guns drawn is they throw these men up against the wall,

24    both of them, and they say, whose gun is it? Whose gun is it?

25    Tell us whose gun it is.

JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

24
**PROCEEDINGS**

1      And Mr. Marshall is there, and he's just thinking

2  this guy better do the right thing.  He's got to own it.  This

3  is his problem.  It's not my problem.  He's gotta own it.  But

4  Mr. Meade is just kind of standing there silently, not saying

5  a word.  So Mr. Marshall says finally, it's his gun.  You know

6  it's his gun.  It's not my gun.

7      So at that point, both of these men are handcuffed

8  and standing there, and the police decide to have a little

9  conference amongst themselves.  They have a conference for a

10  few minutes, they're talking about it, and they make a few

11  decisions.

12      One decision they make is that Salim Randall is

13  going to be the arresting officer that night.  Now, this

14  officer, you're going to learn, will later testify that to

15  this day, he doesn't know why he's the arresting officer.  But

16  they decide he's going to be the arresting officer, and they

17  decide they're going to go and take one these men into

18  custody.  And that man turns out to be Mr. Marshall.

19      Mr. Marshall is then placed into the police car, and

20  he's going towards their precinct.  And obviously, he just --

21  he's thinking to himself, just 20 minutes ago, I'm lying in my

22  bed.  If I didn't go out to get this cold medicine, I wouldn't

23  be in this spot.  I don't know what they think I'm doing.

24  This is wrong.  He's angry and upset.  But on the other hand,

25  he believes this is all going to get straightened out.  He's

25

**PROCEEDINGS**

1   imagining he goes to the precinct; obviously, after they

2   question him for a while, they're going to figure out it's not

3   his gun, and this problem is going to go away.

4        Well, it turns out things didn't get straightened

5   out.  Things got a lot worse for him.  You're going to learn,

6   ladies and gentlemen, shortly after this arrest, the

7   defendants in this case, Police Officer Burbridge and Police

8   Officer Randall, met with prosecutors from the Brooklyn

9   district attorney's office, and at that point they had a

10  critical decision to make, the decision being do they simply

11  tell the truth and just admit to the prosecutors that they got

12  there split seconds too late and didn't actually see whose gun

13  it was or just accept the consequences of that, let the chips

14  fall where they may.  If that means the case gets thrown out,

15  so be it.  Just come clean and tell the prosecutors what

16  actually happened.  Or do they come up with a story to try to

17  justify the arrest?

18        The reason we're here today, ladies and gentlemen,

19  is they chose that second path of dishonesty, and they told

20  the prosecutors a story.  Wait till you hear the story that

21  they came up with.  Remember, out on the street, it's whose

22  gun is it?  Whose gun is it?  Now, when they meet with the

23  prosecutors, all of the sudden the story is, well, what

24  happened was we were driving down the street, and we politely

25  came up to Mr. Marshall; and we asked him, sir, can we please

JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

26
**PROCEEDINGS**

1    have a moment of your time.  And as soon as we asked him that
2    question, right in front of us, he took out a gun, out of his
3    waistband and threw it into the street.  That was the story
4    they came up with.  The proof in this case is going to be that
5    was an outright deliberate fabrication.  Absolutely did not
6    happen.

7         And you'll learn, ladies and gentlemen, the next
8    thing is one of the officers appeared in front of the grand
9    jury.  Both of them actually testified in front of the grand
10   jury.  And you'll learn the arresting officer, Officer
11   Randall, swore under oath that he saw with his own eyes
12   Mr. Marshall remove this gun.  It was in his possession.
13   You're going to learn, though, that later on he would admit
14   that, in fact, he never saw the gun in his possession.  It was
15   again another outright fabrication to the grand jury.

16        Now, Mr. Marshall has no idea what these police
17   officers are telling the grand jury, but he did what any
18   innocent person would do.  He decided that he wanted to
19   volunteer and testify to the grand jury.  He didn't have to.
20   He actually volunteered to go in there and tell the grand jury
21   what happened.  He figured there's nothing I have to hide.
22   They need to hear from me, from my own words, what happened
23   that night.  They'll know.  They'll know I'm innocent.

24        Well, he did that.  He took a gamble and went in
25   there, again, not knowing what the officers had actually said.

JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

27

**PROCEEDINGS**

1    He goes in there, and he says what happened. But he's not

2    aware of the fact that the officers have changed the actual

3    story about what happened that night. So by the time they're

4    done testifying, he gets indicted by the grand jury. Multiple

5    charges of possessing a weapon.

6          Now, in this trial, you as jurors are going to hear

7    things that grand jury never heard. You as jurors are going

8    to see things that grand jury never heard. And you'll

9    understand how it is that all the charges in this case were

10   dismissed.

11         In May of 2009, criminal possession of a weapon in

12   the second degree, dismissed, thrown out. Criminal possession

13   of a weapon in the third degree, dismissed, thrown out.

14         THE COURT: Strike the words "thrown out." They

15   were just dismissed. Nobody threw them anyplace.

16         MR. NORINSBERG: You'll learn that all the charges

17   were dismissed in this case.

18         Now, what we're going to do in this trial is explore

19   what happened and what led up to the dismissal of these

20   charges. And the proof in this case, ladies and gentlemen, is

21   going to be that these officers had massive credibility

22   problems you're going to hear about in this trial.

23         For example, you're going to learn that the

24   arresting officer, while he told one prosecutor that he

25   actually saw Mr. Marshall in possession of the gun, he

JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

28

**PROCEEDINGS**

1    actually told another prosecuting attorney that he never saw

2    Mr. Marshall in possession of the gun.

3           You're going to learn that the officers' story has

4    changed over time.  They've given at least three different

5    stories about what happened here.  In one version of events,

6    they're as far away as 25 feet from where this takes place,

7    where Mr. Marshall has his gun.  In another version of events,

8    Officer Burbridge and the car is right next to Mr. Marshall,

9    and Officer Burbridge actually steps out onto the street in

10   front of Mr. Marshall, and that's when he sees the gun thrown.

11   In another version, he didn't step out in the street.  He's

12   actually still in the car, but the car's 10 feet away.  And

13   that's when he sees this happen.  At least three different

14   stories that you're going to learn about, about what they

15   claim.

16          You'll learn, ladies and gentlemen, that part of the

17   story that they came up with, they said right before they saw

18   Mr. Marshall throw this gun, they saw him try to hide behind

19   Mr. Meade.  But you'll learn again their stories are

20   completely different.  One officer says Mr. Meade stopped and

21   Mr. Marshall kept walking, and that's when he threw the gun.

22   The other officer said, no, what happened, Mr. Marshall walked

23   backwards, that's when he threw the gun.  They can't keep

24   their story straight.

25          But you'll learn it's not just their changing

JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

29

**PROCEEDINGS**

1  stories that raises doubts about their credibility.  The proof
2  in this case will also be that the arrest paperwork simply
3  does not match what they claim happened that day.  For
4  example, you're going to learn that even though both officers
5  have claimed that they actually saw Mr. Marshall pull out a
6  gun with their own eyes and throw it, there's not one word of
7  that in any of the arrest paperwork.  Nothing in the arrest
8  report about that.  Nothing in the complaint report about
9  that.  Nothing in the officer's memo book entry.

10       Now, you'll learn that the arresting officer was
11  asked about this, the one who filled out the paperwork.  Why
12  is it that -- if this happened, why is it not in your report?
13  You'll learn that this officer admitted he has no explanation
14  whatsoever for why he didn't put those things.  He admitted
15  they're very important facts, but he says he has no idea why
16  they're not in his report.

17       Apart from the changing stories and the police
18  paperwork, you'll learn also that the most telling thing in
19  this case is the complete lack of concrete evidence connecting
20  Mr. Marshall to this gun.  The proof in this case will be,
21  ladies and gentlemen, there's not one shred of physical
22  evidence connecting him to this gun.  No physical evidence, no
23  forensic evidence, no DNA evidence, nothing.

24       In fact, you're going to learn that the claim
25  they're talking about, that he pulled out his gun, you would

30

**PROCEEDINGS**

1   expect that you might see fingerprints on that gun.  No

2   fingerprints found on the barrel of the gun.  No fingerprints

3   found on the cartridge for the bullets.  No fingerprints found

4   on the gun grip.  Nowhere.

5           And you'll learn, ladies and gentlemen, that the

6   officer, Officer Randall, the arresting officer, actually

7   himself -- you'd think he'd be interested in getting

8   fingerprints, but you'll learn that he actually filled out a

9   police report where he specifically checked off the box to not

10  check for fingerprints.  But even though he did it, they

11  checked it anyway.  Nothing showed up.  No DNA evidence on the

12  grip, no DNA evidence on the barrel, no DNA evidence anywhere

13  on that gun.

14          Now, I expect during this trial, you'll hear the

15  defense call some witnesses from the City of New York, who

16  will come in, and I expect the proof to be that they'll give

17  you explanations and excuses for why there's no DNA evidence,

18  why there's no fingerprint evidence on this gun.  But the

19  bottom line is what the proof in this case will show there is

20  no forensic evidence in this case connecting this man to this

21  gun because he did not own this gun.  He didn't posses it, he

22  didn't own it and he never touched it.  It was not his gun.

23  That's what the proof in this case is going to show, ladies

24  and gentlemen.

25          So when you hear all of this evidence, when you hear

31

**PROCEEDINGS**

1   about the police officers' different versions of events, the

2   arrest reports that don't have what they claim to have

3   happened and the complete lack of DNA and forensic evidence

4   and fingerprint evidence, you'll start to understand why the

5   charges were dismissed want.

6         Now, what we're going to do in this case, the way I

7   see our job is to simply present to you the evidence, present

8   it to you and you decide the case.  The way we're going to do

9   it, we're going to get right down to business this morning.

10  We're not going to waste any time.  I'm immediately calling

11  the arresting officer, and I'm also calling right after that

12  Officer Burbridge.  So you'll get to hear it.  And what we're

13  going to do is work through the evidence piece by piece as if

14  you're looking at it on a video frame, going back to May 15th,

15  2008, to see what makes sense and what doesn't make sense.

16        And if any of you might have an expectation, if you

17  think that perhaps after we do this and we cross-examine the

18  officers we're going to have a dramatic moment in court where

19  they admit that they haven't told the truth, think again.

20  That will never happen.  These officers, I expect, will

21  testify and give the same false claims that they told the

22  prosecutor and the grand jury.  But it's up to you as the

23  jurors in this case, having much more evidence available than

24  anyone's who has looked at the case before, to decide whether

25  or not those claims are true.

32

**PROCEEDINGS**

1      Now, one last thing I expect also. I expect that

2   you're going to hear from a third police officer who was on

3   the scene, an Officer Fox, and you're going to find there are

4   credibility issues with this officer as well. You'll learn

5   that this officer never testified before. Didn't testify in

6   the grand jury. Didn't testify during the civil lawsuit.

7   This will be the first time he's going to come and tell his

8   version of events, which I suspect he's going to say the same

9   thing the other two officers said, that he saw the same thing

10  they saw. But again, you are going to be the ultimate judges,

11  and you'll decide whether or not that testimony is credible.

12      Ladies and gentlemen, the bottom line is this. We

13  brought this lawsuit. It's been four years now. We brought

14  this lawsuit because this man never should've been arrested,

15  much less prosecuted. And the proof in this case will that

16  these defendants falsely accused him of a crime he didn't

17  commit and then deliberately lied to the prosecutors to make

18  sure that this case went forward rather than simply own up to

19  the fact that they didn't know who actually threw the gun.

20  And the bottom line is this man wound up spending four and a

21  half months in jail, the entire summer of 2008 in jail as a

22  result of these charges before finally, later the following

23  year the charges were dismissed.

24      So I ask you now to simply listen carefully. This

25  is going to require the highest level of concentration as

**PROCEEDINGS**

1    jurors, the closest detail to attention, thinking constantly

2    as you're going through this process with us, thinking and

3    challenging assumptions and looking closely at the evidence.

4    If you do that and if you honor the pledges that all of you

5    made in jury selection yesterday, you will get the right

6    result, and that is to hold these two defendants responsible

7    for what they did to Joshua Marshall.

8         Thank you.

9         THE COURT:  Thank you.

10        Defendant.

11        MS. GROSS:  Despite what you just heard from

12   plaintiff's counsel, ladies and gentlemen, this is a very

13   simple case.  Three police officers were on patrol.  They saw

14   a man walking down a Brooklyn street on May 15th, 2008.  They

15   approached the man.  They saw the man reach into his

16   waistband, pull out a gun, pitch the gun to the street.  They

17   recovered the gun, and they arrested the man.  That man was

18   Joshua Marshall.  That's the case.

19        Good morning, ladies and gentlemen.  My name is

20   Felicia Gross.  I, along with co-counsel, Johana Castro, will

21   be representing New York police officers Salim Randall and

22   Michael Burbridge.

23        On May 15th, 2008, Officers Randall and Burbridge

24   were out on routine patrol.  They were assigned to Brooklyn

25   North anti-crime unit, a unit of the New York City Police

34
**PROCEEDINGS**

1   Department that specializes in patrolling high-crime areas.

2          They along with a third officer, Kiernan Fox, were

3   out on routine patrol, working night patrol.

4          May 15th was a spring night.  It was a week night, a

5   Wednesday night.

6          A little bit after midnight on Wednesday night,

7   12:40 a.m., they see two men walking down Broadway, which is

8   on the border of Bushwick and Bedford-Stuyvesant neighborhoods

9   in Brooklyn.  The street was deserted at that hour, and the

10   officers' attention was drawn to the men, given the lateness

11   of the hour, the fact that they were near a street corner,

12   late at night in a high-crime area.

13          One of those men was Joshua Marshall.  The other

14   man's name was Demetrios Meade.  Mr. Marshall has in the past

15   referred to Mr. Meade as his associate; and for the duration

16   of the trial, I'll refer to him as his associate as well.

17          (Continued on the next page.)

18

19

20

21

22

23

24

25

35

**PROCEEDINGS**

1    MS. GROSS:   You will hear that as the officers

2  approached plaintiff, plaintiff's eyes became wide.  He became

3  startled.  He sprang into action.  He motioned to his friend

4  to come closer.  He turned the corner down the street, and the

5  two of them sped up down the street in opposite direction from

6  the police officers.

7    Upon seeing those actions, the officers decided to

8  approach.  They pulled up alongside the two men and asked for

9  a moment of their time.  Their intention was to speak with

10  them, ask them what they were doing at that time of night and

11  where they were going, an approach they do routinely on their

12  patrol.

13    Here's what they had:  Two men, late at night, high

14  crime area, near the street corner, and they had just made

15  furtive movements.  Plaintiff just looked frightened, sped off

16  in the opposite direction from the officers.

17    You'll hear that as the officers approached,

18  plaintiff stepped behind his associate, reached into his

19  waistband, pulled out a gun and made a pitching motion towards

20  the street.  Clink.  That's what the officers will testify

21  they heard next.  They knew instantly Joshua Marshall had just

22  thrown that gun into the street.  Clink.  You'll hear each of

23  them testify there was a high-pitched clink noise of a gun.

24  The stainless steel on pavement is unmistakable.  There was no

25  confusing who had thrown the gun, no mistake, no confusion.

36

**PROCEEDINGS**

1   No doubt in their mind, and at no time did they say, "Whose

2   gun was it? Whose gun was it?" That's not what happened

3   here.

4          Once the gun had been thrown into the street,

5   Officer Randall arrested Joshua Marshall. Officer Burbridge

6   retrieved the gun from the street. The gun was a fully-loaded

7   .38 caliber Smith and Wesson revolver, nine inches in length.

8          Officer Randall briefly speak with plaintiff's

9   associate, wrote down his information and let him go. There

10  was no doubt in any of the officers minds as to which man had

11  thrown the gun: Joshua Marshall.

12         Ladies and gentlemen, you have heard that next, the

13  grand jury indicted Mr. Marshall. Plaintiff had the

14  opportunity to talk to the grand jury, and he told them his

15  version of events and the grand jury indicted him. You've

16  also hear that the case against him was dismissed. Just

17  because the case against him was dismissed doesn't mean that

18  he wasn't the one who threw the gun into the street.

19         Finally, ladies and gentlemen, you will hear from

20  two forensic witnesses. They're going to testify as to the

21  forensic evidence that they've collected in this case. First,

22  you'll hear from officer Sand. He's a member of the New York

23  Police Department Evidence Collection Team. He performed a

24  fingerprint test on the gun and he swabbed the gun for DNA

25  evidence to send to the lab, which he did.

**PROCEEDINGS**

1    Next, you'll hear from a criminologist in the City

2    Medical Examiner's Office, Nana Lynn Smith.  She'll tell you

3    that she examined and analyzed the DNA swabs that she received

4    from the evidence collection team.  Both witnesses will tell

5    you there was simply not enough forensic material on the gun,

6    not enough fingerprints, not enough DNA on the gun to make a

7    meaningful match.

8    You have heard plaintiff's counsel say that

9    plaintiff's fingerprints weren't on the gun.  It's misleading.

10   No one's fingerprints were found on the gun because there

11   simply wasn't enough material from the gun to meaningfully

12   test.

13   I know a number of you must watch the television

14   programs like CI and Law and Order, so you may be under the

15   misimpression that --

16            MR. NORINSBERG:  Objection.

17            MS. GROSS:  You may be under the misimpression

18   that --

19            THE COURT:  Could you repeat?  Keep your voice up,

20   please.  Keep your voice up.

21            MS. GROSS:  You may be under the misimpression that

22   many cases --

23            MR. NORINSBERG:  Objection.  There is going to be

24   evidence in the case --

25            THE COURT:  Save that for your summation, please.

38

**PROCEEDINGS**

1        MS. GROSS: Very well, Your Honor.

2        I will mention that because there was not enough

3   DNA evidence on the gun, for you, what that means is that the

4   forensic evidence in this case doesn't help you decide whose

5   gun it was, doesn't tell you whether it was Marshall's or

6   whether it was not. For that, you're going to have to rely on

7   the credible testimony you hear over the next few days.

8        Ladies and gentlemen, that credible testimony will

9   show that it was Marshall's gun. Marshall possessed the gun.

10   Marshall pulled it out of his waistband. Marshall pitched it

11   into the street. And the officers acted reasonably in

12   arresting Joshua Marshall.

13        Ladies and gentlemen, after evaluation of all the

14   evidence in this case, we will ask to you to return a verdict

15   in favor of officers Burbridge and Randall. Thank you.

16        THE COURT: Thank you.

17        Call your first witness, please.

18        MR. NORINSBERG: Plaintiff calls Defendant Salim

19   Randall to the stand.

20        (Witness sworn.)

21        THE CLERK: Please state and spell your name for the

22   court reporter.

23        THE WITNESS: My name is Salim Randall, S-A-L-I-M,

24   as in "Mary." Last name IS Randall, R-A-N-D-A-L-L.

25        THE COURT: Thank you. Take your seat, please.

```
                                                              39
                    DIRECT - OFFICER RANDALL

 1   BY MR. NORINSBERG:

 2   Q    Good morning, Officer Randall.

 3   A    Good morning.

 4   Q    You were served with a subpoena to be here, is that

 5   correct?

 6   A    Yes.

 7   Q    And up are one of the named defendants in this case,

 8   correct?

 9   A    Yes.

10   Q    You were the officer who actually arrested Joshua

11   Marshall on May 15th, 2008, correct?

12   A    Yes.

13   Q    Now, you have previously given sworn testimony relating

14   to this arrest, true?

15   A    That is true.

16   Q    You gave testimony at a grand jury proceeding, correct?

17   A    Yes.

18   Q    You also testified at a deposition in this lawsuit, true?

19   A    Yes.

20   Q    And before coming here today, you made sure to review

21   your testimony from those two proceedings, correct?

22   A    Yes.

23   Q    Now, you have been employed by the NYPD for approximately

24   nine years, is that true?

25   A    That's true.
```

40
DIRECT - OFFICER RANDALL

1   Q    And on May 15th, 2008, you were a police officer,

2   correct?

3   A    Yes.

4   Q    You were working as part of the Brooklyn North Anticrime

5   Unit, correct?

6   A    Yes.

7   Q    And you had been with Brooklyn North Anticrime for

8   approximately five months at that time, true?

9   A    That is true.

10   Q    Your duties and responsibilities in Anticrime were to do

11   patrol, right?

12   A    Yes.

13   Q    You were looking for violent crime, right?

14   A    Yes.

15   Q    And violent crime could include robbery or assault,

16   things of that nature, right?

17   A    That is correct.

18   Q    And that particular night, you had two partners, true?

19   A    Yes.

20   Q    One of those partners was Officer Burbridge, right?

21   A    Yes.

22   Q    The other was Officer Fox, correct?

23   A    Yes.

24   Q    And you were inside of an unmarked police vehicle,

25   driving around, doing patrol, right?

41
DIRECT - OFFICER RANDALL

1   A     That is correct.

2   Q     Officer Fox was actually the driver of that vehicle,

3   right?

4   A     Yes.

5   Q     Officer Burbridge was in the front passenger seat of that

6   vehicle, right?

7   A     Yes.

8   Q     And you were actually in the back seat behind the driver,

9   correct?

10  A     Correct.

11  Q     Now, there came a time where you stopped two individuals

12  on Park Street, true?

13  A     True.

14  Q     And one of the individuals was Joshua Marshall, correct?

15  A     That is correct.

16  Q     And you learned the name of the other individual was Mr.

17  Demetrius Meade, right?

18  A     Yes.

19  Q     And you stopped Mr. Marshall on Broadway and Park Street

20  in Brooklyn, is that correct?

21  A     Yes.

22          (Pause in proceedings.)

23  BY MR. NORINSBERG:

24  Q     You actually stopped them at the corner of Park Street

25  and Broadway, correct?

```
                                                              42
                    DIRECT - OFFICER RANDALL
```

1    A    A little bit in the block, not exactly on the corner.

2    Q    Referring to your deposition, page ten, line 20,

3    question, "Where on Broadway and Park Street did the stop of

4    Mr. Marshall take place?"

5              Answer:  "The corner."

6              Do you recall being asked that question and giving

7    that answer at your deposition?

8    A    It was near the corner.

9    Q    Do you recall being asked that question and giving that

10   answer at your deposition?

11   A    No.

12   Q    Will you agree that you testified at your deposition the

13   stop was actually at the corner?

14   A    No, I don't agree with that.

15   Q    So the testimony that I just read is incorrect?

16   A    Yes, it is.  It was near the corner.

17   Q    Now, the police vehicle was located on Broadway when you

18   first saw Mr. Marshall, right?

19   A    Yes.

20   Q    You were actually at the intersection when you first saw

21   Mr. Marshall, true?

22   A    Yes.

23   Q    And the police vehicle was actually stopped at that

24   traffic light at that intersection, right?

25   A    Yes.

43
DIRECT - OFFICER RANDALL

1   Q   And you're very familiar with this intersection, right,

2   Officer Randall?

3   A   No.

4   Q   You've been there over hundreds of times, haven't you?

5   A   I've driven past it.

6   Q   Referring to your deposition, page 122, line ten,

7   question, "How many times have you been to Park Street and

8   Broadway in your career?"

9           Answer:  "Multiple."

10          Line 15, question, "Would it be over one hundred

11  times?"

12          Answer:  "Yes."

13          Do you recall being asked that question and giving

14  that answer --

15  A   Yes, I do.

16  Q   -- at your deposition?

17  A   Yes.

18  Q   So you were very familiar with this particular

19  intersection, true?

20  A   What I'm trying to say is, even though I've been by it a

21  hundred times, I never really paid much attention to it, so

22  I'm not very familiar with it.

23  Q   All right.  But you acknowledged at your deposition

24  you've been past it over a hundred times, right?

25  A   That's correct?

44
DIRECT - OFFICER RANDALL

1   Q    So when we're talking about something took place on the

2   corner, somewhere off the corner, that's something you would

3   be familiar with, right?

4   A    Yes.

5   Q    Now, at some point, Officer Burbridge suggested that you

6   stop Mr. Marshall, true?

7        MS. GROSS:  Objection.  Objection, Your Honor.  That

8   question is the subject of an in limine ruling.

9        THE COURT:  A what?

10       MS. GROSS:  And in limine ruling.

11       THE COURT:  Repeat the question, please.

12       (Record read by the reporter.)

13       THE COURT:  Overruled.

14  A    That's true.

15  BY MR. NORINSBERG:

16  Q    And prior to Officer Burbridge suggesting that you make

17  this stop, Mr. Marshall had not done anything suspicious in

18  your mind, true?

19  A    I'm sorry.  Repeat that?

20  Q    Prior to Officer Burbridge's statement that he wanted to

21  make this stop, Mr. Marshall had not done anything suspicious,

22  true?

23  A    That's true.

24  Q    He hadn't made any type of furtive move, correct?

25  A    Up until that point, no.

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

45

DIRECT - OFFICER RANDALL

1   Q    Now, you had actually seen Mr. Marshall on the other side

2   of Broadway, as he was walking towards the police vehicle,

3   right?

4   A    True.

5   Q    And your best approximation is -- he was approximately

6   one hundred to 150 feet away from you when you first observed

7   him, correct?

8   A    About a hundred feet.

9   Q    Referring to your deposition, page 121, line 22,

10  question:  "Your best approximation was they were one hundred

11  to 150 feet away, is that correct?"

12          Answer:  "Yes."

13          Do you recall being asked that question and giving

14  that answer at your deposition?

15  A    Yes.

16  Q    So according to your deposition testimony, Mr. Marshall

17  may have been approximately as far away as 150 feet when you

18  first saw him, true?

19  A    True.

20  Q    And you had your eyes on Mr. Marshall the whole time,

21  from the time you first saw him 'til the time he got to the

22  corner of Park and Broadway, true?

23  A    True.

24  Q    You never took your eyes off him during that time, right?

25  A    No.

46

DIRECT - OFFICER RANDALL

1   Q    Would you agree during that entire time, during that

2   hundred to 150 feet when Mr. Marshall is walking towards you,

3   that you never saw him do any type of furtive movement at all?

4   A    I'm sorry. Repeat that question?

5   Q    Let's step back for a second. You're familiar with

6   what's known as furtive movements, right?

7   A    Yes.

8   Q    Furtive movements would indicate that someone is nervous

9   or trying to hide something, right?

10  A    Yes.

11  Q    And can you please tell the jury, did Mr. Marshall make

12  any type of furtive movements prior to Officer Burbridge's

13  decision to stop him?

14          MS. GROSS:  Objection, Your Honor. Objection, Your

15  Honor.

16          THE COURT:  Sustained.

17          Rephrase the question.

18  BY MR. NORINSBERG:

19  Q    Can you tell the members of the jury, during that 100 to

20  150 feet when you had him under view, did Mr. Marshall make

21  any furtive movements at all?

22  A    He did make furtive movements. Yes, he did.

23  Q    Referring to your deposition, page 41, line 25, question,

24  "Prior to" --

25          MS. GROSS:  Objection, Your Honor. Objection, Your

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

47

DIRECT - OFFICER RANDALL

1    Honor.  The testimony he's about to read impinges on the

2    ruling the Court made previously during the motions in limine.

3              MR. NORINSBERG:  The question doesn't get -- these

4    contents are all --

5              THE COURT:  Let me hear the testimony.  Read it.

6    BY MR. NORINSBERG:

7    Q    Question: "Prior to the time that Officer Burbridge made

8    that statement, did Mr. Marshall make any type of furtive

9    movements?"

10             Answer:  "No."

11             Do you recall being --

12             MS. GROSS:  Objection, Your Honor.

13             THE COURT:  Overruled.

14             MS. GROSS:  May I have a sidebar, Your Honor?

15             THE COURT:  What?

16             MS. GROSS:  May I have a sidebar, Your Honor?

17             THE COURT:  You may not.

18             MS. CASTRO:  We just ask that he finish reading --

19             THE COURT:  You may not.

20             Read the other portion, please, that counsel has

21    asked for.

22    BY MR. NORINSBERG:

23    Q    Let's see, referring to the -- let me read the whole

24    thing.  Question: "Prior to that statement by Officer

25    Burbridge, had Mr. Marshall made any type of furtive

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

48

DIRECT - OFFICER RANDALL

1   movements?"

2           MS. GROSS:  Objection.

3           THE COURT:  Overruled.

4   BY MR. NORINSBERG:

5   Q   Answer:  "No.  He made furtive movements afterwards."

6           Question:  "Prior to the time that Officer Burbridge

7   made that statement, did Mr. Marshall make any type of furtive

8   movement?"

9           MS. GROSS:  Objection.

10  BY MR. NORINSBERG:

11  Q   Answer:  "No."

12          THE COURT:  Overruled.

13  BY MR. NORINSBERG:

14  Q   Would it be fair to say that before Officer Burbridge's

15  statement, you, yourself, felt that you didn't have grounds to

16  stop Mr. Marshall?

17  A   That's true.

18  Q   In fact, you felt that you didn't have probable cause to

19  stop him, right?

20  A   You don't need probable cause to stop someone.

21  Q   Referring to your deposition --

22  A   (Nods head affirmatively.)

23  Q   -- Page 42, line 22, question:  "Under what circumstances

24  can police officers make a stop, as far as you know?"

25          Answer:  "As far as I know, you need probable cause

LISA SCHMID, CCR, RMR   UNITED STATES DISTRICT COURT   EASTERN
DISTRICT OF NEW YORK

49
DIRECT - OFFICER RANDALL

1   to make a stop."

2        Do you recall giving that testimony, Officer?

3   A    That is incorrect.

4   Q    So again, the testimony that I've just quoted from your

5   deposition is incorrect?  Is that what you're telling us?

6   A    What I'm trying to say is, you don't need probably

7   cause --

8   Q    The answer is yes or no.  Is that what you're telling us?

9   A    What's the question?

10  Q    That your testimony, once again, that I have quoted from

11  is incorrect?

12  A    That's true.

13  Q    Will you will agree at your deposition, you were under

14  oath, correct?

15  A    I made a mistake.

16  Q    Now, when you saw Mr. Marshall walking, did you say

17  anything to him?

18  A    No.

19  Q    Did you say anything to your fellow officers about

20  Mr. Marshall?

21  A    No.

22  Q    Did you ever say to Mr. Marshall that he looked like he

23  was acting suspicious?

24  A    No.

25  Q    Did you ever say to Mr. Marshall he looked like he was

```
                                                                    50
              DIRECT - OFFICER RANDALL
```

1   nervous?

2   A    No.

3   Q    Did you ever say that, "Hey, I think we ought to stop

4   this guy?"

5   A    I didn't say that, no.

6   Q    And when Officer Burbridge suggested to you that he

7   should stop him, you didn't say anything in response, did you?

8   A    No.

9   Q    In fact, you didn't ask Officer Burbridge any questions,

10  right?

11  A    No.

12  Q    Now, the vehicle that you were in made a right turn onto

13  Park Street, is that correct?

14  A    Incorrect.  Made a left turn.

15  Q    Did you not go down a one-way street from Broadway?

16  A    That is correct.

17  Q    It is your testimony you actually turned left?

18  A    That is correct.

19  Q    Would you agree that it took one second or less from the

20  time Mr. Burbridge made the statement to the time when you

21  actually turned onto Park Street?

22  A    That's correct.

23  Q    And you would agree that Park Street is a one-way street,

24  right?

25  A    Yes.

DIRECT - OFFICER RANDALL

51

1   Q    Traffic flows in opposite direction of the way you had

2   turned your vehicle into the street, correct?

3   A    That is correct.

4   Q    So the police vehicle is going one way, going the wrong

5   way down a one-way street, right?

6   A    Yes.

7   Q    Would you also agree that it was under three seconds from

8   the time of the turn until when Mr. Burbridge first spoke to

9   Mr. Marshall?

10  A    Yes.

11  Q    And you had previously testified that what happened was

12  is that Mister -- that Officer Burbridge approached Mr.

13  Marshall and asked him whether he could please have a minute

14  of his time, is that correct?

15  A    Something to that effect, yes.

16  Q    And that is very polite and respectful when he did that,

17  right?

18  A    Yes.

19  Q    So he rolled up to him and said, sir, may I please have a

20  moment of your time?

21  A    That's correct.

22  Q    That's correct?

23  A    Yes, sir.

24  Q    And then it's your testimony that at that moment in time,

25  Mr. Marshall stepped backwards, right?

                                                                52
                    DIRECT - OFFICER RANDALL

1   A    (Pausing.) Yes.

2   Q    You were hesitating a little when you answered that.  Do

3   you not remember, Officer?

4   A    It was a little of a lateral and a backwards step.  I

5   could demonstrate, if you want.

6   Q    Did Mr. Marshall take a step behind the other individual?

7   Yes, he did or no, he didn't?

8   A    Sure.  Yes.

9   Q    He took a -- so he took a step -- if he's here on the

10  street, he took a step backwards, correct?

11  A    Wrong.

12  Q    Referring to your deposition, page 54, line 17, question,

13  "You testified Mr. Marshall took a step backwards when the --

14  behind the other individual, is that correct?"

15  A    That is correct.

16  Q    Answer: "Yes."

17        Do you recall testifying at your deposition that, in

18  fact, you saw Mr. Marshall take a step backwards?

19  A    He took a step backwards, but he was walking the opposite

20  way.  He was walking to the left.

21  Q    He took a step behind the other individual, according to

22  your testimony, right?

23  A    Right.  But what you just displayed wasn't how it

24  happened.  That's why I said no.  The street wasn't in front

25  of him.

53
DIRECT - OFFICER RANDALL

1   Q    Would you agree he took a step behind the other

2   individual?

3   A    Yes.

4   Q    So you would agree that's different than having the other

5   individual stop and Mr. Marshall continues walking in front of

6   you him.  Would you agree that's difference?

7   A    Yes.

8   Q    So your version is behind, but you're aware of the fact

9   that Officer Burbridge saw him actually walking ahead of the

10  other individual.  You're aware of that, right?

11  A    I don't know if that's right or not.

12  Q    Now, this is when you claim that you saw Mr. Marshall

13  remove his gun, is that correct?

14  A    That's correct.

15  Q    And can you tell the members of the jury before he

16  actually moved removed his gun, how many steps backwards did

17  Mr. Marshall actually take?

18  A    One.

19  Q    Referring to your deposition, page 37, line 13, question,

20  "Was it one step or more than one step?"

21          Answer:  "I don't remember."

22          Page 54, line 21, question:  "How many steps back

23  did he take?"

24          Answer:  "I don't remember."

25          Do you recall giving that testimony at your

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

```
                                                                54
                      DIRECT - OFFICER RANDALL

 1   deposition?

 2   A    Yes.

 3   Q    So at your deposition, you couldn't remember how many

 4   steps back Mr. Marshall supposedly took, true?

 5   A    That's right.

 6   Q    But you're now here today, you told us he only took one

 7   step, is that correct?

 8   A    Yes.

 9   Q    Is your memory better here today than it was a year ago

10   when you gave that sworn testimony?

11   A    I've thought about it a lot since then, yeah.

12   Q    So this case has been on your mind a lot, is that right?

13   A    Absolutely.

14   Q    You testified over a year ago -- about a year ago, is

15   that right?

16   A    Yes.

17   Q    When did you first realize that it was -- you actually

18   remembered it was only one step and not several steps back?

19   A    Somewhere in between that year ago and today.  I don't

20   know exactly.

21   Q    Now, was the step straight back or was it diagonal or in

22   some other direction?

23   A    It was a step backwards and a little closer.  So it was

24   like a step back and a little diagonal at the same time.

25   Q    Referring to your deposition, page 37, line 16, "Was the
```

55

DIRECT - OFFICER RANDALL

1   question, question, "Was the step straight back, was it

2   diagonal or in some other direction?"

3       Answer:  "I don't remember those details. He stepped

4   behind him, where the other individual was positioned in front

5   of him."

6       Do you recall being asked that question and giving

7   that answer at your deposition?

8   A   Yes.

9   Q   So once again, at your deposition, you did not remember

10  those specific details, correct?

11  A   That is correct.

12  Q   Is your memory better here today, now?

13  A   I just said that, yes.

14  Q   Did Mr. Marshall lead with his right leg or his left leg?

15  A   I don't know.  I don't remember.

16  Q   But you do remember that the other individual, Mr. Meade,

17  was in front of him, right?

18  A   At the time he pulled the gun, yes.

19  Q   And that's when you saw him pull the gun, right?

20  A   That's correct.

21  Q   And then you charged Mr. Marshall with possession of a

22  firearm, true?

23  A   Yes.

24  Q   But you never actually saw Mr. Marshall in physical

25  possession of a firearm, did you? Yes or no?

```
                                                              56
                DIRECT - OFFICER RANDALL

 1   A    Yes.

 2   Q    Referring to your deposition, page 58, line 20, question,

 3   "You never saw the object in Mr. Marshall's actual physical

 4   possession, is that correct?"

 5             Answer:  "That is correct."

 6             Do you recall being asked that question and giving

 7   that answer at your deposition?

 8   A    Yes, I do.

 9   Q    According to your sworn testimony at the deposition, you

10   never saw Mr. Marshall in actual physical possession of that

11   gun, true?  Yes, sir or no, sir?  Is that true?

12   A    True, with explanation.

13   Q    That's what you answered at your deposition.  You said

14   that is correct?

15   A    Right.

16   Q    Now, after this incident, you also testified before the

17   grand jury, correct?

18   A    That's correct.

19   Q    And when you testified before the grand jury, you

20   understood it was important that you be completely honest and

21   truthful, right?

22   A    Yes.

23   Q    You knew that your testimony from that grand jury could

24   send this man to jail, right?

25   A    Yes.
```

57
DIRECT - OFFICER RANDALL

1   Q    You knew that your testimony from that grand jury could

2   send him away for five years, correct?

3          MS. GROSS:  Objection.

4   A    No.

5   BY MR. NORINSBERG:

6   Q    But you knew that he would be facing serious felony

7   charges, right?

8   A    Yes.

9   Q    Now, when you testified before the grand jury, you told

10  the grand jury that you actually saw Mr. Marshall pull out a

11  firearm from his waistband, is that right?

12  A    Yes.

13  Q    But in fact, you never actually saw Mr. Marshall remove

14  any object from his waistband, did you?  Yes or no?

15  A    Yes, I did.

16  Q    Referring to your deposition once again, page 33, line

17  six, question:  "The object that you saw him pull out of his

18  pants?"

19          Answer:  "I didn't see the object as he pulled it

20  out of his pants."

21          Do you recall being asked that question and giving

22  that answer?

23  A    Yes, I do.

24  Q    So you actually interrupted the question at the

25  deposition and made it clear that, quote, I didn't see the

```
                                                                58
                    DIRECT - OFFICER RANDALL

1   object as he pulled it out of his pants, right?

2   A    I didn't interrupt any questions.

3   Q    You answered that instead, quote, I didn't see the object

4   as he pulled it out of his pants, right?

5   A    Like I said, with an explanation.

6   Q    Would you agree --

7             MS. GROSS:  Objection.  May the witness continue to

8   --

9             THE COURT:  Have you finished your answer?

10            THE WITNESS:  No.

11            THE COURT:  You may finish.

12            THE WITNESS:  What I'm trying to say was, I saw him

13  pull the gun out of his pants and throw it in the street, but

14  because he was behind Meade, I couldn't actually see the gun

15  itself.

16            But I saw the motion.  I saw him throw the gun.  I

17  heard the clink when it hit the ground. I got out the car,

18  looked at the spot and saw the gun.  When you put all the

19  pieces of the puzzle together, yes, I saw him pull the gun out

20  and throw it in the street.

21  Q    He was behind you?  Is that what you're telling us now?

22  A    No.  I said he was behind Mr. Meade.

23  Q    He was behind Mr. Meade and that's why you didn't see

24  him?

25  A    Yes.  That's why I didn't physically see the gun in his
```

LISA SCHMID, CCR, RMR   UNITED STATES DISTRICT COURT   EASTERN
DISTRICT OF NEW YORK

59
DIRECT - OFFICER RANDALL

1   hand. I saw him pull it out.

2   Q   You told the grand jury that you personally saw Mr.

3   Marshall remove an object in his waist. True or not true?

4   A   That's true.

5   Q   But in fact, you didn't see any part of a gun at this

6   moment in time, did you?

7   A   At what moment in time?

8   Q   When you claimed you saw him remove it?

9   A   No. I saw him pull a gun out of his pants.

10  Q   Referring to your deposition, page 106, line ten,

11  question: "Did you visually see any part of that object at

12  that moment in time?"

13          Answer: "No."

14          Do you recall being asked that question and giving

15  that answer at your deposition?

16  A   Yes, sir. That's correct.

17  Q   So according to your deposition testimony, you didn't see

18  any part of the object at that time, true?

19  A   As he was pulling it out, I couldn't see it, no.

20  Q   Now, as the arresting officer you filled out certain

21  reports in connection with this incident, correct?

22  A   That's correct.

23  Q   And one of the reports you filled out is an arrest

24  report, true?

25  A   Yes.

60
DIRECT - OFFICER RANDALL

1        MR. NORINSBERG:  May I approach the witness, Your

2   Honor?

3            THE COURT:  You may.  You don't have to ask.

4            MR. NORINSBERG:  (Nods head affirmatively.)

5   BY MR. NORINSBERG:

6   Q    (Approaching.)  I would like to you show you what's been

7   marked as Plaintiff's 6 for identification. (Handing.)

8   A    (Peruses document.)

9   Q    Do you recognize that document?

10  A    Yes.

11  Q    Do you recognize it as your arrest report?

12  A    Yes.

13  Q    And you, yourself, actually prepared that arrest report,

14  is that correct?

15  A    I might have.

16  Q    Referring to your deposition, page 114, line five,

17  question:  "Did you prepare this arrest report?"

18            Answer:  "Yes."

19            Do you recall giving that testimony?

20  A    No.

21  Q    Okay.  But you agree that at your deposition, you said

22  that you were the one that actually prepared the report, true?

23  A    I agree that I at least reviewed it.

24  Q    You said you prepared the report, true?

25  A    I don't know.

```
                                                          61
                    DIRECT - OFFICER RANDALL
 1   Q    Referring to your deposition testimony again, line 114 --
 2   page 114, line five: "Did you prepare this arrest report?"
 3            Answer: "Yes."
 4            You didn't say you might have prepared it.  You
 5   didn't say it's possible you reviewed it.  You said you
 6   prepared it, true?
 7   A    Okay.  Yes.
 8   Q    And can you --
 9            MR. NORINSBERG:  I'd like to offer the arrest report
10   into evidence, Your Honor.
11            THE COURT:  Yes.  Admitted.
12            MR. NORINSBERG:  Yes.  I would like to now show a
13   blowup of this exhibit, 6A, same exhibit.
14            Can you see it, Your Honor.
15            THE COURT:  I'll move so, I can see it better.
16            Next time, let's try to put it in front of the all
17   the jurors.
18            Can all of you see that?
19            Move it up, so everybody can see.
20            THE COURT:  (Sits in the jury box.)
21            THE COURT:  All right.  Go ahead.
22   BY MR. NORINSBERG:
23   Q    Now, you recognize this as a blowup of your same arrest
24   report?
25   A    Yes.
```

DIRECT - OFFICER RANDALL

1   Q    Can you please tell this jury, did you mention anything

2   on your arrest report about seeing Mr. Marshall reaching into

3   his waistband?

4   A    No.

5   Q    Now, you also claim you saw Mr. Marshall toss the object,

6   right?

7   A    Yes.

8   Q    And you told the grand jury you personally observed him

9   throwing the object, right?

10  A    Yes.

11  Q    Can you tell the members of this jury, did you mention

12  anything on your report about seeing Mr. Marshall toss an

13  object?

14  A    No.

15  Q    Now, you would agree that those are important facts,

16  aren't they, Officer Randall?

17  A    Yes.

18  Q    In fact, you would agree they're very important facts?

19  A    Yes.

20  Q    And yet, none of those very important facts are in your

21  arrest report, are they?

22  A    No.

23  Q    And the highlighted section we have here is the detailed

24  section of the report, right?

25  A    Yes.

63

DIRECT - OFFICER RANDALL

1  Q    That gives you a chance to put in the specific details
2  about what led up to the arrest, right?
3  A    Yes.
4  Q    But you didn't do that, did you?
5  A    No.
6  Q    Can you please tell this jury why didn't you mention
7  anything about seeing Mr. Marshall reaching into his waistband
8  on your arrest report?
9  A    Because on an arrest report like this, we don't write
10 those kind of fine details.  We give a general explanation of
11 what happened.  And then later on, we talk to the DA, and then
12 we give them the details.
13 Q    Referring to your deposition, page 120, line 11,
14 question:  "Why didn't you mention that fact on your arrest
15 report?"
16        Answer:  "No particular reason."
17        Do you recall giving that testimony in your
18 deposition?
19 A    Yes.
20 Q    So you didn't mention the explanation you just gave to
21 your jury -- to the jury here, and you never mentioned that in
22 your deposition, did you?
23 A    No.
24 Q    You said there was, quote, no particular reason, right?
25 A    (Nods head affirmatively.)  Yes.

64
DIRECT - OFFICER RANDALL

1   Q    And in fact, you also said there was no particular reason

2   why you didn't mention seeing the gun tossed, right?

3   A    Yes.

4   Q    Would you agree that the purpose of the detailed section

5   is to give an account of the arrest?

6   A    Yes.

7   Q    But you didn't do that here, did you?  Yes or no?

8   A    No, I didn't, but that's because --

9   Q    I didn't ask you why because.  You didn't do it, did you?

10  A    No.

11       MS. GROSS:  Objection, Your Honor.  Your Honor,

12  might the witness be allowed to answer question?

13       THE COURT:  You may continue your answer.

14  A    The reason why I told you at the disposition (sic) no

15  particular reason, I'm not trying to hid anything.  I just

16  didn't write it down.  In general, that's not what we do.

17  Write one sentence or two, then that's it.  We give the rest

18  to the DA when we talk to them on the phone.

19  Q    And you also filled out another document a memo book

20  entry, is that correct?

21  A    That's correct.

22  Q    And your memo book entry is something that contains an

23  entry for this incident, is that correct?

24  A    Yes.

25  Q    I would like to show you Plaintiff's 1.  (Handing.)  Can

```
                                                            65
                    DIRECT - OFFICER RANDALL

 1   you please take a look at that document?

 2   A     (Peruses document.)

 3   Q     Do you recognize that document?

 4   A     Yes, I do.

 5   Q     Do you recognize your handwriting on that document?

 6   A     Yes.

 7   Q     Can we agree that you, yourself, were the one that

 8   prepared this document?

 9   A     Yes.

10         MR. NORINSBERG:   ^I would offer the memo box entry

11   in evidence.

12         THE COURT:  Admitted.

13   BY MR. NORINSBERG:

14   Q     In your memo book entry for this incident, did you

15   mention anything at all about seeing Mr. Marshall reach into

16   his waistband?

17   A     No.

18   Q     Yes or no?  The answer is no, correct?

19   A     Yes.

20   Q     Did you mention anything at all about this seeing Mr.

21   Marshall toss an object?

22   A     No.

23   Q     Would you agree that those are very important facts?

24   A     Yes.

25   Q     Can you tell the members of the jury why didn't you
```

66
DIRECT - OFFICER RANDALL

1   mention anything in your memo book about seeing Mr. Marshall

2   reach into his waistband?

3   A    Because just like the complaint report, I'm OMNI form,

4   arrest report, you write one or two sentences and give the

5   rest to the ADA.

6   Q    Referring to your deposition, page 81, line 21, question,

7   "Why didn't you mention that in your memo book?"

8          Answer:  "I don't know."

9          Do you recall being asked that question and giving

10  that answer at your deposition?

11  A    Yes, I do.

12  Q    So at your deposition, you testified that you didn't know

13  the reason why you hadn't mentioned anything in your memo

14  book, correct?

15  A    That's correct.

16  Q    But here today, now you have given us a reason why, is

17  that true?

18  A    Yes.  But at the disposition (sic), it was a totally

19  different situation than now.

20  Q    You were also asked at your deposition -- strike that.

21         You understood that when you testified at that

22  deposition, you were testifying under oath, correct?

23  A    Oh, definitely.

24  Q    You understood when you testified at that deposition that

25  it was under penalty of perjury, correct?

67
DIRECT - OFFICER RANDALL

1   A    Yes.

2   Q    You knew you were obligated to give the truth, the whole

3   truth and nothing but the truth, correct?

4   A    Yes.

5   Q    Now, you were also asked at your deposition why you never

6   mentioned anything about tossing the gun in your memo book, is

7   that correct?

8   A    Yes.

9   Q    Once again, you had no explanation, did you?

10  A    No.

11  Q    You agree, correct?

12  A    Yes.

13  Q    Now, Officer Randall, you retrieved -- you received

14  training from the police academy as to the types of

15  information that should be put in the memo book, correct?

16  A    Yes.

17  Q    You received training as to what was supposed to be put

18  in the memo book, right?

19  A    Yes.

20  Q    The training consists of lectures and reading materials,

21  correct?

22  A    Yes.

23  Q    According to that training, you were supposed to record

24  activities that occurred during your tour, true?

25  A    True.

68

DIRECT - OFFICER RANDALL

1    Q    Now, at the time of your deposition, you testified that

2    you didn't even know what the purpose was of making a memo

3    book entry, right?

4    A    Is that a question or you're telling me?

5    Q    Did you testify at your deposition that you didn't even

6    know the reason why -- what a memo book is for, what the

7    purpose of make an entry is for?

8    A    I don't remember.

9    Q    Referring to your deposition, page 80, line eight,

10   question --

11           THE COURT:  Take this down.  Take this down.  It's

12   not being used.  I can't see the jury, please.  Fold it to the

13   side.

14           MR. NORINSBERG:  We have one other blowup we're

15   going to use in a minute.  Perhaps we can leave these --

16           THE COURT:  All right.  Then leave it there for the

17   moment.  Take the sign off.

18           MR. COHEN:  (Complies.)

19           THE COURT:  Thank you.

20   BY MR. NORINSBERG:

21   Q    Question -- page 80, line eight, question:  "What is the

22   purpose of making a memo book entry?"

23           Answer:  "I don't know."

24           Do you recall being asked that question and giving

25   that answer at your deposition?

69

DIRECT - OFFICER RANDALL

1    A    Yes.

2    Q    At the time of your deposition, you were a police officer

3    for eight years, correct?

4    A    Yes.

5    Q    So it's your sworn testimony at that deposition that you

6    didn't know what the purpose was of making a memo book entry,

7    right?  Is that your testimony?

8    A    There's an explanation for that, too.

9    Q    There's an explanation for a lot of things you said here

10    today, right, Officer?

11    A    Yes.

12         MS. GROSS:  Objection; argumentative.

13         THE COURT:  Sustained.  Strike that.

14    BY MR. NORINSBERG:

15    Q    Now, Officer you're familiar with what's known as --

16         MS. GROSS:  Objection, Your Honor.  The witness said

17    there's an explanation.  I'd like him to be permitted to

18    answer the question.

19         THE COURT:  No.  It was stricken at your request.

20    BY MR. NORINSBERG:

21    Q    Now, Officer, you're familiar with what's known as a

22    complaint report, correct?

23    A    Yes.

24    Q    A complaint report is a report of a crime that's being

25    committed, is that correct?

                                                              70
                    DIRECT - OFFICER RANDALL

1    A    Yes.

2    Q    I would like to show you has been marked as Plaintiff's

3    16.   (Handing.)  Do you recognize this document?

4    A    (Peruses document.)  Yes.

5    Q    What do you recognize that document to be?

6    A    This is a complaint report from the incident.

7    Q    You prepared the complaint report in the case, correct?

8    A    I at least -- I don't know if I did it myself, but I

9    definitely signed off on it, so.

10   Q    Referring to your deposition, page 116, line six,

11   question:  "What else did you do during the six hours of

12   overtime?"

13         Answer:  "I did the complaint report."

14         Do you recall being asked that question and giving

15   that answer?

16   A    Sir, it's a three-man team.

17   Q    Would you agree that at your deposition, you said that

18   you were the one that prepared the very report that I just

19   showed you, that is sitting in front of you?

20   A    Yes.

21         MR. NORINSBERG:  I offer the complaint report into

22   evidence.

23         THE COURT:  Admitted.

24         MR. COHEN:  Your Honor, at this time, I'll put this

25   here.  (Publishes exhibit.)

71
DIRECT - OFFICER RANDALL

BY MR. NORINSBERG:

Q    Now, do you recognize this to be a blowup of the
complaint report that you prepared (indicating)?

A    (Examines document.)  Yes.

Q    Once again, you never mentioned anything about seeing Mr.
Marshall reach into his pants and pull out a gun, is that
correct?

A    Yes.

Q    So if I understand your testimony correctly, you prepared
an arrest report.  You prepared a memo book entry.  You
prepared a complaint report.  And yet none of those documents
have any mention about seeing Mr. Marshall pull out a gun and
toss it, true?

A    True.

Q    Or not true?

A    That is true, sir.

        MR. NORINSBERG:  I'm done with that?

        MR. COHEN:   (Removes exhibit from easel.)

BY MR. NORINSBERG:

Q    Now, apart from testifying before the grand jury, you
actually spoke to members of the Brooklyn DA's office
regarding this arrest, is that correct?

A    Yes.

Q    And you specifically told them that you saw Mr. Marshall
in possession of this firearm, right?

72
DIRECT - OFFICER RANDALL

1   A     Yes.

2   Q     Now, I would like to show you Plaintiff's Exhibit 17.

3   (Handing.)

4   A     (Peruses document.)

5   Q     Do you recognize that document?

6   A     Yes.

7   Q     That's the criminal complaint based on the statement that

8   you gave, is that correct?

9   A     Yes.

10          MR. NORINSBERG:   ^I offer that complaint and report

11  into -- criminal complaint into evidence.

12          THE COURT:   No objection?   Admitted.

13          MS. GROSS:   Objection.

14          THE COURT:   Now you're objecting?

15          MS. GROSS:   (No response.)

16          THE COURT:   Are you objecting?

17          MS. GROSS:   We are, Your Honor.

18          THE COURT:   On what grounds?

19          MS. GROSS:   The witness didn't sign this document.

20          THE COURT:   On hearsay grounds?

21          MS. GROSS:   Yes.

22          THE COURT:   All right.   You'll have to brief it.

23  I'll hold it in abeyance.

24  BY MR. NORINSBERG:

25  Q     We can agree that to the extent there are any statements

73
DIRECT - OFFICER RANDALL

1   that refer to statements from Officer Randall, those were

2   statements that you, yourself, gave to the DA's office, true?

3   A    I'm sorry. Repeat that?

4   Q    To the extent that there's any mention of statements from

5   Officer Randall on this report, those statements came from

6   you, true?

7   A    Yes.

8        MR. NORINSBERG:   ^And again, I offer the documents

9   as evidence.

10       THE COURT:   Admitted.

11  BY MR. NORINSBERG:

12  Q    Now, you told the prosecutors in the Brooklyn DA's office

13  that you saw Mr. Marshall in physical possession of this gun,

14  right?

15  A    Yes.

16  Q    But in fact, you never saw Mr. Marshall in actual

17  physical possession of this gun, true?

18  A    Incorrect.

19  Q    Referring to your deposition, page 58, line 20, question:

20  "You never saw the object in Mr. Marshall's actual physical

21  possession, correct?"

22       Answer:  "That is correct."

23       Do you recall being asked that question and giving

24  that answer?

25  A    Yes.

74
DIRECT - OFFICER RANDALL

1   Q    So according to your deposition testimony, you never saw
2   the object in Mr. Marshall's actual physical possession, true?
3   A    I'm sorry.  One more time?
4   Q    According to your sworn deposition testimony, you never
5   saw the gun in Mr. Marshall's actual physical possession,
6   true?
7   A    Yes.  Like I explained before --
8   Q    Is that true or not true?
9   A    Yes.
10        MS. GROSS:  Objection.  Objection, Your Honor.
11        THE COURT:  You may continue your answer.
12   A    The reason why I say there's a play on words is because
13   the whole time I've said the same thing:  I saw Mr. Marshall
14   pull a gun out of his pants, take it, and toss it into the
15   street, while standing behind Mr. Meade.  And while --
16   Q    Okay.  I'm sorry.  Continue.
17   A    While he was behind Mr. Meade, yes, part of my view was
18   blocked, so I never saw actually had my eye balls on the gun
19   as he threw it.
20        But he pulled it out, threw it on the curb.  I went
21   towards -- I heard the clink on the curb, on the sidewalk --
22   I'm sorry, on the street -- saw the gun, and it was obvious
23   that he had pulled that gun out and threw it.  So I did see
24   him take a gun and throw it on the ground.  I just never
25   actually -- I wasn't -- I didn't see the gun as he was pulling

```
                                                                75
                    DIRECT - OFFICER RANDALL

 1   it out.

 2   Q    So if I understand your testimony, though, you have been

 3   consistent all along.  That's what you told everybody, right?

 4   A    Absolutely.

 5   Q    You told that to to Brooklyn DA's office, right?

 6   A    Yes.

 7   Q    But then you met with another prosecuting attorney,

 8   didn't you?

 9   A    I don't remember who.

10   Q    Do you recall telling another prosecuting attorney named

11   Judy Phillips that you never actually saw Mr. Marshall with

12   this gun?

13          MS. GROSS:  Objection.  Objection, Your Honor.

14   A    No, I said the same thing all along.

15   BY MR. NORINSBERG:

16   Q    Do you recall -- you don't recall making that statement,

17   its that your testimony?

18   A    I never said that.  I said what I just told you.

19   Q    I would like to show you Plaintiff's Exhibit 5 for

20   identification.  (Handing.)

21   A    (Peruses document.)

22   Q    I'm going to direct --

23          MS. GROSS:  Objection, Your Honor.

24   Q    -- your attention to one particular sentence here.

25          MS. GROSS:  Your Honor, I object.
```

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

DIRECT - OFFICER RANDALL

76

1        THE COURT:  Object to what?

2        MS. GROSS:  I object to the use of this document,

3    Your Honor.  This is not being used to refresh.

4        MR. NORINSBERG:  I'm about to refresh.

5        THE COURT:  I'm going to allow the examination to

6    continue up to this point.  When something objectionable

7    happens, you may object.

8        MS. GROSS:  Your Honor, as I understand, the witness

9    doesn't -- his recollection doesn't needs refreshing on this

10   point.  He answered the question.

11       THE COURT:  He will tell us that, not you.  Sit

12   down, counsel.

13   BY MR. NORINSBERG:

14   Q    Sir, looking at the part of that document that I just

15   circled, does that refresh your memory that, in fact, you told

16   the another prosecuting attorney --

17       MS. GROSS:  Objection.

18   BY MR. NORINSBERG:

19   Q    -- named Judy Phillips that you never saw Mr. Marshall in

20   possession of this gun?

21       MS. GROSS:  Objection, Your Honor.

22   BY MR. NORINSBERG:

23   Q    Does that refresh your memory, yes or no?

24       THE COURT:  Counsel, I overruled your objection.

25   A    No.

77

DIRECT - OFFICER RANDALL

1    THE COURT:  You may continue.

2    BY MR. NORINSBERG:

3    Q    Now, you're familiar with the Gun Enhancement Unit of the

4    New York City Police Department?

5    A    Yes.

6    Q    And you met with members of the Gun Enhancement Unit at

7    some point after this arrest, true?

8    A    I might have spoken on the phone, but I did speak to

9    them.

10   Q    Do you recall telling members of the Gun Enhancement Unit

11   that you never actually saw Mr. Marshall in possession of this

12   gun?

13   A    I recall telling them that I saw him take a gun out of

14   his pants and throw it in the street.

15   Q    Referring to your deposition, page 59, line 25, question:

16   "Did you ever tell the members of the Gun Enhancement Unit

17   that you did not observe Mr. Marshall in possession of any

18   gun?"

19          Answer:  "I can't remember."

20          Do you recall giving that testimony?

21   A    Yes.

22   Q    In that your deposition, you couldn't remember.  And in

23   fact, you made that statement to the members of the Gun

24   Enhancement Unit, correct?

25   A    That's not what I meant, though.  What I was trying to

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

78
DIRECT - OFFICER RANDALL

1   say was ---

2   Q    I just asked you whether you gave that testimony, sir.

3            MS. GROSS:  Objection.

4   A    Yes.

5   BY MR. NORINSBERG:

6   Q    And as you sit here today, would you agree that you might

7   well have told a member of the Gun Enhancement Unit that you

8   never observed Marshall in possession of a gun?

9   A    No.

10  Q    Referring to your deposition, question -- page 60, line

11  13, question:  "As you sit here today, can you rule out the

12  possibility that you made that statement?"

13           Answer:  "Well, since I don't remember, it may or

14  may not be true."

15           Do you recall giving that testimony?

16  A    Yes.

17  Q    So at your deposition you would agree that it may be true

18  that you made that statement, but you couldn't remember,

19  right?

20  A    What I'm trying to say is --

21  Q    Was that your testimony, deposition testimony?

22  A    Yes.

23  Q    You reviewed that deposition before coming in here today,

24  right?

25  A    Yes.

```
                                                                    79
                    DIRECT - OFFICER RANDALL

 1   Q    You reviewed it very carefully, right?

 2   A    Yes.

 3   Q    Now, going back to your first meeting with the prosecutor

 4   in the Brooklyn DA's office, you understood that the

 5   statements that you made to that DA were very important?

 6   A    Yes.

 7   Q    You understood that whatever information you provided

 8   that district attorney could result in a prosecution of felony

 9   charges for Mr. Marshall, correct?

10   A    Yes.

11   Q    Now, you told us earlier that you were the arresting

12   officer in this case, right?

13   A    Yes.

14   Q    Yet it was Officer Burbridge who first pointed out

15   Mr. Marshall, right?

16   A    Yes.

17   Q    It was Officer Burbridge who decided to stop Mr.

18   Marshall, right?

19   A    Yes.

20   Q    It was Officer Burbridge who actually questioned Mr.

21   Marshall, right?

22   A    Yes.

23   Q    It was Officer Burbridge who found the gun, right?

24   A    Yes.

25   Q    Officer Randall, can you tell the members of this jury,
```

80
DIRECT - OFFICER RANDALL

1  can you think of any reason at all why you were the arresting

2  officer in this case?

3  A    Yes.

4  Q    Referring to your deposition, page 58, line four,

5  question:  "As you sit here today, can you think of any reason

6  why you were the arresting officer in this case?"

7         Answer:  "No."

8         Do you recall giving that testimony at your

9  deposition?

10 A    Yes, I do.

11 Q    So at your deposition, you couldn't think of any reason

12 at all why you were the actual arresting officer, right?

13 A    Sir, at the disposition (sic) --

14 Q    Is that correct?

15 A    At the disposition (sic)?

16 Q    Is that correct, at your deposition?

17         MS. GROSS:  Objection.

18         THE WITNESS:  Can I explain?

19         THE COURT:  Well, answer the question yes or no if

20 you can, then --

21         THE WITNESS:  Yes.

22         THE COURT:  Then you may explain.

23         THE WITNESS:  I want to explain that at the

24 disposition (sic), the reason why ---

25 Q    Answer the question, yes or no?

LISA SCHMID, CCR, RMR   UNITED STATES DISTRICT COURT   EASTERN
DISTRICT OF NEW YORK

81
DIRECT - OFFICER RANDALL

1   A    Yes, sir.

2           THE COURT:   You may explain.

3   A    Yes, sir.   Yes.   At the disposition (sic), the reason

4   why --

5   BY MR. NORINSBERG:

6   Q    He answered the question.

7           MR. LOONAM:   He may explain.

8   A    The reason why I said that was, because to be honest with

9   you, there was no one there, even though I did have a lawyer,

10   to object.   I felt like I was being badgered and that you were

11   being unpleasant.   So I really wasn't thinking very well, as

12   opposed to today, this is different.

13   BY MR. NORINSBERG:

14   Q    So today, now, you feel like you can give clearer answers

15   than you could at the deposition, right?

16   A    Absolutely.

17   Q    You had a lawyer at the deposition, didn't you?

18   A    Even though he objected, he couldn't stop you from

19   continuing your line questioning, and you said whatever you

20   want.

21   Q    You had a lawyer named Steve Severedis, right?

22   A    Yes.

23   Q    He's was aggressively representing you at this

24   deposition, wasn't he?

25   A    He did his best.

82
DIRECT - OFFICER RANDALL

1   Q    He was making multiple objections, wasn't he?

2   A    They didn't do anything.

3           MS. GROSS:   Objection.

4   BY MR. NORINSBERG:

5   Q    Would you agree --

6           THE COURT:   Move to another point.

7   BY MR. NORINSBERG:

8   Q    -- that you have a discussion with your fellow officers

9   about who was going to take the arrest, right?

10  A    Yes.

11  Q    And can you tell us Officer Randall, what exactly was

12  said during this discussion?

13  A    I can't remember exactly, but I can tell you that the

14  result of the conversation was I was going to take it.

15  Q    So you're not sure what was said, but you knew you were

16  going to be the arresting officer, right?

17  A    I didn't know.  I found out after that conversation that

18  I would be the arresting officer.

19  Q    And that conversation took place at the scene, isn't that

20  true?

21  A    It might have been on the way back to the precinct.

22  Might have been in the precinct.

23  Q    You didn't remember?

24  A    I don't remember exactly.

25  Q    Now, would you agree that according to your memory book,

LISA SCHMID, CCR, RMR   UNITED STATES DISTRICT COURT   EASTERN
DISTRICT OF NEW YORK

DIRECT - OFFICER RANDALL

1    you didn't make any other stops that evening?

2    A    Yes.

3    Q    And would you agree that according to the memo book, you

4    didn't make any other arrests that evening, right?

5    A    Yes.

6    Q    Now, after the arrest you put in for overtime, is that

7    correct?

8    A    That is correct.

9        MS. GROSS: Objection.

10       MR. NORINSBERG: You put in for six hours --

11       THE COURT: I'll allow it.

12   BY MR. NORINSBERG:

13   Q    -- you put in for six hours of overtime, correct?

14   A    Yes.

15   Q    Now, this took you approximately just five minutes to get

16   to the precinct, right?

17   A    About.

18   Q    But then you were at the precinct for another six hours,

19   is that correct?

20   A    No.

21   Q    But you put in for six hours of overtime, right?

22   A    Yes.

23   Q    Now, going back to the point where you claim that you saw

24   Mr. Marshall remove out his gun, can you tell the jury where

25   exactly did he remove his gun from? Was it his right side in

84

DIRECT - OFFICER RANDALL

1   the front, his left side in the front or somewhere else?

2   A    I know it was in front of his waistband.

3   Q    Was it in his right or left side or somewhere else?

4   A    I don't remember.

5   Q    Did Mr. Marshall reach into his pants with his right hand

6   or his left hand?

7   A    Actually, I can't remember that, either.

8   Q    How large was the object that was pulled out his pants?

9   A    We know that the gun was about nine inches in length.

10  Q    At the time of your deposition, you didn't know, right?

11  A    No, I didn't know that yet.

12  Q    When you saw Mr. Marshall and Mr. Meade for the first

13  time, was Mr. Marshall walking closer to the buildings going

14  down Park Street or closer to the street?

15  A    Mr. Marshall was walking closer to the buildings.

16  Q    Referring to your deposition, page 31, line 22, question:

17  "Was Mr. Marshall walking closer to this street or closer to

18  the buildings on Park Street?"

19         Answer:  "I don't recall."

20         Do you recall giving that testimony?

21  A    Yes.

22  Q    But your memory is better here today than it was at the

23  deposition, is that correct?

24  A    Absolutely.

25  Q    Now, at the time when you made these observations, you

LISA SCHMID, CCR, RMR   UNITED STATES DISTRICT COURT   EASTERN
DISTRICT OF NEW YORK

85
DIRECT - OFFICER RANDALL

1  were inside of the police vehicle, is that correct?

2  A    That is correct.

3  Q    You were the back seat behind the driver, correct?

4  A    Yes.

5  Q    And you were somewhere between ten and 25 feet away from

6  where the gun was supposedly being removed, correct?

7  A    Yes.

8  Q    And it was dark out, right?

9  A    It was lit by street lamps.

10 Q    Referring to page 36e, line 23, question: "Was it dark

11 out at that time?"

12       Answer:  "Yes."

13       Page 37, line four, question:  "Where was the

14 closest light from where Mr. Marshall was standing?"

15       Answer:  "I can't recall."

16       MS. GROSS:  Objection, Your Honor.

17 BY MR. NORINSBERG:

18 Q    Do you recall being asked those questions and giving

19 those answers?

20       MS. GROSS:  Objection.

21 A    Yes.

22       THE COURT:  Excuse me.  Why?

23       MS. GROSS:  The objection is that he omitted part of

24 the questioning there, and it --

25       THE COURT:  Go ahead and read the whole thing,

DIRECT - OFFICER RANDALL

1   please.

2          MS. GROSS:  Lines 25 through three on the next page.

3          MR. NORINSBERG:  I'll read the whole thing again,

4   Your Honor, this is --

5   BY MR. NORINSBERG:

6   Q    Question, this is page 36, line 23, question:  "Was it

7   dark out at that time?"

8          Answer:  "Yes."

9          Question:  "Were there any lights on that street?"

10          Answer:  "Yes."

11          Question:  "Where was the closest lights from where

12   Mr. Marshall was standing?"

13          Answer:  "I can't recall."

14          Do you recall giving that testimony?

15   A    Yes.

16          THE COURT:  How much longer is your direct going to

17   take?

18          MR. NORINSBERG:  We're close to the end, Your Honor,

19   I mean --

20          THE COURT:  All right.  I want to take a break, but

21   we can -- I'd rather you finish.

22          MR. NORINSBERG:  I think it would make sense, we

23   could take a brief recess and then could I close out whatever

24   issues we haven't covered.

25          THE COURT:  All right.  Fine.

87

DIRECT - OFFICER RANDALL

1          Why don't you take a ten-minute break, ladies and

2    gentlemen?  Do not discuss the case.  Don't do any research of

3    your own.

4          (Jury exits.)

5          THE COURT:  All right.  Take ten minutes everyone,

6    please.

7          You can step down, sir.

8          (Witness steps off the stand.)

9          (Recess.)

10          (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

88
DIRECT - OFFICER RANDALL

1    (The jury entered.)

2            THE COURT:   Proceed, please.   Mr. Witness, will you

3    take the stand, please.

4    CONTINUED DIRECT EXAMINATION

5    MR. NORINSBERG:

6    Q    Good morning again, Officer Randall.

7    A    Hi.

8    Q    You told us earlier that Officer Burbridge retrieved the

9    gun, right?

10   A    Yes.

11   Q    And then, he handed it over to you, correct?

12   A    Yes.

13   Q    And then, you put it in a paper bag, right?

14   A    Yes.

15   Q    And the reason you put it into the paper bag was so that

16   no other officer would get any fingerprints on it, right?

17   A    Part of it, yes.

18   Q    Now, as a police officer, you know that somebody might

19   leave fingerprints on a gun, right?

20   A    Yes.

21   Q    So you want to do everything possible to preserve that

22   evidence, correct?

23   A    Yes.

24   Q    And one way of showing that this gun belonged to

25   Mr. Marshall would be to check for his fingerprints, true?

89
DIRECT - OFFICER RANDALL

1   A   Yes.

2   Q   If Mr. Marshall's fingerprints were on that gun, that

3   would be an important piece of evidence, right?

4   A   Yes.

5   Q   That would show conclusively that the gun belonged to

6   him, correct?

7   A   Yes.

8   Q   Now, when you were back at the precinct, you took

9   Mr. Marshall's fingerprints at the precinct, right?

10  A   Yes.

11  Q   So you have a set of his fingerprints to compare with any

12  prints that might be found on the gun, correct?

13  A   I don't do that, but it can be done.

14  Q   Now, as the arresting officer, you certainly would be

15  interested to know if Mr. Marshall's fingerprints were found

16  on that gun, right?

17  A   Yes.

18  Q   Were Mr. Marshall's fingerprints ever found on this gun?

19  A   No.

20  Q   Were Mr. Marshall's fingerprints ever found on the

21  cartridge inside the gun?

22  A   No.

23  Q   Now, as the arresting officer, did you ever actually

24  request that the fingerprints be lifted from this gun?

25  A   No.

LISA SCHMID, CCR, RMR   UNITED STATES DISTRICT COURT   EASTERN
DISTRICT OF NEW YORK

90

DIRECT - OFFICER RANDALL

1    Q    Referring to your deposition testimony, Page 64, Line 23,

2    "QUESTION:  Did you ever ask for fingerprints to be lifted

3    from this gun?

4              "ANSWER:  Yes."

5              Do you recall giving that testimony at your

6    deposition?

7    A    Yes, I do.

8    Q    So according to your deposition testimony, you actually

9    asked for fingerprints to be lifted, right?

10   A    I thought I did, yes.

11   Q    But, in fact, you didn't, correct?

12   A    That is true.

13   Q    I'd like to show you the complaint report again.  Now,

14   Officer, you have a copy of this same exhibit in front you; is

15   that correct?

16   A    I have the typed one.

17   Q    You have the typed one in front of you?

18   A    Right.

19   Q    I'm going to show you now what's been marked as

20   Plaintiff's Exhibit 2 for identification.  If you could, take

21   a look at it.  (Handing.)

22   A    Okay.

23   Q    Is that the handwritten version of the same document,

24   Officer?

25   A    Yes.

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

91
DIRECT - OFFICER RANDALL

1    Q    It's the same document we're looking at here?

2    A    Yes.

3            MR. NORINSBERG:  I offer the handwritten version

4    into evidence, as well.

5            THE COURT:  Any objection?  Admitted.

6            MS. CASTRO:  Your Honor, what exhibit number is it?

7    Because Plaintiff's two, according to our records, was

8    Plaintiff's Exhibit 16, which is not a handwritten version.

9            THE COURT:  Show it to counsel.

10           MR. NORINSBERG:  We previously offered 16 into

11   evidence, and this is the handwritten version of 16 which is

12   marked separately as Exhibit 2.

13           THE COURT:  All right.

14           MR. NORINSBERG:  So I've offered two into evidence?

15           THE COURT:  Yes, it's admitted.

16           (Plaintiff's Exhibit 2 was marked in evidence, as of

17   this date.)

18   BY MR. NORINSBERG

19   Q    Now, Officer Randall, on this complaint report, there is

20   a section on the report that actually specifically says

21   "prints requested"; is that correct?

22   A    Yes.

23   Q    And then, there's a box to say yes, they were requested

24   or no, they were not requested, right?

25   A    Yes.

LISA SCHMID, CCR, RMR   UNITED STATES DISTRICT COURT   EASTERN
DISTRICT OF NEW YORK

92
DIRECT - OFFICER RANDALL

1    Q    You've checked the box "no"; is that correct?

2    A    No.

3    Q    You testified earlier that you were the one that prepared

4    the complaint report, correct?

5    A    I reviewed it.

6    Q    Okay.  So your testimony is that you checked that box

7    "no," or is it that somebody else did?

8    A    It was a clerical error.

9    Q    It was a mistake?

10   A    Yes.

11   Q    According to this document, you did not request

12   fingerprints; true or not true?

13   A    That is true.

14   Q    And according to the typewritten version of this

15   document, there's the same section that appears; prints

16   requested or not requested, correct?

17   A    Yes.

18   Q    And on that document also, there's a "yes" and "no" box,

19   correct?

20   A    Yes.

21   Q    And on that box -- on that document as well, the "no" box

22   is checked, correct?

23   A    Correct.

24   Q    So two of these documents have the same option.  And on

25   both documents, you did not request fingerprints to be tested;

93

DIRECT - OFFICER RANDALL

1   true or not true?

2   A   Well, first you write one out.  And then, you read off

3   the first one while you type onto the printed one.  So if I

4   checked "no" here, I would probably also check "no" on the

5   computer also.

6   Q   Can we agree that according to the complaint report, no

7   request for fingerprints was ever made by you?

8   A   We can agree, yes.

9   Q   Officer Randall, can you please tell this jury, can you

10  think of any reason at all why fingerprints would not have

11  been requested in this case?

12  A   Not at all.

13         MS. GROSS:  Objection.

14  BY MR. NORINSBERG

15  Q   You cannot think of a reason?

16         THE COURT:  Excuse me.  If you're going to make an

17  objection to a question, you have to make it before the

18  witness answers.

19         MS. GROSS:  Yes, your Honor.

20         THE COURT:  So in the future, please stand, and the

21  witness will not answer, and I can rule.  Since the question

22  has now been answered, we'll let it stand.  Proceed.

23  BY MR. NORINSBERG

24  Q   So to be clear about your testimony, you cannot think of

25  any reason why fingerprints wouldn't have been requested,

94
DIRECT - OFFICER RANDALL

1  true?

2  A    That's true.

3  Q    In fact, you were specifically told by your supervisors

4  to get prints for every gun arrest, correct?

5            THE COURT:  Excuse me, take this down.

6            MS. GROSS:  Objection.

7            THE COURT:  Overruled.

8            THE WITNESS:  That is correct, sir.

9  BY MR. NORINSBERG

10  Q    But that was not done in this case according to your

11  complaint report, true?

12  A    Yes.

13  Q    Now, you told us earlier that you were as many as 25 feet

14  away in the car when you saw the gun being removed; is that

15  correct?

16  A    Yes.

17  Q    So would it be fair to say that Mr. Marshall was up to

18  25 feet in front of you from where you were?

19  A    Part of it was in front of me, part of it was on the side

20  of me.  He was at a diagonal angle.

21  Q    But he was approximately 25 feet ahead of you at some

22  angle, correct?

23  A    He could have been up to 25 feet, yes.

24  Q    Now, if he was ahead of you at some angle 25 feet, you

25  were looking at his back, correct?

95
DIRECT - OFFICER RANDALL

1    A    At what point?

2    Q    At the point where he supposedly removed a weapon.

3    A    Incorrect.

4    Q    Would you agree, Officer, when you got out of the car,

5    the first thing you asked him was, "Whose gun is this?"

6    A    No.

7    Q    In fact, your fellow officers repeatedly asked, "Whose

8    gun is this, or you're both going in."

9            Didn't you say that?

10   A    No.  No one said that.

11   Q    No one asked that question?

12   A    No.

13   Q    Now, Officer, you've testified before in court; is that

14   correct?

15   A    Yes.

16   Q    You testified multiple times in court, right?

17   A    Yes.

18            MS. GROSS:  Objection.  Objection, your Honor.

19            THE COURT:  Overruled.

20   BY MR. NORINSBERG

21   Q    At the time of your deposition, you had testified

22   approximately 50 times in court, true?

23   A    Yes.

24   Q    And on top of that, you testified another 50 times in the

25   grand jury proceedings, correct?

96

                    DIRECT - OFFICER RANDALL

1   A   Yes.

2   Q   So you had given sworn testimony in court proceedings

3   approximately 100 times at the time you testified at your

4   deposition, correct?

5   A   Correct.

6   Q   You were a seasoned, veteran cop familiar with

7   testifying, true?

8   A   I wouldn't go that far.

9   Q   Would you agree, Officer Randall, that Mr. Marshall has

10  given testimony that is completely contrary to what your

11  testimony is?

12          MS. GROSS:  Objection.

13          THE COURT:  Sustained.  Don't answer.

14          MR. NORINSBERG:  I'd like you to assume that

15  Mr. Marshall will testify in this courtroom, as he has

16  previously, that he did not have any gun in his possession and

17  did not toss away a gun.  Assuming he testifies to that in

18  this courtroom --

19          MS. GROSS:  Objection.

20          THE COURT:  Sustained.

21          MR. NORINSBERG:  Would you agree --

22          THE COURT:  Sustained.  That's for the jury, not for

23  the witness.

24  BY MR. NORINSBERG

25  Q   Would you agree that if you're telling the truth --

97
DIRECT - OFFICER RANDALL

1        MS. GROSS:  Objection.

2        THE COURT:  Let him finish the question, please.

3   BY MR. NORINSBERG

4   Q   Would you agree that if you're telling the truth, that

5   Mr. Marshall must have had a gun on him?

6        MS. GROSS:  Objection.

7        THE COURT:  Sustained.

8        MR. NORINSBERG:  Now, as the arresting officer, you

9   were interested in finding out the outcome of the charges

10  against Mr. Marshall, right?

11       THE WITNESS:  Yes.

12  BY MR. NORINSBERG

13  Q   And at some point, you learned the outcome of those

14  charges; is that correct?

15  A   Yes.

16  Q   You learned that all charges against Mr. Marshall had

17  been dismissed, correct?

18  A   Yes.

19       MR. NORINSBERG:  Thank you.  I have nothing further.

20       THE COURT:  Thank you.

21  CROSS-EXAMINATION

22  BY MS. GROSS

23  Q   Good morning, Officer Randall.

24  A   Good morning.

25  Q   I wanted to ask you a couple of questions about your

98
CROSS - OFFICER RANDALL

1    background.  But before we do, counsel just asked you several
2    questions about prior statements you had made during the
3    course of your deposition to the effect that you had never
4    seen Plaintiff in actual, physical possession of the gun.
5            Do you recall those questions?
6    A    Yes.
7    Q    What did you mean by that?
8    A    Well, what I mean is I saw Marshall reach into his
9    waistband, pull out an object, underhandedly toss it towards
10   the street where I heard a clink.  I got out the car, I looked
11   to the point where I heard the noise, and saw the silver
12   firearm on the street.  From that point, I knew that he had --
13   the object that he pulled out of his pants was, in fact, a
14   gun.
15           So yeah, he had a gun in his hand as he pulled it
16   and threw it.  Where the confusion is coming in is that I said
17   he was -- because he was standing behind his associate, you
18   know, trying to hide, part of my vision was blocked.  So no, I
19   didn't actually see -- I didn't have eyeballs on the gun,
20   itself, but I saw him as he pulled the gun and tossed it.
21   That's where the confusion is coming in.
22   Q    So counsel also asked you about several documents,
23   including the arrest report, in which you wrote that Defendant
24   was found in possession of a loaded firearm.
25           What did you mean by that statement?

CROSS - OFFICER RANDALL

1  A    Well, it's the same statement I put on the all the

2  paperwork.  It says at TPO, Defendant was found to be in

3  possession of a loaded firearm.  Basically I'm saying the

4  basic facts that at time, place of occurrence -- which is the

5  time and date on the report -- we found him to have possession

6  of a gun.  That's what we wrote.

7  Q    Counsel asked you about the arrest report.  He asked why

8  there weren't additional details.

9         Can you explain that to the jury?

10  A    Well, the reason why there weren't any additional details

11  is, like I said before, we usually tell it to the D.A. while

12  we're doing the paperwork.  And when I say "we," the three-man

13  team.  We don't -- usually, we don't put a long, drawn out,

14  you know, description of what happened.  We write something

15  short, to the point.  And then, later on in court -- or later

16  on, we talk to the D.A.  And then, we elaborate on those

17  points.  And it was consistent in my memo book, the complaint

18  report and the arrest report.  You know, it was all the same.

19  And that's just, in general, what we do.

20  Q    Okay.  You were asked previously about statements that

21  you made to a person from the gun enhancement unit.  Did you

22  make a statement to the person from the gun enhancement unit

23  that you saw Plaintiff in possession of the gun?

24  A    I told the guy from the gun enhancement unit the same

25  thing I just said now.  Whatever they wrote down, that's their

100
                    CROSS - OFFICER RANDALL

1   interpretation of what I said.

2   Q   Okay.  I'd like to turn now to your background.

3            Could you please tell us where you're currently

4   employed.

5   A   I currently work at NYPD.

6   Q   What rank do you hold in the police department?

7   A   Police officer.

8   Q   What date were you first appointed as a police officer?

9   A   July 1st, 2003.

10  Q   Did you attend the police academy?

11  A   Yes.

12  Q   Did you graduate from the academy?

13  A   Yes.

14  Q   And have you been assigned to different commands during

15  your career at the NYPD?

16  A   Yes.

17  Q   What were some of your different responsibilities?

18  A   Patrol, basically responding to incidents, responding to

19  calls for help.

20  Q   Where are you currently assigned?

21  A   I'm currently assigned to Brooklyn North task force.

22  Q   And where were you assigned on May 15th, 2008?

23  A   Brooklyn North anti-crime unit.

24  Q   What were your duties in the anti-crime unit?

25  A   It's a part of patrol.  We drove around in an unmarked

CROSS - OFFICER RANDALL

1   car in high-crime areas looking to prevent crime and respond

2   to jobs.

3   Q    Which neighborhoods was the anti-crime unit responsible

4   for?

5   A    We covered the whole Brooklyn North, but we focused on

6   the high-crime areas of Bushwick, Brownsville, Bed-Stuy, Crown

7   Heights.

8   Q    How long were you in the anti-crime unit?

9   A    About three years.

10  Q    Where is that unit based out of?

11  A    It's based out of the 77 Annex.

12  Q    And is that in Bushwick?

13  A    No.   The 77 Annex is actually in Crown Heights.

14  Q    As of May 15th, 2008, how many arrests have you made?

15  A    About 30.

16  Q    And how many of those were gun arrests?

17  A    Maybe three or four.

18  Q    I'd like to turn your attention to May 15th, 2008.

19       Were you working that day?

20  A    Yes.

21  Q    What day of the week was it?

22  A    I believe it was a Tuesday going into a Wednesday or a

23  Wednesday going into Thursday.

24  Q    Do you have your memo book in front of you to refresh?

25  A    I'm sorry.   Yes, I do.   It was a Wednesday night going

CROSS - OFFICER RANDALL

1    into Thursday morning.

2    Q    Were you working a specific tour of duty?

3    A    Right.  We worked 5:30 at night to 2:05 the next morning.

4    Q    Did you go out on patrol that tour?

5    A    Yes.

6    Q    Who did you go a patrol with?

7    A    Officers Fox and Officer Burbridge.

8    Q    Where did you go out on patrol?

9    A    That night, we were covering mainly the

10   Bedford-Stuyvesant area and Bushwick.

11   Q    Were you wearing a police uniform?

12   A    No.

13   Q    What were you wearing?

14   A    We were wearing regular clothes, plain clothes.

15   Q    Were you wearing a shield?

16   A    Yes.

17   Q    What type of patrol car were you in?

18   A    We were in an unmarked RMP.

19   Q    Can you describe what that is?

20   A    Basically, an unmarked RMP is a -- it's a police car

21   which is usually dark in color.  It has no clear police

22   markings on it.

23   Q    Let's turn to your encounter with Plaintiff.  During your

24   patrol on May 15th, did you encounter a man by the name of

25   Joshua Marshall?

LISA SCHMID, CCR, RMR   UNITED STATES DISTRICT COURT   EASTERN
DISTRICT OF NEW YORK

103

CROSS - OFFICER RANDALL

1   A   Yes.

2   Q   Is he in the courtroom today?

3   A   Yes.

4   Q   Did you later learn that person was a Plaintiff in this

5   case?

6   A   Yes.

7   Q   Had you ever met or encountered him prior to this

8   incident?

9   A   No.

10  Q   Where did you encounter him on May 15th?

11  A   At Park and Broadway.

12  Q   What time of day was it?

13  A   About one in the morning.

14  Q   How would you describe the neighborhood?

15  A   It's a high-crime area.

16  Q   Why do you say that?

17  A   Well, compared to other parts of New York City, other

18  parts of Brooklyn, there's a lot more violent crime there, you

19  know, comparatively.

20  Q   How did you come to encounter Plaintiff near Broadway and

21  Park Street that day?

22  A   I first observed him walking down Broadway towards Park

23  Street.

24  Q   Would it help you to view an enlarged version of the

25  scene?

CROSS - OFFICER RANDALL

1   A    Yes.

2          MS. GROSS:  May I approach, your Honor?

3          THE COURT:  Yes.

4          MS. GROSS:  Your Honor, I'm showing the witness

5   what's been premarked for identification as Exhibit F1, which

6   Plaintiff's counsel has seen.

7   BY MS. GROSS

8   Q    Officer Randall, do you recognize this location?

9   A    Yes.

10         MS. GROSS:  Your Honor, I move that Exhibit F1 be

11  admitted and that I be permitted to publish it to the jury.

12         THE COURT:  Granted.

13         MS. GROSS:  Your Honor, may I ask the witness to

14  step down and point out?

15         THE COURT:  Yes.

16         MS. GROSS:  Officer Randall, will you please step

17  down.

18  BY MS. GROSS

19  Q    Officer Randall, can you describe where you first saw

20  Mr. Marshall and his associate.

21  A    Around here.

22  Q    Which way were they walking?

23  A    Towards Park.

24         THE COURT:  Would you give the witness a marking

25  pencil, please.

```
                                                              105
                    CROSS - OFFICER RANDALL

 1            THE WITNESS:  Right by that "X."

 2            THE COURT:  Put your initials next to that, please.

 3    BY MS. GROSS

 4    Q    Which way were Mr. Marshall and his associate walking?

 5    A    Towards --

 6            THE COURT:  Indicate with an arrow, please.

 7    BY MS. GROSS

 8    Q    Which street is this?

 9    A    This is Broadway.

10    Q    And which street is this side street?

11    A    Park Street.

12    Q    Where were you and your fellow officers?

13    A    We were stopped here at this intersection.  It's kind of

14    off a little, but here.

15            THE COURT:  Mark that with a two and your initials.

16    That's in the lower right.

17            THE WITNESS:  Yes, sir.

18    BY MS. GROSS

19    Q    I'm sorry.  So the officer's -- your car was here

20    approximately?

21    A    It's approximately here.

22    Q    Were you stopped?

23    A    Yes.

24    Q    How did Mr. Marshall appear when you first saw him?

25    A    Well, he appeared as he does today.
```

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

106
CROSS - OFFICER RANDALL

1   Q    What happened next?

2   A    Well, he looked in our direction.  And then, he looked

3   alarmed.  His eyes bulged out.  And then, he waved his friend

4   as they were walking this way -- not his friend, I'm sorry --

5   his associate who he's walking with.

6        They got to the corner, saw us, looked alarmed.  He

7   told the other person -- he waved him on, like come with me,

8   waving towards himself.  That's when he made the turn down

9   Park Street.

10  Q    What happened next?

11  A    That's when we made the turn onto Park Street.  We were

12  going against traffic.  It's a one-way street going this way.

13  We pulled up beside them.  That's when Officer Burbridge asked

14  him, "Can I have a moment of your time?"

15           THE COURT:  Is that shown on that exhibit?

16           MS. GROSS:  Your Honor, I'd like to show the witness

17  another exhibit.

18           THE COURT:  Fine.

19  BY MS. GROSS

20  Q    Officer Randall, what is this?  What does this represent?

21  A    That is a continuation of that photo.  This is to the

22  point of Park Street and Broadway.

23           THE COURT:  Give us the number, please.

24           MS. GROSS:  I'm sorry.  It's Defendant's Exhibit D1.

25           THE COURT:  D as in dog?

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

CROSS - OFFICER RANDALL

1          MS. GROSS:  Correct.

2          THE COURT:  Mark it in evidence.

3          (Defendant's Exhibit D1 was receiced in evidence, as

4   of this date.)

5          THE COURT:  The first photograph is?

6          MS. GROSS:  F1.

7          THE COURT:  Marked in evidence.

8          (Defendant's Exhibit F1 was received in evidence, as

9   of this date.)

10         THE WITNESS:  Basically, this is just the

11   continuation of where it cuts off.

12   BY MS. GROSS

13   Q    What street is that?

14   A    It's Park Street.

15   Q    Can you describe what happened next.

16   A    Well, at that point, like I said, Burbridge asked

17   Marshall, "Can I have a moment of your time?"  And Marshall

18   was walking closer to the wall, and the other, Meade, was

19   walking closer to the car.

20   Q    Where were you?

21   A    I was in the car.  We were -- this is the view as I saw

22   it.  So our car was here.

23         THE COURT:  Mark that as three and your initials.

24   And where was the Plaintiff at that moment?  Mark that with an

25   "X" and your initials.

108
CROSS - OFFICER RANDALL

1   BY MS. GROSS

2   Q   So as you approached, what did you see?

3   A   At that point, I saw Marshall take a short step trying to

4   hide behind his friend who was about five-nine, maybe 150, a

5   very slim guy, and reach in his waistband, pull out the weapon

6   which we know is 9 inches long.  There was a long draw, and

7   then underhandedly tossed it in the street towards, you know,

8   towards the car.

9   Q   What did you hear next?

10  A   At that point, we heard the clink of the gun hitting the

11  ground.

12  Q   What was the lighting like at that time?

13  A   It was nighttime, but there were street lamps.  This is

14  one right here.  So it's directly underneath the street lamp.

15  Q   Where were Officers Burbridge and Fox -- where was

16  Officer Burbridge at that time?

17  A   At what point?

18  Q   As you approached.

19  A   As we approached, Burbridge was sitting in the front,

20  passenger side of the car.

21  Q   Where was Officer Fox?

22  A   Fox was driving.

23  Q   From the back seat, describe your view.

24  A   Well, I was looking diagonally, so I was looking through

25  the front window.  So I had to, kind of, peek -- look up a

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

```
                                                          109
                 CROSS - OFFICER RANDALL
```

1   little bit to see out.

2   Q    What happened when you got out of the --

3            THE COURT:  Were there cars along the curb?

4            THE WITNESS:  There were cars, but there were no

5   minivans, just regular cars.  So the cars that were here

6   weren't this tall.  We could see.  We stopped -- just how this

7   looks, we stopped between the cars so we could see.

8            THE COURT:  They were parked in the direction

9   opposite to the one you were traveling in, correct?  You were

10  going up the street --

11           THE WITNESS:  Yes.

12           THE COURT:  -- and they were parked going down the

13  street?

14           THE WITNESS:  Yes.

15           THE COURT:  Proceed.

16  BY MS. GROSS

17  Q    Where did you see the gun next?

18  A    The gun was right on the ground.  You can't see it in the

19  picture, but by the curb.

20  Q    Officer, you may be seated.

21           Officer Randall, can you describe what this is?

22  A    That is a 38 caliber Smith & Wesson revolver.

23  Q    Is this the gun you recovered from the scene?

24  A    Yes, it is.

25  Q    How do you know that?

110
CROSS - OFFICER RANDALL

1   A    Because I engraved my initials on it.

2   Q    I'm sorry, could you come up and show us where your

3   initials are.

4            THE COURT:   What's that exhibit number, please?

5            MS. GROSS:   Exhibit C1.

6            THE COURT:   Admitted.

7            (Defendant's Exhibit C1 was received in evidence, as

8   of this date.)

9   BY MS. GROSS

10  Q    And what are these?

11  A    Those are rounds recovered from the firearm.

12  Q    How many rounds were recovered?

13  A    Six.

14  Q    Could you describe the gun a little bit.  What kind of

15  gun is it?

16  A    It's a Smith and Wesson, 38 cal, 4-inch barrel.  It's

17  about 9 inches in length total with a revolver, six shot.

18  Q    Officer Randall, what did you do after the gun hit the

19  ground?

20  A    As soon as we heard the gun hit the ground, I got out the

21  car.  I immediately approached Mr. Marshall, told him to put

22  his hands behind his back, and put cuffs on him.

23  Q    So he was under arrest?

24  A    Yes.

25  Q    Who recovered the gun?

CROSS - OFFICER RANDALL

1  A    Officer Burbridge.

2  Q    What did he do with the gun?

3  A    We had a -- he put it in a paper bag that Fox gave us,

4  and he gave it to me.

5  Q    What did you do with the gun?

6  A    I just held the gun on my person, you know, for the rest

7  of the night until ECT came and took it from me.

8  Q    What offense was Plaintiff arrested for?

9  A    Criminal possession of a firearm.

10  Q    Why didn't you arrest his associate, Demetrios Meade?

11  A    Because Demetrios Meade didn't pull a gun out of his

12  pants and throw it on the ground.

13  Q    At any point during the incident, did you say, whose gun

14  was it, whose gun was it?

15  A    No.   That was never said.

16  Q    Was there any doubt in your mind whose gun it was?

17  A    There was no doubt.  As soon as I saw him reach in his

18  pants, I knew something was going on.  When I saw the motion

19  to pull it out, it was a little more suspicious.  When I saw

20  the underhanded toss, I heard the clink, I already knew, right

21  then and there, he threw a gun.

22  Q    From the time you approached Mr. Marshall until he tossed

23  the gun, did you ever lose sight of him?

24  A    No.

25  Q    Who had possession of the gun as you went back to the

CROSS - OFFICER RANDALL

1  83rd Precinct?

2  A    I did.

3  Q    What did you do at the 83rd?

4  A    I just held it, held it in a paper bag.  And later that

5  night, 1 went back to the 77 Annex, which is our base, and

6  awaited ECT.

7  Q    What did you do with the gun the next morning?

8  A    The next morning, ECT finally showed up.  And I basically

9  just handed off the gun to them where they did their tests.

10 Q    Did there come a time when you prepared an arrest report?

11 A    Yes.

12 Q    Can you explain how that works?  Do you prepare it on

13 your own?

14 A    Actually, there was three of us.  There was Officer Fox,

15 Burbridge and myself.  And we share the work.  There were many

16 forms.  And we also had to do fingerprinting, photographs,

17 faxing and all this other stuff.  So we all took -- we all

18 helped each other, you know, to do the report -- to do the

19 reports.

20 Q    Did there come a time when you had a conversation with

21 the assistant district attorney concerning the circumstances

22 of Plaintiff's arrest?

23 A    Yes.

24 Q    How many times did you speak with the ADA?

25 A    Once.

113
CROSS - OFFICER RANDALL

1   Q    When you spoke with the ADA, did you tell the ADA the

2   truth?

3   A    Yes.

4   Q    Did you testify before the grand jury in the criminal

5   case?

6   A    Yes.

7   Q    Did you testify truthfully?

8   A    Yes.

9        MS. GROSS:   Thank you, Officer.   I have no further

10  questions.

11       THE COURT:   Thank you.

12       MS. CASTRO:   Your Honor, I just want to make sure,

13  for the record, that Exhibits F1, D1 and C1 were received into

14  evidence.

15       THE COURT:   Yes, they are in evidence.

16  DIRECT EXAMINATION

17  BY MR. NORINSBERG

18  Q    Good afternoon, Officer Randall.

19  A    Hello.

20  Q    You testified a few moments ago that you placed

21  Mr. Marshall in handcuffs; is that correct?

22  A    Yes.

23  Q    You also placed Mr. Meade in handcuffs at the scene;

24  didn't you?

25  A    No.

LISA SCHMID, CCR, RMR   UNITED STATES DISTRICT COURT   EASTERN
DISTRICT OF NEW YORK

1    Q    Is it your testimony Mr. Meade was never placed in

2    handcuffs at the scene?

3    A    No.  I just said that I didn't put him in handcuffs.

4    Q    Is it your testimony that he was or wasn't in handcuffs,

5    Mr. Meade?

6    A    I don't remember.

7    Q    Would you agree that after you got out of the car, you

8    and your fellow officers put handcuffs, not just on

9    Mr. Marshall, but also on Mr. Meade at the same time, true?

10   A    I don't agree to that, no.

11   Q    At that point in time, you weren't sure which one of

12   these men threw a gun, and that's why you handcuffed both of

13   them, true?

14   A    No.

15   Q    There would be no reason to handcuff Mr. Meade if you

16   clearly saw Mr. Marshall throwing the gun, right?

17   A    Not necessarily.

18   Q    Would you agree --

19            MS. GROSS:  Your Honor, your Honor, objection.  I

20   ask that the witness be able to finish his answer.

21            THE COURT:  Did you want to continue?

22            THE WITNESS:  Just because he didn't throw a firearm

23   doesn't mean that he shouldn't be handcuffed.

24   BY MR. NORINSBERG

25   Q    Now, as you sit here today, is it your memory that he was

```
                                                          115
               REDIRECT - OFFICER RANDALL

 1   handcuffed, Mr. Meade; yes or no?

 2   A    No.

 3   Q    You don't remember?

 4   A    No, I don't remember.

 5   Q    Now, you testified a few moments ago that when you saw

 6   Mr. Marshall, his eyes started bulging, right?

 7   A    Yes.

 8   Q    Is that your testimony?

 9   A    Yes, sir.

10   Q    You saw that from almost 150 feet away; is that correct?

11   A    What could have been up to 150 feet away.

12   Q    At least 100 feet away, maybe even 150 feet away at

13   night, you saw his eyes bulging, right?

14   A    There was ample streetlight.  Yes.

15   Q    And you were in an unmarked police car.  You hadn't put

16   your lights and sirens on.  You hadn't done anything to notify

17   them you were the police, but it's your testimony that as soon

18   as he saw your car, he froze and his eyes started bulging,

19   right?

20   A    Yes.

21   Q    Now, you testified a few moments ago that where

22   Mr. Marshall was on that photograph, you testified it was

23   directly under that street lamp; is that correct?

24   A    When he threw the gun on the ground, yes.

25   Q    But at your deposition, you said you couldn't recall
```

116
REDIRECT - OFFICER RANDALL

1   where the nearest street lamp was, right?

2   A   That's because I went back to that spot.

3   Q   And that helped refresh your memory for your testimony

4   here today; is that correct?

5   A   As far as the lighting, yes.

6   Q   Now, when exactly did you go back to that spot?

7   A   The day that picture was taken.

8   Q   So after your deposition, did you go back to make sure

9   your testimony was correct?

10  A   No.

11  Q   Now, you also testified there was no van on the street;

12  is that correct?

13  A   Yes.

14  Q   Are you aware of the fact that Officer Burbridge has

15  testified that there was a van on the street?

16  A   No, I don't know what he testified to.

17  Q   And you testified that you filled out many, many forms

18  that night; is that correct?

19  A   We, as a team, filled out many forms, yes.

20  Q   But you, as the arresting officer, only filled out three

21  forms; the arrest report, the complaint report and the memo

22  book entry, correct?

23  A   Well, I definitely filled out the memo book entry.  But

24  as far as the complaint report and the arrest report, I

25  definitely reviewed it, but I didn't necessarily do it myself.

117

REDIRECT - OFFICER RANDALL

1   Q   Okay, Officer Randall.  Can we agree that at your

2   deposition, you said under oath that you, yourself, prepared

3   those reports?  Can we agree on that?

4   A   No.  I said I did it, but I didn't say I did it myself.

5   That wasn't made clear.

6   Q   So when you said you did it, you didn't mean that you,

7   yourself, did it?

8   A   I should've said we did it.

9   Q   You should've said that, but you didn't, right?

10  A   Yes, sir.

11  Q   Now, I notice you keep referring to Mr. Meade as the

12  associate of Mr. Marshall; is that correct?

13  A   Yes.

14  Q   You said that you never met Mr. Marshall before, right?

15  A   No.

16  Q   You didn't know anything about Mr. Marshall's dealings

17  with this gentlemen on the street, Demetrios Meade, correct?

18  A   No.

19  Q   You're just using the word "associate" because you sat

20  here during opening and heard your lawyer use that word, true?

21          MS. GROSS:  Objection.

22          THE WITNESS:  No.  I said it because I saw them

23  talking, so he was associating with him.

24  BY MR. NORINSBERG

25  Q   Those were your words and had nothing to do with the

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

REDIRECT - OFFICER RANDALL

1   opening statement you heard?

2   A    No.  If you're not a friend, you're an associate.  It's

3   just a common word I use.

4   Q    Now, lastly, Officer, you gave testimony about regard to

5   where you first observed Mr. Marshall.

6           And you indicated that on the photograph; is that

7   correct?

8   A    Yes, sir.

9   Q    And according to your testimony, the police vehicle made

10  a left onto Park Street; is that correct?

11  A    Yes.

12  Q    Are you aware of the fact that according to Officer

13  Burbridge, the police vehicle was going the other direction on

14  Broadway and made a right onto Park Street?  Are you aware of

15  that?

16          MS. GROSS:  Objection.  Objection.

17          THE COURT:  I'll allow the question.

18          THE WITNESS:  Yes.

19          MR. NORINSBERG:  Nothing further.

20          THE COURT:  Thank you, sir.  Call the next witness,

21  please.

22          MR. NORINSBERG:  At this point, the Plaintiff calls

23  Defendant, Michael Burbridge, to the stand.

24          THE COURT:  Swear the witness, please.

25  MICHAEL BURBRIDGE, having first been duly sworn, was examined

119
REDIRECT - OFFICER RANDALL

1   and testified as follows:

2           THE CLERK:  Please state and spell your name for the

3   court reporter.

4           THE WITNESS:  Police Officer Michael Burbridge,

5   M-I-C-H-A-E-L, B-U-R-B-R-I-D-G-E.

6   DIRECT EXAMINATION

7   BY MR. NORINSBERG

8   Q   Good afternoon, Officer Burbridge.

9   A   Good afternoon.

10  Q   You are here pursuant to a subpoena; is that correct?

11          MS. CASTRO:  Objection.

12          THE COURT:  Objection?  Why?

13          MS. CASTRO:  He's here as a defendant.

14          MR. NORINSBERG:  He was served with a subpoena.

15          THE COURT:  Did you serve the subpoena?

16          MR. NORINSBERG:  Yes.

17          THE COURT:  Overruled.

18  BY MR. NORINSBERG

19  Q   You were served with a subpoena to be here; is that

20  correct?

21  A   I don't recall a subpoena.

22  Q   Now, you're one of the defendants in this case, correct?

23  A   That's correct.

24  Q   And you have previously given sworn testimony relating to

25  this incident, true?

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

120
DIRECT - OFFICER BURBRIDGE

1   A   That's true.

2   Q   You gave testimony at a grand jury proceeding, correct?

3   A   Yes.

4   Q   And you gave testimony at a deposition, right?

5   A   Yes.

6   Q   And before coming here today, you reviewed your prior

7   testimony, right?

8   A   That's correct.

9   Q   You wanted to make sure it was fresh in your memory,

10  correct?

11  A   That's correct.

12  Q   Now, you've been with the NYPD almost eight years,

13  correct?

14  A   A little over seven now, yes.

15  Q   And your command is Brooklyn North anti-crime?

16  A   Not anymore.

17  Q   Okay.  But as of March of 2008, was that your command?

18  A   Yes, it was.

19  Q   And you actually had first joined the Brooklyn anti-crime

20  unit in March of 2008, right?

21  A   That's correct.

22  Q   So at the time of the incident, you had been working in

23  that unit for only two months, true?

24  A   True.

25  Q   Now, you were working on the night of May 15th, 2008,

121
DIRECT - OFFICER BURBRIDGE

1    right?

2    A    Yes.

3    Q    And your tour was 5:30 p.m. to 2:05 a.m., right?

4    A    Yes.

5    Q    You had a partner with you that night, right?

6    A    Two partners.

7    Q    One of your partners was Officer Fox, and the other one

8    was Officer Randall, right?

9    A    Yes.

10   Q    There was no other police officer in that car, correct?

11   A    That's correct.

12   Q    Now, Officer Fox was actually your regular partner,

13   right?

14   A    That's correct.

15   Q    You had been partners with him before May 15th, 2008,

16   right?

17   A    Yes.

18   Q    And you had been partners with Randall prior to May 15th,

19   2008, as well, eight?

20   A    Limited number of times.

21   Q    But the answer would be yes, right?

22   A    Yes.

23   Q    You were all in this unmarked police vehicle, right?

24   A    Yes, we were.

25   Q    And you, yourself, were actually in the front passenger

DIRECT - OFFICER BURBRIDGE

1   seat of that vehicle, right?

2   A   Yes.

3   Q   And Officer Fox was driving, right?

4   A   Yep.

5   Q   You were on Broadway heading northwest towards Manhattan;

6   is that correct?

7   A   Yes, I was.

8   Q   You were doing patrol at that time?

9   A   Yes.

10  Q   And there came a time when you stopped two individuals

11  walking on Park Street in Brooklyn, right?

12  A   Yes.

13  Q   And you learned the names of those individuals

14  eventually, right?

15  A   Yes, I did.

16  Q   One was Joshua Marshall, the other was Demetrios Meade,

17  right?

18  A   That's correct.

19  Q   When you first observed Mr. Marshall and Mr. Meade, they

20  were on Broadway; is that correct?

21  A   Yes, it is.

22  Q   They were on Broadway walking in the direction of

23  Manhattan; is that correct?

24  A   That's correct.

25  Q   And you saw them before you reached the intersection,

123
                    DIRECT - OFFICER BURBRIDGE

1   right?

2   A    Yes, I did.

3   Q    And then shortly after you saw Mr. Marshall, you made a

4   decision to stop these two; is that correct?

5   A    Yes.

6   Q    And would you agree, Officer Burbridge, that it was only

7   a matter of seconds from the time you first saw Mr. Marshall

8   until the time you stopped him?

9   A    Yes.

10  Q    Now, you're familiar about what's known as furtive

11  movements, right?

12  A    That's correct.

13  Q    Furtive movements would be something of a suspicious

14  movement, right?

15  A    That's correct.

16  Q    Furtive movements would be an evasive movement, right?

17  A    That's correct.

18  Q    Can you please tell the members of this jury, did you

19  observe any furtive movements by Mr. Marshall before you

20  decided to stop him?

21        MS. CASTRO:  Objection.  Your Honor, the stop is not

22  in question.  Further, counsel is diving into questions that

23  are inappropriate.

24        THE COURT:  You may continue.  Overruled.

25        THE WITNESS:  I'm sorry, could you restate that.

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
                        DISTRICT OF NEW YORK

124
DIRECT - OFFICER BURBRIDGE

1    BY MR. NORINSBERG

2    Q    Prior to the time that you saw Mr. Marshall, did you

3    observe any furtive movements before you decided to stop him?

4    A    Can you rephrase it.

5        MR. NORINSBERG:  Strike it.

6    BY MR. NORINSBERG

7    Q    Prior to the time that you decided to stop Mr. Marshall,

8    had you observed suspicious movements?

9    A    Yes.

10   Q    Referring to your deposition on Page 66, Line 23,

11   "QUESTION:  Did you observe any furtive movements by Joshua

12   Marshall before you decided to stop him?

13       "ANSWER:  No."

14       MS. CASTRO:  Objection.  I also note there's an

15   objection at the deposition to that question also.

16       THE COURT:  Overruled.

17   BY MR. NORINSBERG

18   Q    Do you recall being asked that question and giving that

19   answer?

20   A    Yes.

21   Q    You remember that?

22   A    Yes.

23   Q    So according to your deposition testimony, you did not

24   observe any suspicious movements by Mr. Marshall before you

25   decided to stop him; true or not true?

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

125
DIRECT - OFFICER BURBRIDGE

1        MS. CASTRO: Objection.

2        THE COURT: Overruled.

3        MS. CASTRO: Your Honor, this pertains to your

4   Honor's in limine rulings.

5        THE COURT: The reference is to the night from the

6   time of first observation to the time of arrest; is that

7   correct?

8        MR. NORINSBERG: Yes.

9        MS. CASTRO: Your Honor, may we be heard at sidebar?

10       THE COURT: You may not.

11       MS. CASTRO: Your Honor, I just note my objection

12   that counsel's question --

13       THE COURT: Your objection is always noted.  We have

14   a full-time reporter.  Proceed with the questioning.

15   BY MR. NORINSBERG

16   Q   Now, before you decided to stop Mr. Marshall, you hadn't

17   activated your sirens at that point, correct?

18   A   That's correct.

19   Q   You hadn't activated your flashing lights, correct?

20   A   That's correct.

21   Q   You hadn't yelled out, "Stop, police," or words to that

22   effect; is that right?

23   A   That's correct.

24   Q   You hadn't made any effort to stop these two individuals;

25   is that correct?

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

126

DIRECT - OFFICER BURBRIDGE

1    A    That's correct.

2    Q    Did you see Mr. Marshall's eyes bulging as he was walking

3    down the street?

4    A    I don't remember them bulging.

5    Q    Did you see him suddenly stop in his tracks and look

6    scared when he saw your police car?

7    A    Yes.

8    Q    You saw that, right?

9    A    Yes, I did.

10   Q    Even though you said in your deposition you didn't

11   observe anything suspicious, right?

12            MS. CASTRO:  Objection.

13   BY MR. NORINSBERG

14   Q    Now, after you saw Mr. Marshall, the police vehicle made

15   a right onto Park Street, isn't that true?

16   A    That's true.

17   Q    So you were here just a few moments before when Officer

18   Randall was giving his testimony, correct?

19   A    That's correct.

20   Q    And you saw Officer Randall explain to the jury where

21   things were on that photograph, correct?

22   A    That's correct.

23   Q    And you saw Officer Randall say that the police vehicle

24   actually was coming from the other side of Broadway and made a

25   left onto Park Street, true?

127
DIRECT - OFFICER BURBRIDGE

1   A    He said that, but that's not what I'm saying right now.

2   Q    So your version of where the police vehicle was right

3   before the stop is different than what we heard a few moments

4   ago from the Defendant, Officer Randall; is that true?

5   A    I remember what I saw.

6   Q    It's different than what you just heard, correct?

7   A    Maybe.

8   Q    Now, Park Street is a one-way street, right?

9   A    That's correct.

10  Q    So when you made this right onto Park Street, you're

11  going down a one-way street the wrong way, correct?

12  A    That's correct.

13  Q    You were completely blocking oncoming traffic, right?

14  A    I don't know if there was traffic.

15  Q    Any traffic that would've been coming in your direction

16  would be blocked by the police vehicle, right?

17  A    That's correct.

18  Q    And you did this, you made this right turn down the

19  one-way street the wrong way so you could stop Mr. Marshall,

20  right?

21  A    So I could talk to Mr. Marshall.

22  Q    You hadn't heard any words between Mr. Marshall and

23  Mr. Meade, right?

24  A    That's correct.

25  Q    But as far as you were concerned, this was an urgent

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

128
DIRECT - OFFICER BURBRIDGE

1  situation, right?

2  A   Yes, it was.

3  Q   You needed to conduct a general, street-level

4  investigation.

5          That's your testimony, right?

6  A   That is correct.

7  Q   You felt it needed immediate action, right?

8  A   Yes, it did.

9  Q   And can you please tell the jury exactly what questions

10 were you planning on asking Mr. Marshall when you stopped him.

11 A   Just a general investigation to see where they were

12 coming from, where they were going to.

13 Q   Referring to your deposition, Page 84, Line 10,

14 "QUESTION:  Let's say Joshua Marshall said sure.  What were

15 you planning on asking him?

16          "ANSWER:  I don't know.  I could not tell you."

17          Do you recall being asked that question and giving

18 that answer at your deposition?

19 A   Yes.

20 Q   So even though this was an urgent situation and you made

21 a turn down a one-way street the wrong way, you didn't know

22 what you were going to ask him, right?

23 A   You can ask him anything you want.

24 Q   And then, when you actually approached Mr. Marshall, they

25 were walking on the right side of Park Street, right?

DIRECT - OFFICER BURBRIDGE

1   A    That's correct.

2   Q    And at that point, your police vehicle made a right turn

3   and went down Park Street?

4   A    As they were walking down Park, yes, we made a right.

5   Q    You're in a vehicle and they're walking, right?

6   A    That's correct.

7   Q    So you caught up with them very quickly, right?

8   A    Yes.

9   Q    And at that moment in time, you said, "Sir, may we please

10  have a moment of your time?"

11       That's what you asked him, right?

12  A    In context, yes.

13  Q    What do you mean "in context"?  That's what you asked

14  him, right?

15  A    Something along the lines, of, "Hey, police, can we have

16  a moment of your time," not in such a low voice, but as to a

17  voice where he can hear me, "Police, can we have a moment of

18  your time."

19  Q    And that was just to do this street-level investigation,

20  right?

21  A    That's correct.

22  Q    And as far as you were concerned, Officer, up until that

23  point, if these two men didn't want to stop and answer

24  questions, that would've been it.  It would've been over,

25  right?

130
DIRECT - OFFICER BURBRIDGE

1  A  That's correct.

2  Q  Now, would it be fair to say that you were still inside

3  your police vehicle when you first addressed Mr. Marshall?

4  A  Yes.

5  Q  And when you addressed him and asked him to please give

6  you a moment of his time, he didn't respond to you.

7  Is that your testimony?

8  A  Yes.

9  Q  And you didn't ask any additional questions, right?

10  A  No.

11  Q  And once you asked this question, Mr. Meade stopped

12  walking, right?

13  A  Yes.

14  Q  But your testimony is that Mr. Marshall continued walking

15  forward, right?

16  A  That's correct.

17  Q  Now you were here when Officer Randall testified a few

18  moments back, right?

19  A  Yes.

20  Q  You heard Officer Randall testify that actually, what

21  happened is Mr. Marshall went backwards, right?  Did you hear

22  that?

23  A  I heard that, yes.

24  Q  Would you agree that the testimony you just gave is

25  inconsistent with the testimony Officer Randall just gave?

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

131

DIRECT - OFFICER BURBRIDGE

1           MS. CASTRO:  Objection.

2           THE COURT:  Sustained.

3    BY MR. NORINSBERG

4    Q    Would you agree that your testimony is moving forward,

5    not backwards, right?

6    A    Yes.

7    Q    So Mr. Marshall would be ahead of Mr. Meade on this

8    sidewalk, correct?

9    A    He was.

10   Q    And it's at that point, Officer Burbridge, you claim that

11   you saw Mr. Marshall reach into his waistband and pull out the

12   gun; is that right?

13   A    That's correct.

14   Q    You saw this with your own eyes, right, Officer?

15   A    Yes, I did.

16   Q    And as a police officer, you're trained to make careful

17   observations, right?

18   A    Yes, I am.

19   Q    That's part of the job, right?

20   A    Yes.

21   Q    Can you please tell the members of this jury, did

22   Mr. Marshall pull out the gun with his right hand or his left

23   hand?

24   A    I'm not sure.

25   Q    Did he pull it from the right side of his waistband or

132

DIRECT - OFFICER BURBRIDGE

1   the left side?

2   A   It's from the center, from what I remember.

3   Q   It was from the center?

4   A   Yes.

5   Q   Referring to your deposition, Page 35, Line 14,

6   "QUESTION:   Did he pull out the gun from his right-side

7   waistband or his left-side waistband?   ANSWER:   I don't

8   recall."

9         Do you recall giving that testimony?

10  A   Yes.

11  Q   So at your deposition, you couldn't remember that

12  important detail, could you?

13  A   I guess not.

14  Q   But you told us a minute ago the police are trained to

15  make these observations, right?

16  A   We are.

17  Q   Now, Mr. Marshall was approximately 10 feet away from

18  your police car when he allegedly threw this gun; is that

19  correct, Officer?

20  A   Yes.

21  Q   10 feet ahead of where you were, right?

22  A   On an angle away from the vehicle.

23  Q   He was 10 feet further down the road on Park Street than

24  where you were, right?

25  A   He wasn't 10 feet further down the road.   He was 10 feet

```
                                                              133
              DIRECT - OFFICER BURBRIDGE

 1    on an angle away from where I was seated.

 2    Q    Would you agree that if you were inside of a police

 3    vehicle and you were 10 feet away from him --

 4    A    Yes.

 5    Q    -- you certainly didn't step out in front of him in the

 6    street, did you?

 7    A    No.

 8    Q    Do you recall testifying in front of a grand jury on this

 9    case?

10    A    Yes, I do.

11    Q    You knew when you testified in front that grand jury that

12    it was critical for you to tell the truth?

13    A    Yes.

14    Q    You knew that you could be sending this man to jail for

15    several years, right?

16    A    Yes.

17    Q    Do you recall telling the grand jury under oath that you

18    actually stepped in front of Mr. Marshall as he was tossing

19    the gun?

20    A    Yes.  If it's there, that's what I said.

21    Q    Well, Officer, if you're 10 feet away inside of a police

22    car, how, at the same time, could you be out on the street

23    stepping in front of Mr. Marshall when he throws the gun?  How

24    is that possible?

25    A    I wasn't in front of him like that, but it could be if
```

134
DIRECT - OFFICER BURBRIDGE

1   he's that way.  If he faces me at one point, he could in front

2   of me.

3   Q    You told the grand jury, "I stepped in front him when he

4   threw the gun," right?

5   A    I didn't step in front of him because he was 10 feet away

6   down the block.  How is that possible?  You tell me.

7   Q    That's what I'm asking you.  I'm asking you:  How is that

8   possible?

9   A    It's not.

10  Q    Would you agree that your testimony at the deposition

11  when you said you were inside the vehicle 10 feet away is

12  completely inconsistent with the idea of being out of the

13  vehicle on the street and stepping in front of him?

14  A    It's not inconsistent at all.

15  Q    So those two are perfectly consistent?

16  A    They could be.

17  Q    Remember, referring to your deposition -- strike that.

18          Referring to your grand jury testimony, Page 5, Line

19  21, "QUESTION:  And what did you do after you observed that

20  individual?

21          "ANSWER:  I asked the individual for a moment of

22  time, at which point, as I stepped in front of him, I observed

23  Mr. Marshall remove what appeared to be a silver firearm from

24  his waist and throw it under the vehicle."

25          Do you remember being asked that question and giving

                                                                    135
                    DIRECT - OFFICER BURBRIDGE

1   that answer at the grand jury?

2   A    Yes, I guess.

3   Q    You never actually stepped in front of Mr. Marshall on

4   the street, did you?

5   A    No, I did not.

6   Q    In fact, the truth is, Officer, you were still inside the

7   car when the gun was thrown, true?

8   A    It was either at a point when I was halfway in or halfway

9   out of the vehicle.

10  Q    You got out of the car only after the gun was thrown,

11  true?

12  A    It's a matter of seconds.  It could have been -- if I was

13  in the car or outside of the car, but I saw it.

14  Q    Referring to your deposition, Page 40 Line 17, "QUESTION:

15  As you sit here today, do you have a specific memory of

16  getting out of the car before the gun was thrown?

17          "ANSWER:  Before the gun was thrown?

18          "QUESTION:  Yes.

19          "ANSWER:  No."

20          Page 41, Line 9, "QUESTION:  Had you made a decision

21  to get out of the vehicle before the gun was thrown?

22          "ANSWER:  No."

23          Do you recall being asked those questions and giving

24  those answers at your deposition?

25  A    Yes.

136
DIRECT - OFFICER BURBRIDGE

1   Q    So at your deposition, you had no memory of actually

2   getting out of the car before the gun was thrown, true?

3   A    I'm sorry, rephrase that.

4   Q    At your deposition, you had no recollection of actually

5   getting out of the car before the gun was thrown, right?

6   A    Yes.

7   Q    Now, the gun was in the air for a split second, right?

8   A    That's correct.

9   Q    And the gun actually landed on the street in a space

10  between a van and a curb, true?

11  A    That's true.

12  Q    Now you heard Officer Randall testify before?

13  A    Yes.

14  Q    You heard him testify that that minivan wasn't there,

15  right?

16  A    Yes.

17  Q    And you heard him testify that it was just regular cars

18  there, right?

19  A    That's correct.

20  Q    And that because it was just regular cars, he had a clear

21  vantage point to that, right?

22  A    That's correct.

23  Q    But, in fact, there was a van there, right?

24  A    Yes, there was.

25  Q    So the van was blocking your view, wasn't it?

137

DIRECT - OFFICER BURBRIDGE

1   A     No, it wasn't.

2   Q     Would you agree that you still might have been inside the

3   car even when the gun landed?

4   A     Can I make myself clear, your Honor?

5          THE COURT:  I'm sorry?

6          THE WITNESS:  Can I make myself clear about the van

7   situation?

8          MS. CASTRO:  Objection, your Honor.  It was asked

9   and answered.

10         THE COURT:  Are you objecting to the witness?

11         MS. CASTRO:  I'm objecting to counsel's question.

12         THE COURT:  Yes, you can try to explain it.

13         THE WITNESS:  In the current photo of the scene, the

14  van in which I'm referring to, which is where the gun was

15  recovered, was actually situated behind the van in the photo.

16  So if you see -- look at the photo, there's a police car in

17  the photo.  That's where the van would've been.  Where the gun

18  was thrown was on an angle away from us, but towards the

19  street, therefore landing by the van that was basically where

20  that police car is.

21  BY MR. NORINSBERG

22  Q     You agree there is a van on the street?

23  A     I do.

24  Q     In the location where the gun was thrown, right?

25  A     Yes.

138
DIRECT - OFFICER BURBRIDGE

1   Q   You agree that you were actually still inside the car

2   when the gun actually landed?  Do you agree with that?

3   A   Maybe it was in, maybe I was out.  Split second.

4   Q   Well, after the gun was thrown, you got out of the car,

5   right?

6   A   Yes.  Yes.

7   Q   And then, you told both of the men to get against the

8   wall, right?

9   A   That's correct.

10  Q   And then, you put both of the men in handcuffs, true?

11  A   I don't know if I personally did, but I believe both were

12  in handcuffs.

13  Q   Both men were placed in handcuffs at some point very

14  shortly after you got out of the car, right?

15  A   Yes, they were.

16  Q   And when they were in handcuffs standing there against

17  the wall, you asked whose gun is it, true?

18  A   No.

19  Q   And then, your fellow officers asked them whose gun is

20  it, true?

21  A   No.

22  Q   You do agree Officer Randall and Officer Fox were present

23  at the scene, right?

24  A   That's correct.

25  Q   You agree that your fellow officers may have been asking

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

139

DIRECT - OFFICER BURBRIDGE

1   some questions at that point in time, true?

2   A    They may have.

3   Q    And you don't remember exactly what they were asking, do

4   you?

5   A    No, I don't.

6   Q    Now, Mr. Marshall was charged with criminal possession of

7   a weapon; is that right?

8   A    That's correct.

9   Q    And one way to show that Mr. Marshall had possession of

10  this weapon, this gun, is to see if there are fingerprints on

11  the gun, right?

12  A    That's correct.

13  Q    To your knowledge, Officer Burbridge, were Joshua

14  Marshall's fingerprints ever found on this gun, yes or no?

15  A    To my knowledge, no.

16  Q    Would you agree, Officer, that it's standard police

17  procedure to perform fingerprint tests anytime a gun is

18  recovered?

19           MS. CASTRO:  Objection.

20           THE COURT:  You may answer.

21           THE WITNESS:  Okay.  It's not all the time, but most

22  of the time, yes.

23  BY MR. NORINSBERG

24  Q    To your knowledge, Officer Burbridge, were fingerprint

25  tests done on this gun?

140
DIRECT - OFFICER BURBRIDGE

1   A    To my knowledge, yes, they were.

2   Q    Referring to your deposition, Page 51, Line 20,

3   "QUESTION:  To your knowledge, were any fingerprint tests ever

4   done in this case?

5           "ANSWER:  To my knowledge, I'm not sure if they were

6   or not."

7           Do you recall giving that testimony?

8   A    Yes.

9   Q    So at your deposition about a year ago, you weren't sure

10  whether the fingerprint test had ever been done, right?

11  A    Then, I wasn't sure.  Now, I am.

12  Q    Now you are, a year later?

13  A    Yes.

14  Q    So is your memory of this incident better now than it was

15  one year ago when you gave your sworn deposition testimony?

16  A    Yes.  I was just sitting here when Randall said there

17  were fingerprint tests done.  So how am I to say that now I

18  don't know, when it was clearly brought out in court saying

19  there were fingerprint tests done?

20  Q    So you wouldn't want to contradict what Officer Randall

21  said?

22          MS. CASTRO:  Objection.

23          THE COURT:  Sustained.

24  BY MR. NORINSBERG

25  Q    Now, when you recovered this gun, it actually had a

```
                                                              141
                    DIRECT - OFFICER BURBRIDGE

 1   cartridge inside it, correct?

 2   A     It had many cartridges.

 3   Q     And the cartridges are where the bullets are housed,

 4   right?

 5   A     That's correct.

 6   Q     So somebody, some human being had to place those bullets

 7   into the cartridges, right?

 8   A     That's correct.

 9   Q     There were six bullets that were placed into the

10   cartridges, right?

11   A     Yes.

12   Q     To your knowledge, were any of those bullets ever

13   fingerprint tested?

14   A     I don't know.  I would assume they were.  It's not my

15   field.

16   Q     To your knowledge, were any fingerprint tests ever done

17   on the cartridges themselves?

18   A     I wouldn't know that.

19   Q     Now, to your knowledge, were Demetrios Mead's

20   fingerprints ever found on that gun?

21   A     To my knowledge, no.

22   Q     Did anyone ever test to see if Mr. Meade's fingerprints

23   were on that gun?

24              MS. CASTRO:  Objection.

25              THE COURT:  If you know, you may answer.
```

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT   EASTERN
DISTRICT OF NEW YORK

142
DIRECT - OFFICER BURBRIDGE

1       THE WITNESS: I have no idea.

2   BY MR. NORINSBERG

3   Q   You have no idea?

4   A   No.

5   Q   Now, going back to the scene, after you retrieved the

6   gun, you checked to see if it was loaded?

7   A   That's correct.

8   Q   You saw that it was loaded.  You saw the bullets that we

9   saw in that photograph before, is that correct?

10  A   I didn't see a photograph before.

11  Q   You did see that the gun was loaded and it had bullets,

12  right?

13  A   Yes.

14  Q   Then you removed the bullets and gave it to PO Randall,

15  right?

16  A   That's correct.

17  Q   Now, Officer, this wasn't the first time that you

18  recovered a gun during an arrest, right?

19  A   No.

20  Q   You've recovered many guns while working in the

21  anti-crime unit, right?

22  A   That's correct.

23  Q   So you're familiar with the process of preserving

24  evidence and making sure that you don't compromise the

25  evidence in any way, right?

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

143

DIRECT - OFFICER BURBRIDGE

1   A     Yes.

2   Q     Can you tell the members of this jury, what steps did you

3   take to make sure that you did not leave your own fingerprints

4   on the gun?

5   A     I don't recall taking any steps.  I remember just giving

6   the gun to Officer Randall.

7   Q     And after you gave it to him, do you have any idea what

8   happened to it?

9   A     No.

10  Q     Now, Officer Randall was actually the arresting officer,

11  right?

12  A     That's correct.

13  Q     He's the one that actually placed Mr. Marshall under

14  arrest, right?

15  A     I'm not sure if he was or not.

16  Q     Referring to your deposition, Page 60 Line 21.

17  "QUESTION:  Who actually placed Joshua Marshall under arrest?

18          "ANSWER:  Officer Randall."

19          Do you recall being asked that question and giving

20  that answer?

21  A     Yes.

22  Q     So at your deposition, you remembered that it was Officer

23  Randall who actually placed Joshua Marshall under arrest,

24  correct?

25  A     Yes.

144

DIRECT - OFFICER BURBRIDGE

1   Q    But you were the first one who observed Mr. Marshall,

2   right?

3   A    That's correct.

4   Q    You were the first one who spoke to Mr. Marshall, right?

5   A    That's correct.

6   Q    You were the one that actually decided to stop

7   Mr. Marshall, right?

8   A    That's correct.

9   Q    You were the one that actually recovered the firearm from

10  the street?

11  A    That's correct.

12  Q    Yet it was Officer Randall who was made the arresting

13  officer?

14  A    That's correct.

15  Q    And the reason why he was made the arresting officer was

16  it was his turn to get the arrest, right?

17  A    That's correct.

18  Q    Now Officer Randall was sitting in the back seat of the

19  car; is that correct?

20  A    Yes, he was.

21  Q    Officer Randall was sitting behind the driver, right?

22  A    That's correct.

23  Q    To your knowledge, Officer Burbridge, did Officer Randall

24  ever see Mr. Marshall remove the gun from his waistband?

25          MS. CASTRO:  Objection.

LISA SCHMID, CCR, RMR   UNITED STATES DISTRICT COURT   EASTERN
DISTRICT OF NEW YORK

```
                                                                   145
                DIRECT - OFFICER BURBRIDGE

 1              THE COURT:  Sustained.

 2    BY MR. NORINSBERG

 3    Q    Now, before stopping Mr. Marshall, you hadn't made any

 4    arrests that night, correct?

 5    A    That's correct.

 6    Q    You hadn't issued any summons that night before stopping

 7    Mr. Marshall, right?

 8    A    That's correct.

 9    Q    After this incident, you filled out what's called a

10    stop-and-frisk form; is that right?

11    A    That is correct.

12    Q    I'm anything to show you what's been marked as

13    Plaintiff's Exhibit 11.

14              Do you recognize this document?

15    A    Yes, I do.

16    Q    Is this the stop-and-frisk form that you filled out for

17    Mr. Marshall?

18    A    Yes, it is.

19    Q    And is your handwriting on that document?

20    A    Yes, it is.

21              MR. NORINSBERG:  I offer this document as evidence.

22              THE COURT:  Admitted.

23              (Plaintiff's Exhibit 11 was received in evidence, as

24    of this date.)

25    BY MR. NORINSBERG
```

```
                                                           146
                  DIRECT - OFFICER BURBRIDGE
```

1   Q    Now, you were careful when you filled out this

2   stop-and-frisk report, correct?

3   A    Yes.

4   Q    You wanted to include as much pertinent information as

5   possible, right?

6   A    Yes.

7   Q    Now, do you see on this form, there's a section that

8   talks about what circumstances led to the stop?  Do you see

9   that?

10  A    Yes.

11  Q    And the form lists a number of categories, correct?

12  A    Yes, it does.

13  Q    And you checked off "furtive movements"; is that correct?

14  A    Yes, I did.

15  Q    So according to your report, you saw Mr. Marshall make

16  furtive movements prior to the stop, right?

17  A    Yes.

18  Q    In fact, Officer, you didn't observe any furtive

19  movements by Mr. Marshall before you decided to stop him; did

20  you?

21          MS. CASTRO:  Objection.

22          THE WITNESS:  I'm sorry.  Can you restate that.

23  BY MR. NORINSBERG

24  Q    In fact, Officer Burbridge, you didn't observe any

25  furtive movements by Mr. Marshall before you decided to stop

```
                                                                  147
                    DIRECT - OFFICER BURBRIDGE

 1   him?

 2   A     That's incorrect.

 3   Q     Referring to your deposition, Page 66 Line 23, "QUESTION:

 4   Did you observe any furtive movements by Joshua Marshall

 5   before you decided to stop him?

 6             "ANSWER:  No."

 7             Do you recall being asked that question and giving

 8   that answer?

 9             MS. CASTRO:  Objection, your Honor.  Again, I note

10   that there was an objection at the deposition.  This is

11   mischaracterizing the officer's deposition testimony.

12             THE COURT:  Overruled.

13   BY MR. NORINSBERG

14   Q     Do you recall being asked that question and giving that

15   answer?

16   A     Can you say that again a little slower.

17   Q     Do you recall being asked the following question and

18   giving the following answer, 66, Line 23:  "QUESTION:  Did you

19   observe any furtive movements by Joshua Marshall before you

20   decided to stop him?

21             "ANSWER:  No."

22             Do you recall giving that testimony, Officer?

23   A     Yes.

24   Q     Now, according to your stop-and-frisk form, you did

25   observe furtive movements, right?
```

DIRECT - OFFICER BURBRIDGE                    148

1   A   Yes, I did.

2   Q   But according to what I just read in your deposition, you

3   didn't, right?

4   A   That's correct.

5        MS. CASTRO:  Objection again, your Honor.  Counsel

6   has mischaracterized the deposition testimony.  The question

7   right before indicates the furtive movements.

8        THE COURT:  Read the one before too, please.

9   BY MR. NORINSBERG

10  Q   Reading from Page 66, Line 19, "QUESTION:  So, Joshua

11  Marshall signaling to Demetrios Meade to come this way, in

12  your mind, was a furtive movement?

13       "ANSWER:  Yes."

14       Do you recall giving that testimony?

15  A   Yes, I do.

16  Q   So you consider that to be a furtive movement?

17  A   Yes.  That plus other factors.

18  Q   Would you agree that if one citizen on a street motions

19  to another citizen on the street, that's not a basis to stop

20  them, is it?

21  A   No.

22  Q   You agree with that, right?

23  A   I agree with that.

24  Q   Now, on your form, towards the bottom left of the

25  document, it says, "Did officer explain reason for stop?"

149

DIRECT - OFFICER BURBRIDGE

1           Do you see that?

2    A     Yes.

3    Q     And then, the box is checked yes.

4           Do you see that?

5    A     Yes.

6    Q     So on this form, you claim that you had actually

7    explained the reasons why you stopped; is that correct?

8    A     Yes.

9    Q     But, in fact, Officer, you did not explain the reasons

10   why you wanted to stop Mr. Marshall; did you?

11   A     Not at first, no.

12   Q     At any point in time, did you explain the reason why you

13   wanted stop Mr. Marshall?

14   A     After he was under arrest.

15   Q     Referring to your deposition, Page 30, Line 8, "QUESTION:

16   Did there ever come a point in time that night when you

17   explained to Joshua Marshall why you had stopped him?

18           "ANSWER:  No."

19           Do you recall giving that testimony?

20   A     Yes.

21   Q     So according to your sworn deposition testimony, there

22   never came a time at any point that night that you explained

23   to Mr. Marshall why you had stopped him, is that true?

24   A     I wouldn't say that's true.

25           MS. CASTRO:  Objection, your Honor.  Again, the stop

```
                                                            150
                 DIRECT - OFFICER BURBRIDGE

 1   is not at issue.

 2            THE COURT:  Overruled.

 3   BY MR. NORINSBERG

 4   Q    Is that true?

 5   A    I'm sorry, say that again.

 6   Q    According to your deposition testimony, at no point that

 7   night did you ever explain to Mr. Marshall the reason why you

 8   had stopped him, true?

 9   A    I wouldn't say that's true.

10   Q    According to your testimony, sir, what you said at the

11   deposition.

12   A    According to my testimony, but I wouldn't say that's true

13   in general.

14   Q    So what your testimony was at the deposition was

15   inaccurate?

16   A    I don't believe so but --

17   Q    Now on the top of the form in front of you, it says

18   "period of observation prior to the stop."

19            Do you see that?

20   A    Yes, I do.

21   Q    And the purpose of this section of the form is the police

22   are supposed to put in the period of observation before they

23   made the stop, right?

24   A    Yes.

25   Q    But on this form, you actually left that box blank; is
```

                                                            151
                    DIRECT - OFFICER BURBRIDGE

1    that correct?

2    A    Yes, I did.

3    Q    Can you please explain to the members of this jury why

4    you left that portion of this document blank.

5    A    I couldn't explain it to you.

6    Q    You have no explanation?

7    A    No explanation.

8    Q    And you had no explanation at your deposition, right?

9    A    No.

10   Q    Now, apart from filling out this stop-and-frisk form, you

11   didn't fill out any other forms; is that right?

12   A    No.

13   Q    Being that you were in the passenger seat, you were

14   what's known as a recorder, correct?

15   A    That's correct.

16   Q    As a recorder, your job is to record what happens in your

17   memo book, correct?

18   A    That's correct, but --

19   Q    So for example, when you arrest someone, you're supposed

20   to record the specific details relating to that arrest in your

21   memo book, true?

22   A    Generally.  If you're the arresting officer, you're more

23   likely to do it than the assisting officers.

24   Q    Yet, Officer, even though you were the designated

25   recorder that night, you didn't make any memo book entries for

```
                                                            152
             DIRECT - OFFICER BURBRIDGE

 1    this incident; did you?

 2    A    No, I didn't.  I normally wouldn't.

 3              THE COURT:  Let's break now.  We will be back at

 4    five to two.  Have your lunch, ladies and gentlemen.

 5              (The jury exited.)

 6              (Lunch recess was taken.)

 7    JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

 8              THE COURT:  Is there an application?

 9              MS. GROSS:  Your Honor, there's a matter that

10    defense counsel would like to raise without the presence of

11    the jury when counsel is present.

12              THE COURT:  Go ahead.

13              MS. GROSS:  Your Honor, Defendant's position is that

14    the door has been opened with respect to the reasons for the

15    initial stop.  There have been a number of questions from

16    Plaintiff's counsel as to the reasons for the initial stop.

17              THE COURT:  I'll see you tomorrow at 9:30.  Motion

18    denied.  Brief it in writing.

19              MS. GROSS:  Okay.  Your Honor, from our perspective,

20    as the cross and direct continue, Plaintiff's counsel, we ask

21    that they be precluded from referencing --

22              THE COURT:  Denied.  They haven't opened any door.

23    They've just been referring, as I understand it, I thought it

24    was quite clear, to the period from the time the Defendants

25    first observed the Plaintiff until the arrest.
```

153
DIRECT - OFFICER BURBRIDGE

1        MS. GROSS:  Your Honor, we intend to ask for a

2    curative instruction in the morning.

3        (The jury entered.)

4        THE COURT:  Proceed, please.

5        MR. NORINSBERG:  Yes, your Honor.  Thank you.

6    BY MR. NORINSBERG

7    Q   Good afternoon, Officer Burbridge.

8    A   Good afternoon.

9    Q   Officer Burbridge, after this arrest, you had a meeting

10   with prosecutors in the Brooklyn DA's office; is that correct?

11   A   That's correct.

12   Q   And at that meeting, the prosecutors asked you what had

13   happened, correct?

14   A   That's correct.

15   Q   And you knew, at that point in time, that it was very

16   important for you to be truthful to the prosecutors, right?

17   A   Yes.

18   Q   You had to tell them the truth, the whole truth and

19   nothing but the truth, right?

20   A   That's correct.

21   Q   And you knew there was no room for any dishonesty in that

22   discussion, right?

23   A   Yes.

24   Q   You also understood that whatever you told the prosecutor

25   could have a direct impact on whether these charges moved

LISA SCHMID, CCR, RMR   UNITED STATES DISTRICT COURT   EASTERN
DISTRICT OF NEW YORK

154
DIRECT - OFFICER BURBRIDGE

1    forward, correct?

2    A     Yes.

3    Q     You knew that the prosecutor wasn't there out on the

4    street when this incident happened, correct?

5    A     I'm sorry, could you say that again.

6    Q     You understood the D.A. was not out on the street when

7    this incident happened?

8    A     Yes, obviously.

9    Q     So you knew that the prosecutor would be relying on what

10   you told them, right?

11   A     That's correct.

12   Q     When you met with that prosecutor, you told them that you

13   actually stepped out in front of the car, stepped out in front

14   of Marshall, and you were looking at him when he tossed the

15   gun, true?

16   A     No, it's not true.

17   Q     You never said that?

18   A     The way you're describing it, no.

19   Q     Did you tell the prosecutor that you were 10 feet away

20   inside of a car?

21   A     Yes.

22   Q     Now, would you agree that whatever statements you made to

23   the D.A. were directly responsible for this case moving

24   forward?

25   A     Yes.

155

DIRECT - OFFICER BURBRIDGE

1   Q    You also told the D.A. that you saw Marshall take a gun

2   from his waistband, right?

3   A    That's correct.

4   Q    And you told them you that saw Mr. Marshall throw the

5   gun, right?

6   A    That's correct.

7   Q    During this meeting with the district attorney, did you

8   also tell them that you observed Mr. Marshall making furtive

9   movements before the stop?

10  A    Yes, I did.

11  Q    Did you also tell them that you explained to Mr. Marshall

12  the reasons for the stop?

13  A    I don't recall.

14  Q    At some point after the meeting with the district

15  attorney, you testified before the grand jury, right?

16  A    That's correct.

17  Q    And you had reviewed your grand jury testimony before

18  your deposition testimony, right?

19  A    I'm sorry, say that again.

20  Q    You had looked at your prior testimony that you had given

21  at the grand jury before you testified at the deposition in

22  this case, right?

23  A    I don't know if it was before or not.

24  Q    Do you recall being asked the following question and

25  giving the following answer at your deposition, question --

156
DIRECT - OFFICER BURBRIDGE

1   Page 75 Line 9, "QUESTION: Before coming here today, did you

2   review your grand jury testimony?

3           "ANSWER: Yes, I did."

4           Do you recall that?

5   A    If it's there, yes.

6   Q    So before you gave your testimony in the deposition, you

7   made sure to be familiar with your prior testimony at the

8   grand jury, right?

9   A    I guess I did, yeah.

10  Q    Now, you also told the grand jury you had seen Marshall

11  take out the gun from his waistband, right?

12  A    That's correct.

13  Q    You told them that you saw him throw the gun, right?

14  A    That's correct.

15  Q    And as a result of your testimony, Mr. Marshall was

16  indicted, right?

17  A    That's correct.

18           MS. CASTRO:  Objection.

19           THE COURT:  Overruled.

20           THE WITNESS:  That's correct.

21  BY MR. NORINSBERG

22  Q    You're aware, though, that after you testified in the

23  grand jury and after Officer Randall testified, eventually all

24  of these charges were dismissed?  You're aware of that, right?

25  A    I'm now aware of that, yes.

DIRECT - OFFICER BURBRIDGE                    157

1   Q    Now, at the time of your depositions, you were still

2   partners with Officer Fox; is that correct?

3   A    That's correct.

4   Q    Is he still your regular partner?

5   A    No.

6   Q    But at the deposition he was, right?

7   A    That's correct.

8   Q    And, in fact, you had a discussion with Officer Fox

9   regarding this lawsuit, didn't you?

10  A    You'd have to refresh my memory.

11  Q    Referring to your deposition, Page 100, Line 19,

12  "QUESTION:  Have you ever had any discussions with Police

13  Officer Fox about the claims in this lawsuit?

14          "ANSWER:  Yes."

15          Do you recall being asked that question and giving

16  that answer at your deposition?

17  A    Yes.  If it's on the paper, yes.

18  Q    So you had a discussion with Officer Fox relating to the

19  claims in this lawsuit, right?

20  A    Yes.

21  Q    And in fact, you had discussions with Officer Fox just

22  one week before you testified at the deposition, true?

23  A    I don't recall off the top of my head if it was a week.

24  This was a year ago.

25  Q    Same Page 100, Line 23, "QUESTION:  When did you have

158
DIRECT - OFFICER BURBRIDGE

1   discussions about this lawsuit with Police Officer Fox?

2   "ANSWER:  Not too long ago.  Maybe last week."

3   Do you recall being asked that question and giving

4   that answer?

5   A   I don't recall, but if it's on the paper, then I did

6   answer it like that.  It's a year ago.

7   Q   So according to your deposition testimony, you spoke to

8   Officer Fox about the lawsuit just one week before you,

9   yourself, gave your testimony, correct?

10  A   According to the deposition, yes.

11  MR. NORINSBERG:  Thank you.  I have nothing further.

12  CROSS-EXAMINATION BY

13  BY MS. CASTRO

14  Q   Good afternoon, Officer.

15  A   Good afternoon.

16  Q   Officer, I just want to get a little background info from

17  you.

18  First off, how long have you been employed with the

19  New York City Police Department?

20  A   A little over seven years now.

21  Q   What is your current command?

22  A   90th Precinct detective squad.

23  Q   Prior to working on the detective squad, where were you

24  assigned?

25  A   Brooklyn North anti-crime unit.

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

159
CROSS - OFFICER BURBRIDGE

1   Q    For how long?

2   A    Four years.

3   Q    What were your duties and responsibilities in the

4   anti-crime unit?

5   A    Plain-clothes unit, you deal with street-level violence,

6   including robberies, shootings, weapons possession on a street

7   level when they happen, when they occur.

8   Q    Now, Officer, how many arrests have you made in the

9   course of your career?

10  A    Approximately 210.

11  Q    And how many arrests, approximately, have you been

12  involved in?

13  A    Four to 500.

14  Q    And of those four to 500 arrests, how many of them have

15  been for guns?

16  A    Two hundred to 250.

17  Q    Now, Officer Burbridge, I want to direct your attention

18  to May 15th, 2008.

19       Were you working that night?

20  A    Yes, I was.

21  Q    What tour were you working?

22  A    I was working 5:30 p.m. to 2:05 a.m.

23  Q    What was your assignment that night?

24  A    Borough anti-crime patrol.

25  Q    What does that mean?

CROSS - OFFICER BURBRIDGE

1    A    Basically in Brooklyn North, there's 10 precincts which

2    we are assigned to which we can patrol anyone, depending on

3    where the violence is, where shootings are happening, where

4    robberies are occurring.  We have a tendency to float through

5    those commands and do our anti-crime work.

6    Q    What neighbors are those ten precincts in?

7    A    They range from East New York, Brownsville, Bushwick,

8    Bedford-Stuyvesant, Williamsburg, Crown Heights.

9    Q    Now, on May 15th, 2008, who were you working with?

10   A    Officer Fox, Officer Randall.

11   Q    How were you dressed that night?

12   A    I was in plain clothes, although I don't recall exactly

13   what I was wearing.

14   Q    Were you on foot, or were you in a car?

15   A    I was in a car.

16   Q    What type of car?

17   A    Unmarked, black Chevrolet Impala.

18   Q    Now specifically, can you tell us where you were inside

19   the car?

20   A    I was seated in the front passenger seat.

21   Q    Where were the other vehicles?

22   A    Officer Fox was driving the vehicle next to me, Officer

23   Randall was seated behind him.

24   Q    Directing your attention to approximately 12:40 a.m.,

25   where were you?

161
CROSS - OFFICER BURBRIDGE

1   A    We were on Broadway approaching the intersection of Park

2   Avenue.

3   Q    Now, at that time, what did you observe?

4   A    As we were driving on Broadway, to my right-hand side on

5   the sidewalk before Park Avenue, two individuals walking.

6   Q    Can you describe those individuals?

7   A    One individual male, lighter-skinned, heavy-set, pony

8   tail, approximately 6 foot.  The other individual, taller, a

9   little over 6 foot, lanky, skinny, dark skinned.

10   Q    Now, have you come to learn these individuals' names?

11   A    Yes.

12   Q    Who are they?

13   A    Joshua Marshall, the individual with the pony tail,

14   Demetrios Meade, the individual -- the taller individual,

15   darker complexion.

16   Q    Officer, what happened once you observed these

17   individuals?

18   A    As I looked in their direction to the right of me, I

19   observed Mr. Marshall look in my direction, as they got to the

20   corner of Park and Broadway, immediately make a right-hand

21   turn as to walk away from me onto Park as we're at the

22   intersection.

23        Now, when this occurs, Mr. Meade, who the individual

24   was walking with continues straight on Broadway, a little bit

25   past where the intersection is.  As this occurs, Mr. Marshall

162
CROSS - OFFICER BURBRIDGE

1    looks back at Mr. Meade and motions to him, come this way,

2    come this way. Doesn't say anything, but just motions to him

3    to come this way. At that point, Mr. Meade follows him, at

4    which we make the right-hand turn in the car.

5          And just like that, we weren't far off the corner.

6    They were on my side at an angle. I could see them.

7    Mr. Meade was closer to the street on the sidewalk.

8    Mr. Marshall was a little in front of him and further away

9    from me, so deeper on the sidewalk. But it was at almost a

10   45-degree angle of my view.

11   Q    Officer, I'm going to show you what's been entered into

12   evidence as Defendant's Exhibit D1 for identification. Could

13   you step off the stand, please.

14         THE COURT: Move it to the center and tilt it so all

15   the jurors can see it.

16   BY MS. CASTRO

17   Q    Officer, using Defendant's Exhibit D1, can you tell us

18   where your car came to a stop?

19   A    Right in this general area facing the opposite direction

20   of the cars that are parked on the side of the street.

21   Q    How far down is this down the block?

22   A    It's maybe 15 feet off the corner of Broadway.

23   Q    Let me just show you Defendant's Exhibit F1 that's in

24   evidence.

25         Using this photo, would you be able to tell us?

```
                                                              163
                    CROSS - OFFICER BURBRIDGE

 1    A    Yes.   Our car was generally right here.

 2    Q    Can you circle that.

 3    A    Sure.

 4              THE COURT:   Are you using the blue?

 5              MS. CASTRO:   It's a black marker.

 6              THE COURT:   All right.

 7              MS. CASTRO:   Please put your initials.

 8              THE COURT:   And a circle.

 9    BY MS. CASTRO

10    Q    Now, referring to Defendant's Exhibit D1, could you tell

11    us where you observed Mr. Marshall and Mr. Meade?

12    A    Mr. Marshall was approximately in this area right here

13    walking down the street there.

14    Q    Indicate by a black X.   And can you circle that and put

15    your initials.

16    A    Sure.

17    Q    Where was Mr. Meade?

18    A    Mr. Meade was closer on the sidewalk, but back a little

19    further.

20    Q    When you say "closer," are you referring to closer to

21    your vehicle?

22    A    Closer to my side, from my point of view from the

23    vehicle.

24    Q    What happened once you observed them?

25    A    As I observed them, looked out the window on an angle and
```

164
CROSS - OFFICER BURBRIDGE

1   basically said, "Police. Can I have a moment of your time,"

2   at which point Mr. Meade stopped. Mr. Marshall took another

3   step or two. I was either in the midst or getting out of the

4   car. I can't remember. I'm just trying to view it.

5   Mr. Marshall does a stutter step.

6   Q    What does that mean?

7   A    Like, he kind of takes -- he's walking -- after I say

8   what I say, takes a step or two. And then, kind of like this

9   (indicating) from my point of view, it looks like he was

10  trying to get himself -- or Mr. Meade in between my point of

11  view and him.

12  Q    What happened next?

13  A    I saw him basically reach into the front of his waistband

14  and angle towards the street but away from me. If I was

15  looking at a 45-degree angle, he threw the gun at a 45-degree

16  angle in the opposite direction, but still towards the street

17  side. Pulled it out. As that happened, as I saw him pull the

18  gun out, I pulled my gun out. I pointed it at the two

19  individuals and said, "Get up against the wall." I saw him

20  throw the gun.

21  Q    Is that wall depicted in this photo?

22  A    Yes.

23  Q    Where did you have them step up against?

24  A    Up against the wall here. As I pulled my gun out, I

25  remember Mr. Meade put his hands up right away. He was

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

165
CROSS - OFFICER BURBRIDGE

1   standing right here. And then, I told him, "Get up against

2   the wall. Get up against the wall." They both got up against

3   the wall. At some point right after that, Officer Fox,

4   Officer Randall came up behind me. They each went to the guys

5   as I went to retrieve the gun from the ground.

6   Q    You can go back on the stand.

7        Officer, during the time that you observed the

8   Plaintiff initially and then up until the time you saw him

9   throw the gun, did you ever take your eyes off of him?

10  A    No, I did not.

11  Q    And in total, how long did it take for you to initially

12  observe him up until the time he threw the gun? How long did

13  that take?

14  A    It was less than a minute. I couldn't give the exact

15  time though.

16  Q    Now, after you had the individuals up against the wall,

17  what did you do?

18  A    They were cuffed. I don't recall if I cuffed them. I

19  gave the gun to Officer Randall.

20  Q    Why did you give it to Officer Randall?

21  A    Because he was up for the arrest. It was his turn,

22  basically.

23  Q    Do you rotate who the arresting officer is?

24  A    We always rotate because we're a team. And if I had an

25  arrest the night before and Officer Fox had one the night

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

166
CROSS - OFFICER BURBRIDGE

1   before that, it was Randall's turn.

2   Q    Now, can you describe the gun that you observed the

3   Plaintiff throw?

4   A    Yes.

5   Q    What kind of a gun?

6   A    It was a revolver, a silver revolver, which is --

7   basically, there's two types of firearms, handguns.  There's

8   semi-automatics or there's revolvers.  Semi-automatic would be

9   more square-looking gun which takes a magazine in the bottom

10  or a clip and feeds through there, where a revolver has a

11  cylinder in the middle of the gun.  And it -- in shorter

12  terms, it basically looks like an old western gun.

13  Q    I'm just showing you what has been entered into evidence

14  as Defendant's Exhibit C1.

15       Is this the gun you observed?

16  A    Yes, it is.

17  Q    What happened after you gave Officer Randall the gun?

18  A    We placed Mr. Marshall in our car and we went to the 83rd

19  Precinct for processing.

20  Q    Now, Officer, you were in the courtroom when you heard

21  Plaintiff's counsel, Mr. Norinsberg, during his opening

22  statement ask whose -- when you all got there, you screamed

23  out, "Whose gun is it?  Whose gun is it."

24       Did you ever say that?

25  A    No.

167

CROSS - OFFICER BURBRIDGE

1  Q   Did you ever hear any of the other officers say that?

2  A   No, I did not.

3  Q   Did you ever question whose gun it was?

4  A   Not at all.

5  Q   Why not?

6  A   Because I saw Mr. Marshall take the gun out of his waist

7  and throw it to the ground.

8  Q   Now, had you had a question as to whose gun it was, say

9  you didn't observe who threw the gun, what would you have done

10 in that situation?

11 A   In that situation, if you couldn't determine whose gun it

12 is -- you know you had a gun and you had two guys, say you

13 didn't know -- it was one of the two.  You would handcuff both

14 individuals, take them back to the precinct, and basically

15 separate them and interrogate them as to whose gun it is until

16 one of them would give you a written confession so as you can

17 release the other guy.

18 Q   Did that happen in this case?

19 A   No, it did not.

20 Q   Why not?

21 A   Because I observed Mr. Marshall with the gun.

22 Q   And what happened once you got to the precinct?

23 A   Arrest processing began.  That's really it.

24 Q   Did there come a point in time when you spoke to the

25 district attorney's office about this case?

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

168
CROSS - OFFICER BURBRIDGE

1   A    Yes, there was.

2   Q    When was that?

3   A    At some point later down the line. I couldn't give you

4   an exact date.

5   Q    How many times did you speak with the district attorney's

6   office about this case?

7   A    Just once that I remember. Just once.

8   Q    When you spoke to the assistant district attorney that

9   was handling this case, did you tell him or her the truth?

10  A    Yes, yes.

11  Q    Did you testify at the grand jury with respect to this

12  case?

13  A    Yes, I did.

14  Q    Did you testify truthfully at that proceeding?

15  A    Yes, I did.

16  Q    Apart from testifying at the grand jury, did you have any

17  further involvement in the prosecution of Mr. Marshall's case?

18  A    No, I didn't.

19        MS. CASTRO: Thank you, Officer. I have no further

20  questions.

21        THE COURT: Thank you.

22  REDIRECT EXAMINATION

23  BY MR. NORINSBERG

24  Q    Officer, you just told us that you saw Mr. Marshall make

25  a stutter step?

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

169

REDIRECT - OFFICER BURBRIDGE

1  A    Yes.

2  Q    Is that your testimony?

3  A    That's correct.

4  Q    You never said that at any time before, did you?

5  A    I don't recall if I did.

6  Q    You never said that in your grand jury testimony, did

7  you?

8  A    I don't recall if I did.

9  Q    You never said that at your deposition, did you?

10 A    I don't recall if I did.

11 Q    Now, you told us earlier that you might have been in the

12 midst of getting out of the car when he threw the gun.

13       You can't remember?

14 A    It's a matter of seconds, so you're not sure if you're in

15 or you're out.  It's four years ago, you should remember.

16 Q    So that's your testimony here; you can't remember if you

17 were getting out of the car when you saw the gun tossed?

18 A    Yes, that's my testimony right here.

19 Q    You testified you saw Mr. Marshall reach into the

20 waistband, correct?

21 A    That's correct.

22 Q    Now if he was 10 feet away from you and he was further

23 down on Park Street, his back would be towards you, correct?

24 A    No.

25 Q    So he turned around just enough to face the police car so

170

                    REDIRECT - OFFICER BURBRIDGE

1    the police could see him throwing the gun?

2    A    Did I show you where he threw the gun?

3    Q    You can answer my question first.

4    A    Sure.

5    Q    Did Mr. Marshall turn around just enough so that he could

6    face the police vehicle, so the police could see him reach

7    into his waist and throw the gun?

8    A    No.  He's didn't face the police vehicle.

9    Q    He's trying to hide the gun from you.  He wouldn't have

10   turned around at all.  His back would be towards you, correct?

11   A    And he would've thrown it in the other direction.

12   Q    He would've thrown it away, right?

13   A    Yeah, in the opposite direction where I couldn't see.

14   But he didn't do that.

15   Q    He wouldn't have turned around just so you could see him

16   remove a gun, would he?  That doesn't make sense.

17   A    If he was throwing it in the direction where he threw it,

18   then it makes perfectly good sense.  Now, if he didn't want to

19   show me at all, he would throw it in the opposite direction.

20   I'm looking at him like this.  He would throw it that way,

21   wouldn't he?

22   Q    Are you asking questions?

23   A    I'm just --

24              MS. CASTRO:  Objection.

25              THE WITNESS:  I'm giving you an explanation.  You

171
REDIRECT - OFFICER BURBRIDGE
1   want an explanation, I'm giving you an explanation.

2   BY MR. NORINSBERG

3   Q    I'd like an explanation to this question.

4   A    Okay.

5   Q    If he's 10 feet away from you and he's further down on

6   Park Street, is it your testimony that he's going to reach

7   into his waistband and partially turn to you so you can see

8   him throw the gun?

9   A    Yes.

10  Q    Now, you testified a few minutes ago that you kept your

11  eyes on him the whole time, right?

12  A    That's correct.

13  Q    But up until that moment, all you had seen was him make a

14  hand motion, according to your testimony, right?

15  A    I'm sorry, what?

16  Q    Before you saw anything about a gun, all you had seen was

17  a hand motion by Mr. Marshall, right?

18          MS. CASTRO:  Objection.

19          THE COURT:  I'll allow it.

20          THE WITNESS:  I'm sorry, say that again.

21  BY MR. NORINSBERG

22  Q    Before you said anything about seeing a gun, the only

23  thing you had seen that you considered to be suspicious was

24  Mr. Marshall supposedly making a hand motion, right?

25  A    It was that and another factor, too.

172

REDIRECT - OFFICER BURBRIDGE

1  Q    Well, the other factors came out after you made your

2  decision, right?

3            MS. CASTRO:  Objection.

4            THE WITNESS:  Before my decision, actually.

5  BY MR. NORINSBERG

6  Q    Would you agree, Officer, that at your deposition, you

7  didn't mention any of those other factors until we had a break

8  and you spoke with your lawyer.  And then, you came back and

9  mentioned the other factors, right?

10           MS. CASTRO:  Objection.

11           THE COURT:  I'll allow it.

12           THE WITNESS:  Say that again.

13 BY MR. NORINSBERG

14 Q    At your deposition, you mentioned other factors only

15 after you had met with your lawyer during a break.  And then,

16 you came back and mentioned the other factors, right?

17           MS. CASTRO:  Objection.

18           THE COURT:  I'll allow it.

19           THE WITNESS:  I don't understand where you're going

20 with this.

21 BY MR. NORINSBERG

22 Q    So you can't answer that question?

23 A    I'm not sure what you're referring to.

24 Q    Did you change your testimony at your deposition after

25 you met with your counsel during a break?

173

REDIRECT - OFFICER BURBRIDGE
1  A    No, I did not.

2           MS. CASTRO:  Objection.

3  BY MR. NORINSBERG

4  Q    Let's see if we can break it down, Officer.

5           You remember there was a break during the

6  deposition, correct?

7  A    Yes.

8  Q    You recall, during that break, you had a discussion with

9  your counsel, right?

10  A    Yes.

11  Q    And you testified that before you had the discussion with

12  your counsel, you never mentioned any additional factors,

13  right?

14           MS. CASTRO:  Objection.

15           THE COURT:  I'll allow it.

16           MS. CASTRO:  Your Honor, it goes to your Honor's in

17  limine ruling.

18           THE COURT:  I will allow it.

19           THE WITNESS:  Say that again.

20  BY MR. NORINSBERG

21  Q    Before you had the discussion with your lawyer at the

22  deposition, you never mentioned any additional factors; true

23  or not true?

24  A    I don't know if I did.

25  Q    Well, do you recall testifying at your deposition that

174

REDIRECT - OFFICER BURBRIDGE

1   the other factors just slipped your mind?  Do you recall that?

2   A    I don't recall that.

3   Q    Referring to your deposition, Page 68, Line 5, "QUESTION:

4   Had you just forgotten about those factors, Officer?

5           "ANSWER:  It slipped my mind, yeah."

6           Page 68, Line 24, "QUESTION:  Now prior to having

7   that discussion with your counsel, you never mentioned any of

8   those other factors, correct?

9           "ANSWER:  That's correct."

10          Do you recall giving that testimony, Officer?

11  A    Yes, I do.

12  Q    Officer, you testified earlier that you met with the D.A.

13  only one time?

14  A    From what I remember I -- from what I remembered, one

15  time.

16  Q    Well, you actually met with the district attorney first

17  on the day following the arrest, correct?

18  A    No, I didn't.

19  Q    Well, you met with him before you testified in the grand

20  jury, correct?

21  A    No, I didn't.

22  Q    You never met with the D.A. before you went to the grand

23  jury; is that your sworn testimony?

24  A    Immediately, right before the grand jury, I would've met,

25  with him.  Not the day after the arrest, though.  The day of

175

REDIRECT - OFFICER BURBRIDGE
1   the grand jury, if that's what you're trying to say, is when I

2   would have met with him.

3   Q    You met with the district attorney's office on two

4   separate occasions, isn't that true?

5   A    If you mean, like, the initial five minutes before I go

6   into the grand jury and the actual grand jury, then that's

7   true in a sense.  But that makes no sense.  It's the same

8   time.

9   Q    And you also spoke with the district attorney's office by

10  telephone the night of the incident, true or not true?

11  A    Not true.

12  Q    You don't recall that, or you're denying you did?

13  A    I didn't.

14           MR. NORINSBERG:  Nothing further.  Thank you, your

15  Honor.

16           THE COURT:  Thank you, sir.  Next witness, please.

17           MR. COHEN:  At this time, we call Joshua Marshall.

18  JOSHUA MARSHALL, having first been duly sworn, was examined

19  and testified as follows:

20           THE CLERK:  Please state and spell your name for the

21  reporter.

22           THE WITNESS:  Josh Marshall, J-O-S-H-U-A,

23  M-A-R-S-H-A-L-L.

24  DIRECT EXAMINATION

25  BY MR. COHEN

176

DIRECT - J. MARSHALL

1   Q   Good afternoon, Mr. Marshall.

2   A   Good afternoon.

3   Q   Mr. Marshall, can you please tell the members of the jury

4   how old you are.

5   A   Thirty-one years old.

6   Q   Where are you currently living?

7   A   Brooklyn, New York.

8   Q   What section of Brooklyn, New York?

9   A   Bushwick.

10  Q   How long have you lived there, sir?

11  A   Past few months.  About six, seven months.

12  Q   Mr. Marshall, I want to direct your attention to

13  May 15th, 2008.

14       Did you have an incident with the police on that

15  day?

16  A   Yes.

17  Q   Can you please tell the members of the jury what you were

18  doing shortly before that incident with the police?

19  A   I was at the grocery store.

20  Q   Which grocery store were you at?

21  A   I was coming back from Broadway and Locust.  There's a

22  grocery store right there.

23  Q   Prior to going to the grocery store that evening, where

24  had you been?

25  A   I was staying at my aunt's house on 17 Park Street.

177

DIRECT - J. MARSHALL

1   Q   Why were you staying at your aunt's house that evening?

2   A   Well, I was living with my mother at the time. I was a

3   little sick on 452. I was a little sick. And she had a whole

4   bunch of guests over, my brother had a whole bunch of guests

5   over. So I went to my aunt's house to get a little peace and

6   quiet.

7   Q   When you said 452, you just mentioned that, where was

8   your mom's house located?

9   A   452 Graham Ave.

10  Q   Is that also in Brooklyn?

11  A   Yes.

12  Q   How far is that from your aunt's house?

13  A   Not too far.

14  Q   Did there come a point that evening when you left your

15  aunt's house?

16  A   Yes.

17  Q   At what time did you leave your aunt's house that

18  evening?

19  A   A little after midnight.

20  Q   What was the reason why you left that late at night from

21  your aunt's house?

22  A   I was having some trouble sleeping, so I went to the

23  grocery store to get some ginger ale, some soup, Vicks, things

24  that would help me get some rest.

25  Q   Can you just describe for the jury where you went shortly

178
DIRECT - J. MARSHALL

1   after midnight on May 15th, 2008?

2   A    No problem.  I left my aunt's house, went to the corner,

3   crossed the street.  There's a grocery store on Broadway and

4   Park.  I went there first, picked up a few items.  I believe

5   there was some soup, some soda, the ginger ale.

6        I was trying to get some Advil tablets from there,

7   but they didn't have the ones that I want, so I went across

8   down the block to Broadway and Locust to obtain that.  At the

9   same time, I picked up some Vicks.

10  Q    So you first went to a grocery store right on the corner

11  of Broadway and Park Street, correct?

12  A    Yes.

13  Q    They didn't have all the items you were looking for, so

14  you went up the street to Broadway and Locust?

15  A    Yes.

16  Q    How far would you say the first grocery store was from

17  the second one?

18  A    A block, the most.

19  Q    When you arrived at that second grocery store, did

20  something happen?  Were you able to buy these products?

21  A    Yeah, I was able to buy the merchandise.

22  Q    What else, if anything, happened when you arrived at that

23  store?

24  A    Well, I saw an associate from the neighborhood named Sip.

25  And he was going to the grocery store as well.

179

DIRECT - J. MARSHALL

1 Q    You ran into an individual named Sip at the grocery

2 store?

3 A    Yes.

4 Q    Is Sip his real name?

5 A    No.

6 Q    At the time, did you know Sip's real name?

7 A    No.

8 Q    Now, sitting here today, do you know Sip's real name?

9 A    Yes.

10 Q    What do you know his name to be?

11 A    Demetrios.

12 Q    Now, you referred to him as an associate.

13        Can you tell the members of the jury what you mean

14 by that?

15 A    Somebody from the neighborhood you see, you may give a

16 small chat.  Nobody that you're really close with.

17 Q    Are you friends with Sip?

18 A    No.

19 Q    Is he just someone you say hello and goodbye to?

20 A    Yeah.  No problem to go and have a small chat with.

21 Q    Did you have a conversation with Sip at the grocery

22 store?

23 A    Yes.

24 Q    And after that conversation, what did you do?

25 A    Well, throughout the conversation, you know, we

180
DIRECT - J. MARSHALL

1    discovered that we was both heading back down the same way.  I

2    was calling it a night.  He was going home for the night, so

3    we decided to walk down Broadway together.

4    Q    Did you guys both walk down Broadway together?

5    A    Yes.

6    Q    Did there come a point when you arrived to the corner of

7    Broadway and Park Street with Sip?

8    A    Yes.

9    Q    What happened when you got to the corner of Broadway and

10   Park Street with Sip?

11   A    We said our goodbyes.  Then I made a right, and he

12   continued.

13   Q    What was your intention after you said goodbye to Sip?

14   What were you intending to do after you said goodbye to him?

15   A    Go make a nice bowl of soup and go to sleep for the

16   night.

17   Q    Where were you intending to go at that point?

18   A    My aunt's house is the first building on the block, so I

19   was going to my aunt's house then.

20   Q    And what happened after you said goodbye to Sip?

21   A    Made the right and started walking.

22   Q    How far did you go before something else happened?

23   A    At the end of the gate, -- there's a gate there -- well,

24   the corner's a store.  So by the time I got to the end of the

25   gate, I realized he came -- he came my direction.

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

DIRECT - J. MARSHALL                                       181

1   Q     I'm going to show you what's already been put into

2   evidence by defense counsel.  I'm now showing you what's been

3   marked as Defendant's Exhibit E1.

4           Do you recognize this photograph?

5   A     Yes.

6   Q     What do you recognize this photograph to be?

7   A     Very close to the incident where I got arrested at,

8   Broadway and Park.

9   Q     And can you please come up here for a second.

10          Can you please tell the members of the jury where

11  you said goodbye to Sip.

12  A     Right here.

13  Q     And what did you do once you said goodbye to him?

14  A     I said right here, and then I made the right, right here

15  on Park Street.

16          THE COURT:  Give him a marker.

17  BY MR. COHEN

18  Q     Put your initials where you said goodbye to Sip.

19          THE COURT:   What color marker is that?

20          MR. COHEN:   I have a yellow highlighter.

21          THE COURT:  Give him the yellow one, please.

22          THE WITNESS:  Here.

23  BY MR. COHEN

24  Q     Can you just please place your initials where you said

25  goodbye to Sip.  Circle that for me.

182

DIRECT - J. MARSHALL

1    And which direction were you coming from with Sip?

2    A    Well, the store's right here, so we crossed the street

3    and we walked down.

4    Q    And then, you made a right turn?

5    A    Yes.

6    Q    Did there come a point when you saw Sip again?

7    A    Yes.

8    Q    At what point was that?

9    A    By the time I got to the gate.

10   Q    I'm going to show you what's now in evidence.  It's

11   Defendant's Exhibit D2.

12        Can you please tell the members of the jury or can

13   you indicate on this photograph where you were when Sip

14   rejoined you.

15   A    Right here.

16        THE COURT:  Marking it with yellow on a vertical

17   dark spot.

18   BY MR. COHEN

19   Q    At any point prior to Sip rejoining you, did you motion

20   to him, Mr. Marshall?

21   A    No, sir.

22   Q    Did you in any way indicate to Sip that he should follow

23   you down Park Street?

24   A    No.

25   Q    Were you surprised to see him come right back beside you

183

DIRECT - J. MARSHALL

1   as soon as he said goodbye?

2   A    A little.

3   Q    Can you explain to the members of the jury why you were

4   just a little surprised.

5   A    Because we said our goodbyes, but at the same time, I

6   knew that he could walk through that block to get to where he

7   lives.  But being that he said he was going to remain walking

8   down Broadway, that's what left me a little surprised.

9   Q    When Sip rejoined you, did he say anything to you, sir?

10  A    He informed me that the police was coming.

11  Q    What did you do when he told you that information?

12  A    Pretty much told him it's not my problem.  I kept on

13  walking, told him it's not my problem, and kept on walking.

14  But at the same time, I looked back and did notice that the

15  police were coming, though.

16  Q    So there came a time when you looked back and noticed the

17  police?

18  A    Yes.

19  Q    Prior to that moment, had you noticed that the police

20  were in the area at all?

21  A    I didn't have the slightest care.  No.

22  Q    When you said goodbye to Sip on the corner of Park and

23  Broadway, had you noticed the police?

24  A    No.

25  Q    When you made a right on Park Street, did you start going

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

DIRECT - J. MARSHALL                                              184

1   down Broadway first and then decided to make a right?

2   A    What you mean?

3   Q    Did you make a sudden change in direction when you were

4   walking down Broadway?

5   A    No.

6   Q    You always intended, when you said goodbye to Sip, to

7   make a right on Park Street; is that correct?

8   A    Yes.

9   Q    I'm going to show you what has been pre-marked as

10  Defendant's Exhibit G.

11         Do you recognize that document, Mr. Marshall?

12  A    Yes.

13  Q    What do you recognize that to be?

14  A    Park Street, the place where I got locked up -- I mean,

15  arrested.  And my aunt's building is the first building right

16  there.

17  Q    It's a photograph, correct?

18  A    Yes.

19  Q    Is it a fair and accurate depiction of what the location

20  looked like on the date of the incident?

21  A    Yes.

22         MR. COHEN:  I ask that Defendant's Exhibit G be

23  moved into evidence as Exhibit G.

24         THE COURT:  Admitted.

25         (Defendant's Exhibit G was received in evidence, as

185
DIRECT - J. MARSHALL

1    of this date.)

2    BY MR. COHEN

3    Q    Now, can you tell the members of the jury what you see on

4    that picture?

5    A    Cars.

6    Q    You mentioned that you see a building that you recognize.

7    A    Yes.

8          THE COURT:  Have the witness stand in front of the

9    jurors.

10          MR. COHEN:  Mr. Marshall, please stand.

11    BY MR. COHEN

12    Q    You mentioned a minute ago that you said your aunt's

13    building is depicted in that picture.

14    A    Yes.

15    Q    Can you show the members of the jury where that building

16    is.

17    A    This one.

18          THE COURT:  The one with the white sign --

19          THE WITNESS:  Yes.

20          THE COURT:  -- in the middle of the picture?

21          THE WITNESS:  Yes.

22    BY MR. COHEN

23    Q    Can you initial that with this yellow marker, please.

24    Thank you.

25          Mr. Marshall, that was your intention; you were

186
DIRECT - J. MARSHALL

1   headed towards that building when you made a right on Park

2   Street; is that correct?

3   A    Yes.

4   Q    A minute ago, you said you did turn and look back and see

5   the police cars coming; is that correct?

6   A    Yes.

7   Q    Can you tell the members of the jury what you actually

8   saw? Were the officers in a vehicle, or on foot, or something

9   else?

10  A    Oh, no.  They was in a vehicle approaching a one-way

11  block.

12  Q    When you say "approaching a one-way block," are you

13  referring to Park Street?

14  A    Yes.

15  Q    Is Park Street a one-way street?

16  A    Yes.

17  Q    Were they driving in the direction that -- the flow of

18  traffic of which Park Street goes?

19  A    They was coming against traffic.

20  Q    So they were going the wrong way on a one-way street?

21  A    Yes.

22  Q    And was this vehicle marked with NYPD insignias or

23  anything like that, or was it unmarked?

24  A    It was an unmarked, black Impala.

25  Q    Can you tell the members of the jury how you knew this

187
DIRECT - J. MARSHALL

1   vehicle was a police vehicle.

2   A   Just coming down a one-way block, you know, you assume

3   that that's the situation.  But at the same time, I saw the

4   antennas as the car got closer.

5   Q   Now, were their police lights on?

6   A   No.

7   Q   How about their sirens; were they on?

8   A   No.

9   Q   What did you do after you saw the police officers coming

10  down the street?

11  A   Continued to walk.

12  Q   In what direction did you continue to walk?

13  A   Straight down Park Street.

14  Q   Did you run at any point?

15  A   No.

16  Q   Did you reach into your pockets?

17  A   No.

18  Q   Were you holding anything?

19  A   Yes.

20  Q   What were you holding, Mr. Marshall?

21  A   I was holding a black plastic bag with the items I bought

22  from the grocery store.

23  Q   While you were walking down Park Street, was Sip walking

24  right next to you?

25  A   Yes.

188

DIRECT - J. MARSHALL

1   Q   Where were you in relationship to Sip and the street?

2   A   I was closest to the wall.  We was both walking parallel.

3   Q   While you were walking with Sip, could you see what he

4   was doing?

5   A   Yes.

6   Q   Can you tell the members of the jury what, if anything,

7   you saw Sip do while you were walking down Park Street.

8   A   Well, he started reaching, grabbed what he had on his

9   waist, and threw it.

10  Q   In what direction did he throw it?

11  A   Ahead of us.  Being that he was closer to the street,

12  there was really no other option to throw the gun.  So he

13  threw it straight ahead of us.

14  Q   When you say he threw it ahead of you, he threw it down

15  Park Street?

16  A   Yes.

17  Q   In the direction you were walking?

18  A   Yes.

19  Q   And at that moment, were you able to see what he threw?

20  A   At first, I didn't pay too much attention to it, but as I

21  realized the situation that was occurring, I paid more detail

22  into it, and then I -- yeah.  Once he got into the -- his hand

23  and started throwing into the -- I realized it was a gun.

24  Q   Prior to Sip doing this, throwing this object that you

25  realized was a gun, did the officers speak you to at all?

189

DIRECT - J. MARSHALL

1   A   No.

2   Q   Did the officers say anything to you?

3   A   No.

4   Q   Had the officers actually had any contact with you at

5   that point?

6   A   No.

7   Q   Did Officer Burbridge say, "Excuse me, sir, may I please

8   have a moment of your time?"

9   A   No.

10  Q   What happened after Sip threw that gun?

11  A   The officers jumped out.  They had their guns drawn, told

12  us to freeze and get against the wall.

13  Q   What did you do?

14  A   I complied, put my hands up in the air, froze.  And then,

15  the next order was get against the wall.  I got against the

16  wall.

17  Q   And what happened when you were up against the wall?

18  A   I got searched.  And then, I stood against the wall for a

19  few seconds.

20  Q   Did there come a point when the officer said something to

21  you?

22  A   Once they retrieved the gun, they asked whose gun it was.

23  Nobody said nothing.  They asked whose gun it was.  Nobody

24  said nothing.  I'm looking to the left to see if Sip was going

25  to take responsibility of the situation, realized he wasn't

LISA SCHMID, CCR, RMR   UNITED STATES DISTRICT COURT   EASTERN
DISTRICT OF NEW YORK

190

DIRECT - J. MARSHALL

1   gonna take responsibility of the situation. They asked again

2   whose gun it was. I told the officers it wasn't my gun.  We

3   was put in handcuffs.

4   Q   When you say, "We was put in handcuffs," was it just you

5   were put in handcuffs, or were both of you put in handcuffs?

6   A   We was both put in handcuffs.

7   Q   You said the officers jumped out of the car.

8        How many officers were there?

9   A   Three to four.

10  Q   Do you see any of the officers in the courtroom today?

11  A   Yes.

12  Q   Do you know them by name?

13  A   I'm aware of their name now, yes.

14  Q   And you recognize them?

15  A   Yes.

16  Q   And you recognize them as the officers that arrested you?

17  A   Yes.

18  Q   Now, Mr. Marshall, at any point before the officers

19  arrested you, did you step behind Sip?

20  A   Impossible.

21  Q   Please, can you explain to the jury how that's

22  impossible.

23  A   We both were walking parallel, one walking -- he's

24  walking -- he's only on the side of me.  There's no way to

25  step behind him.

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

```
                                                                  191
                    DIRECT - J. MARSHALL

 1   Q    Did you reach into your waistband at any point before the

 2   officers arrested you?

 3   A    No.

 4   Q    Did you pull anything out of your waistband before the

 5   officers arrested you?

 6        MS. CASTRO:  Objection to all the leading questions,

 7   your Honor.

 8        THE COURT:  Overruled.

 9        THE WITNESS:  No.

10   BY MR. COHEN

11   Q    We're at a point where you said you were placed in

12   handcuffs, both of you were placed in handcuffs.

13   A    Right.

14   Q    How long did you remain on the scene placed in handcuffs?

15   A    A few minutes, give or take, three to five minutes.

16   Q    Could you explain to the members of the jury what

17   happened during that three to five minutes?

18   A    Well, once they put both the handcuffs on us, they spoke

19   to Sip for a few seconds.  A few seconds later, they stepped

20   off, spoke amongst themselves.  Next thing I noticed, he was

21   being released out of handcuffs and I was being led to the

22   vehicle.

23   Q    Did you hear what they were saying when they were

24   speaking?

25   A    No.
```

A1137

DIRECT - J. MARSHALL

1    Q    What was your reaction, Mr. Marshall, when that was

2    happening?

3    A    Disbelief.  I was puzzled.  I couldn't believe it was

4    happening to me.  I was anticipating to go home, get a bowl of

5    soup.  To be led into this situation --

6    Q    Mr. Marshall, what happened to those items that you had

7    with you that evening?

8    A    They were thrown away.

9    Q    Did the officers voucher the items?

10   A    No.

11   Q    Did they take them into their custody at all?

12   A    Not that I'm aware of, no.

13   Q    After you were taken to the vehicle, where did they take

14   you?

15   A    I was taken to the 83rd Precinct.

16   Q    As far as you know, was Sip taken back to the precinct?

17   A    No.

18   Q    What happened to you when you arrived at the precinct?

19   A    Took my photos, we took my fingerprint and I just waited.

20   It was a surprise to us, being processed.

21   Q    You mentioned they took your fingerprints.

22            Were you wearing gloves that evening?

23   A    No.

24   Q    Was Sip wearing gloves that evening?

25   A    Not that I'm aware of.

DISTRICT OF NEW YORK

193

DIRECT - J. MARSHALL

1   Q    How about the officers; did you see them put on gloves at

2   the scene?

3   A    I'm not sure, no.

4   Q    Before releasing Sip from the scene, did you see the

5   officers attempt to take his fingerprints?

6   A    No.

7            MS. CASTRO:  Objection.

8            THE COURT:  Overruled.

9   BY MR. COHEN

10  Q    Did they ask Sip, while you were at the scene, if he

11  would consent to having his DNA taken?

12  A    I don't know.  No.

13  Q    How long did you stay at the precinct?

14  A    Give or take, six to eight hours.

15  Q    And then, what happened?  Where were you taken after

16  that?

17  A    Central booking.

18  Q    How long did you remain in central booking?

19  A    An additional 12 hours, maybe.

20  Q    And did there come a time when you saw a judge?

21  A    Yes.

22  Q    How long would you say you were in police custody before

23  you saw a judge?

24  A    About eight, 10 hours, 20 hours.

25  Q    And can you describe to the members of the jury what

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

194
DIRECT - J. MARSHALL

1  happened when you saw the judge.

2  A    I was set for bail.  They gave me a set bail.

3  Q    The judge set bail?

4  A    Yes.

5  Q    Did there come a time that you learned what you were

6  charged with?

7  A    Yes.

8  Q    Was that at the time when you saw the judge?

9  A    A few minutes prior to seeing the judge, I was presented

10 an attorney to update me on the situation.

11 Q    What did you learn your charges were with respect to

12 this?

13 A    Criminal possession of a weapon.

14 Q    Were you given an opportunity to enter a plea --

15 A    Yes.

16 Q    -- with respect to these charges?

17 A    Yes.

18 Q    What was your plea?

19 A    Not guilty.

20 Q    Now, I'd like you to describe for the members of the jury

21 how you felt when you were in front of the judge and you

22 learned of these charges.

23 A    I was lost.  I didn't know if I was coming or going at

24 the moment.  My lawyer told me it wasn't looking good for me.

25 The charge, itself, held a minimum of three and a half years.

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

DIRECT - J. MARSHALL                                    195

1   I was lost.

2   Q    What happened after you saw the judge?

3   A    I was given a bail, then I was sent to Rikers Island.

4   Q    You mentioned you were represented by an attorney in

5   connection with these charges.

6   A    Yes.

7   Q    After speaking with this attorney, were you aware of how

8   serious these charges were?

9   A    Yes.

10  Q    Was this case -- withdrawn.

11        Did there come a time that you learned this case was

12  being presented to a grand jury?

13  A    Yes.

14  Q    When did you learn that?

15  A    I was given a court date the following week.  And when I

16  appeared to court, my attorney informed me that if I wanted to

17  present my case to the grand jury, I had the right to.

18  Q    And during that week from the time of your arrest to the

19  time when you had an opportunity to go to the grand jury,

20  where were you?

21  A    On Rikers Island.

22  Q    And did there come a time when you had to decide whether

23  you were going to testify in the grand jury?

24  A    Yes.

25  Q    Without telling the jury what was said, did you have a

DIRECT - J. MARSHALL                                          196

1    discussion about testifying in the grand jury with your

2    attorney?

3    A     Yes.

4    Q     Based on this discussion, did you gain an understanding

5    of the risks of testifying before the grand jury?

6    A     Yes.

7    Q     What was your understanding of the risks of testifying

8    before the grand jury?

9    A     That anything that I said in the grand jury could be held

10   accountable for if I was to take this case to trial.

11   Q     And despite these risks, did you still choose to testify

12   in the grand jury?

13   A     Yes.

14   Q     Please tell the members of the jury why you decided to do

15   that.

16   A     I wanted to plead my innocence.  My attorney told me this

17   would be a situation where I would be able to present my case

18   to -- among peers.  And it was an opportunity, and I should go

19   for it.

20   Q     Now, was your attorney present when you testified in the

21   grand jury?

22   A     Yes.

23   Q     And was your attorney allowed to ask you any questions

24   while this case was presented to the grand jury?

25            MS. GROSS:  Objection.

197

DIRECT - J. MARSHALL

1           THE COURT:  Overruled.

2           THE WITNESS:  No.

3    BY MR. COHEN

4    Q    Who was the only person questioning you in the grand

5    jury?

6    A    The district attorney.

7    Q    Now, Mr. Marshall, had you ever testified in a grand jury

8    before this incident?

9    A    No.

10          MS. GROSS:  Objection, your Honor.  Objection.

11          THE COURT:  Overruled.

12   BY MR. COHEN

13   Q    How did that make you feel, Mr. Marshall?

14   A    What, speaking in front of a grand jury?

15   Q    Yeah.

16   A    Well, I've never been in a position like that before, so

17   I was very nervous.  Never been bombarded with questions, so I

18   didn't really know how to handle the situation.  I was thrown

19   off by the whole arrest situation, me being incarcerated.  So

20   it was just so much coming at me at one time.  But I still

21   gave it a shot, man.  You know, I was looking for a good

22   outcome.

23   Q    Did you get a good outcome?

24   A    No.

25   Q    What happened, Mr. Marshall?

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

DIRECT - J. MARSHALL

198

1    A    I was indicted.

2    Q    What happened after you were indicted?  Where did you go?

3    A    Right back to Rikers Island.

4    Q    At that point, what was your understanding of where your

5    criminal case was going?

6    A    Trial.

7    Q    Why did you know the case was going to trial?

8    A    Because I was not giving a guilty plea.

9    Q    Can you tell the members of the jury why you weren't

10   going to plead guilty in this case.

11   A    Because I was going to plead my innocence to the end.

12   Q    Now, without telling the jury, again, what was said, did

13   you have discussions with your attorney about the risks of

14   taking a case like this to trial?

15   A    Yes.

16   Q    What was your understanding of the risks of fighting a

17   case like this?

18   A    If was to take it to trial and didn't win, I was facing a

19   lot of time.

20   Q    Despite these risks, did you still choose to fight these

21   charges?

22   A    Yes.

23   Q    Why?

24   A    Once again, plead my innocence.  I wasn't going to plead

25   guilty for a situation that I wasn't guilty of.

DIRECT - J. MARSHALL

199

1    Q    After having these discussions about this case with your

2    attorney, what was your mind-set?

3    A    Before what?  Please repeat that.

4    Q    After having these discussions about where your case was

5    heading at that point, after the grand jury had indicted you,

6    what was your mind-set, Mr. Marshall?

7    A    It's a little worse.  I was a little worse because I

8    didn't have good legal representation at the time either.  So

9    law library was really all that was on my mind, trying to

10   fight this case, trying to win the case, trying to fight the

11   case.  I wasn't trying to do time for a case like this,

12   especially when I'm innocent.

13   Q    What was your understanding about how long you would have

14   had to stay in jail while this case was pending?

15   A    Until trial occurs, and trial could take up to a year or

16   two.

17   Q    Did there come a time when you were actually finally

18   released from jail with respect to these charges?

19   A    Yes.

20   Q    When were you released from jail?

21   A    The end of September.  I don't know the exact date.

22   Q    So approximately how long were you in jail in connection

23   with these charges?

24   A    Four and a half months.

25   Q    Can you just describe a little bit for the jury what the

200
DIRECT - J. MARSHALL

1    conditions were like when you were in jail.

2    A    I mean, you're surrounded about everything.  You know,

3    you have people with tuberculosis.  You got people who just

4    don't shower.  You know --

5              MS. GROSS:  Objection, your Honor.

6              THE WITNESS:  -- the eating situation is horrible.

7              THE COURT:  I'll allow it briefly.

8              THE WITNESS:  It was just depressing.  It was very

9    depressing, very overwhelming.  Yeah, very disturbing.

10   BY MR. COHEN

11   Q    Now, after you were released from jail, were you still

12   required to come back to court with respect to these charges?

13   A    Yes.

14   Q    How many times did you have to come back to court?

15   A    Approximately eight times.

16   Q    How long was this case pending after you were released

17   from jail?

18   A    About eight months.

19   Q    Did there come a time when all the charges in connection

20   with your arrest on May 15th, 2008, were dismissed?

21   A    Yes.

22   Q    Can you tell the members of the grand jury when your case

23   was dismissed, Mr. Marshall.

24   A    I believe it was May 2009.

25   Q    I'm going to show you what has been pre-marked as

                                                                    201
                        DIRECT - J. MARSHALL

1    Plaintiff's Exhibit 18.

2            Do you recognize that document, Mr. Marshall?

3    A    Yes.

4    Q    What do you recognize that document to be?

5    A    Notification of dismissal, certificate of dismissal.

6    Q    For who?

7    A    For me.

8    Q    With respect to this case; is that correct?

9    A    Yes.

10           MR. COHEN:   I ask that Plaintiff's Exhibit 18 be

11   moved into evidence.

12           THE COURT:   Admitted.

13           (Plaintiff's Exhibit 18 was received in evidence, as

14   of this date.)

15   BY MR. COHEN

16   Q    Mr. Marshall, I just have a few more questions.  I just

17   put up what's been admitted into evidence as Defendant's

18   Exhibit C1.

19           Do you recognize this gun, Mr. Marshall?

20   A    Yes.

21   Q    What do you recognize it to be?

22   A    The gun that was in our case, my case.

23   Q    On May 15th, 2008, did you ever hold that gun?

24   A    No.

25   Q    On any day prior to May 15th, 2008, did you ever hold

202

DIRECT - J. MARSHALL

1   that gun?

2   A   No.

3   Q   Prior to May 15th, 2008, had you ever seen that gun?

4   A   No.

5        MR. COHEN:   I have no further questions for this

6   witness.

7            THE COURT:   Thank you.

8            MS. GROSS:   Judge, at this time, we'd like to ask

9   for a conference outside the presence of the jury.

10           THE COURT:   Denied.

11           MS. GROSS:   For the record, I'd like to note that

12  it's Defendant's position that the witness has opened the door

13  to certain testimony.  And we'd like to be heard on that

14  issue.

15           THE COURT:   Denied.  Submit a brief, and I'll see

16  you at 9:30 tomorrow.

17  CROSS-EXAMINATION

18  BY MS. GROSS

19  Q   Good afternoon, Mr. Marshall.

20  A   Good afternoon.

21  Q   My name is Felicia Gross.  I'm counsel for Defendants,

22  Salim Randall and Michael Burbridge.  I'm going to ask you a

23  few questions this afternoon.

24           You agree you were on the street after midnight that

25  morning of May 15th, 2008, right?

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

203
CROSS - J. MARSHALL

1  A  Yes.

2  Q  You were in the vicinity of Park Street and Broadway in

3  the Bushwick section, right?

4  A  Yes.

5  Q  May 15th was a weeknight, right?

6  A  I believe so.

7  Q  You bumped into a person you called Sip, right?

8  A  Yes.

9  Q  Sip lived in the Bushwick houses?

10 A  Yes.

11 Q  His name is Demetrios Meade?

12 A  Yes.

13 Q  At that time, you knew Mr. Meade for a few years through

14 the Bushwick area, right?

15 A  You could say yes.

16 Q  You referred to him as your associate, right?

17 A  Yes.

18 Q  On May 15th, you and Mr. Meade were walking down Broadway

19 together, right?

20 A  Yes.

21 Q  You were walking down Broadway toward Park?

22 A  Yes.

23 Q  Then you planned to go separate ways, right?

24 A  Yes.

25 Q  Mr. Meade continued walking down Broadway, right?

204
CROSS - J. MARSHALL

1    A    Yes.

2    Q    And you were going to make a right onto Park Street, you

3    testified?

4    A    I did make a right.

5    Q    You agree that that's a change in direction from

6    Broadway?

7    A    Yes.

8    Q    Mr. Meade was leaving you.  And then after a few seconds,

9    he called your name and came back, right?

10   A    Repeat.

11   Q    Mr. Meade was leaving you?

12   A    Yes.

13   Q    And then, after a few seconds, he called your name and

14   came back?

15   A    Yes.

16   Q    He told you the police were coming, right?

17   A    Yes.

18   Q    So thanks to Mr. Meade, you were alerted that the police

19   were coming?

20   A    Well, because of him, I was alerted that the police was

21   coming.

22   Q    They came down the block in an unmarked car, right?

23   A    Yes.

24   Q    You and your associate knew it was the police?

25   A    Yes.

```
                                                                205
                          CROSS - J. MARSHALL
```

1    Q    You saw that the police car had big antennas?

2    A    Yes.

3    Q    You knew it was a Chevy Impala?

4    A    Yes.

5    Q    By the time the police got to you, you were in reasonable

6    proximity of Mr. Meade?

7    A    Repeat.

8    Q    By the time the police approached you, you and Mr. Meade

9    were in reasonable proximity?

10   A    What you mean by that?

11   Q    You were relatively close?

12   A    Yes.

13   Q    You were both on the sidewalk?

14   A    Yes.

15   Q    And according to you, that's when your associate,

16   Mr. Meade, pulled the gun out of his coat?

17   A    Yes.

18   Q    Threw it into the street?

19   A    Threw it ahead of us.

20   Q    Threw it ahead of you.

21        You heard the sound of the gun hit the ground?

22   A    Yes.

23   Q    You and the officers; you all heard it?

24   A    Yes.

25        MR. COHEN:  Objection.

206
CROSS - J. MARSHALL

1      THE WITNESS:  I can't speak for them.  I know I

2   heard it.

3   BY MS. GROSS

4   Q    Do you recall giving deposition testimony in this case on

5   April 26th, 2011?

6   A    Yes.

7   Q    Do you recall being sworn to tell the truth at that

8   deposition testimony?

9   A    Yes.

10  Q    Do you recall being asked the following question and

11  giving the following answer during that deposition?

12      MR. COHEN:  Page and line, please.

13      MS. GROSS:  Page 111, Lines 11 through 14.

14  BY MS. GROSS

15  Q    "One went to go retrieve the gun because he heard it

16  bounce on the floor.

17      "QUESTION:  Who heard it?

18      "ANSWER:  One of the officers.  We all heard it."

19      Is that your testimony?

20      MR. COHEN:  Objection.  This question calls for

21  speculation.

22      THE COURT:  I'll allow it.

23      Can you answer it?

24      THE WITNESS:  Yes.  I said yes.

25  BY MS. GROSS

CROSS - J. MARSHALL

1  Q    So it's your testimony that you all heard the sound of

2  the gun hit the ground?

3  A    Yes.

4  Q    After the gun was thrown, you agree the officers got out

5  of their car?

6  A    Yes.

7  Q    In fact, the officers jumped out of their car and then

8  put you and Mr. Meade against the wall, right?

9  A    Yes.

10  Q    You saw that the officers had their shields and guns out?

11  A    Yes.

12  Q    You could see that because of the car lights, right?

13  A    No.

14  Q    Do you recall giving grand jury testimony in this case?

15  A    Yes.

16  Q    Do you recall that that testimony was given under oath?

17  A    Yes.

18  Q    Do you recall being asked the following question and

19  giving the following answer, Page 31, Lines 7 through 11:  "So

20  you could see, there was lighting above the area?  Can you

21  see" -- I'm sorry, Line 10.

22         "So you could see, there was lighting above the

23  area?  Can you see?

24         "ANSWER:  No.

25         "QUESTION:  No lighting, but you see the badge and

208
CROSS - J. MARSHALL

1    gun?

2          "ANSWER:  The car lights.  Once they opened the

3    door, I saw the whole inside of the car."

4    A    Okay.

5    Q    Were you asked that question and did you give that

6    answer?

7    A    When you asked the question just a few minutes ago, I

8    thought you meant, like, the lights of the vehicle, you know,

9    like police use in other situations.

10   Q    So it's your testimony that you could see their shield

11   and guns out because of some light coming from the car?

12   A    Yes.

13   Q    One officer went to retrieve the gun, right?

14   A    Yes, I believe so.

15   Q    Found the gun on the ground?

16   A    Yes.

17   Q    The officer searched both of you, right?

18   A    Yes.

19   Q    Put you in a police car?

20   A    They put me in a police car, yes.

21   Q    When they searched Mr. Meade, they didn't find anything,

22   right?

23   A    I don't believe so.

24   Q    After a few minutes, they let him go?

25   A    Yes.

209
CROSS - J. MARSHALL

1  Q    After they arrested you, they transported you to the

2  precinct?

3  A    Yes.

4  Q    And you were transported to the precinct in that same

5  unmarked car?

6  A    I believe so, yes.

7  Q    While you were being transported to the precinct, the

8  officers told you they saw you throw the gun, didn't they?

9  A    Well, first I asked them to --

10 Q    I'm sorry.  Would you just answer the question?

11 A    Right.

12 Q    While you were being transported to the precinct, the

13 officers told you that they saw you throw the gun, isn't that

14 right?

15 A    I can't recall.

16 Q    Do you recall giving a statement to the grand jury?

17 A    Yes.

18 Q    Did you give the following statement:  "I'm on my way to

19 the precinct" --

20        MR. COHEN:  Page, please, and line?

21        MS. GROSS:  Page 18, lines 22 to 25, and page 19,

22 line one.

23 BY MS. GROSS:

24 Q    "I'm on my way to the precinct, to go to the precinct.  I

25 realize that they got me as the individual to be the one with

210
CROSS - J. MARSHALL

1  the gun, saying that they saw me throw the gun."

2          Did you give that statement to the grand jury?

3  A    Yes.

4  Q    Was that a correct statement?

5  A    Yes.

6  Q    So while you were being transported to the precinct, the

7  officers told you that they saw you throw the gun?

8  A    Yes.

9  Q    Isn't that true?

10         You were taken to the 83 Precinct, right?

11  A    Yes.

12  Q    Federal officers came to the precinct, right?

13         MR. COHEN:  Objection.

14         THE COURT:  I'll allow it.

15  BY MS. GROSS:

16  Q    Those federal officers asked you questions, right?

17  A    Yes.

18  Q    Those federal officers asked you about the gun?

19  A    Yes.

20  Q    That wasn't a conversation you wanted to have, was it?

21  A    No.

22  Q    So you never once told the federal officers it wasn't

23  your gun, did you?

24         MR. COHEN:  Objection.

25         THE COURT:  I will allow it.

LISA SCHMID, CCR, RMR   UNITED STATES DISTRICT COURT   EASTERN
DISTRICT OF NEW YORK

211
CROSS - J. MARSHALL

1   A     There was a reason behind that.

2           THE COURT:  All right.  He didn't have to say

3   anything.  He wasn't under the obligation to say anything.  He

4   had a Constitutional right to be silent.  His silence should

5   not be held against him.

6   BY MS. GROSS:

7   Q     You had an opportunity to talk to the federal officers,

8   right?

9   A     Yes.

10  Q     You never once told the federal officers that it wasn't

11  your gun, did you?

12          MR. COHEN:  Objection.

13          THE COURT:  That's been repeated.  I've already

14  instructed the jury.  Sustained.

15  BY MS. GROSS:

16  Q     You were arraigned in criminal court for criminal

17  possession of a weapon, right?

18  A     Yes.

19  Q     Judge set the bail at $25,000?

20  A     Yes.

21  Q     Judge had the options of releasing you on your own

22  recognizance, didn't he?

23  A     I don't know.

24  Q     Judge had the option of setting a lower bail, right?

25          MR. COHEN:  Objection.

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

212
CROSS - J. MARSHALL

1       THE COURT: Sustained.

2   BY MS. GROSS:

3   Q    You couldn't make bail, so you were held in custody,

4   right?

5       MR. COHEN: Objection.

6       THE COURT: Sustained.

7   BY MS. GROSS:

8   Q    You're not claiming you suffered any emotional or

9   psychological injury from this incident, are you?

10      MR. COHEN: Objection.

11      THE COURT: You're objecting?

12      MR. COHEN: Yes.

13      THE COURT: Sustained.

14  BY MS. GROSS:

15  Q    You testified before the grand jury on May 19th, 2008,

16  right?

17  A    (Nods head affirmatively.) Yes.

18  Q    And you told the grand jury your version of what happened

19  that night, right?

20  A    Yes.

21  Q    That your associate, Mr. Meade, threw the gun, not you?

22  A    Yes.

23  Q    Grand jury indicted you on three counts of criminal

24  possession of a weapon, right?

25  A    Yes.

CROSS - J. MARSHALL

1   Q    That means you would stand trial for criminal possession

2   of a weapon?

3   A    Yes.

4   Q    You made bail on September 26, 2008, and were released

5   from custody?

6   A    Yes.

7   Q    You didn't have to pay the lawyer who represented you at

8   the criminal proceeding, right?

9         MR. COHEN:  Objection.

10        THE COURT:  Are you claiming the fee?

11        MR. COHEN:  No.

12        THE COURT:  All right.

13        Don't answer.

14        MS. GROSS:  No further questions, Your Honor.

15        THE COURT:  Now, ladies and gentlemen, the fact that

16  a grand jury indicted him is not evidence of any guilt.  Is

17  that clear?

18        (All jurors answer affirmatively.)

19        THE COURT:  So it's not what the grand jury

20  believed.  It's what you believe.  You understand that?

21        (All jurors answer affirmatively.)

22  BY MR. COHEN:

23  Q    Mr. Marshall, Ms. Gross just asked you, if you changed

24  directions when you got to Park Street.  You weren't changing

25  directions.  You had always intended to go to your aunt's

214
                    CROSS - J. MARSHALL

1   house on Park Street, isn't that correct?

2   A    Yes.

3   Q    That was the direction you intended to go?

4   A    Yes.

5   Q    Now, with respect to the officers making that statement,

6   to you in the vehicle, that they saw you throw the gun.

7   Wasn't that statement made to you in response to you asking

8   why you were arrested -- why they were arresting you?

9   A    Yes.

10          MS. GROSS:  Objection; leading.

11          MR. COHEN:  I have no further questions, Your Honor.

12          THE COURT:  All right.  Step down.  You may step

13   down.

14          You have another witness?

15          MR. NORINSBERG:  That's the last witness for today,

16   Your Honor.

17          THE COURT:  No, it isn't.  Where's your witness?

18          MR. NORINSBERG:  Okay.  Well, I believe that's our

19   case-in-chief, and I believe that --

20          THE COURT:  Are you resting?

21          MR. NORINSBERG:  Yeah.

22          THE COURT:  All right.

23          MR. NORINSBERG:  Can I confer one second with

24   counsel, just to make sure we have all the documents?

25          THE COURT:  You may.  Take a short recess.

        LISA SCHMID, CCR, RMR   UNITED STATES DISTRICT COURT   EASTERN
                         DISTRICT OF NEW YORK

215
CROSS - J. MARSHALL

1          MR. NORINSBERG: Okay.

2          THE COURT: Take a short recess, ladies and

3   gentlemen, please.

4          MR. NORINSBERG: (Nods head affirmatively.)

5          THE COURT: All right.

6          MR. NORINSBERG: Thank you.

7          THE COURT: Five minutes, please.

8          (Recess.)

9          (Jury exits.)

10         MR. NORINSBERG: We're prepared to rest on the

11   record.

12         THE COURT: Plaintiffs rest?

13         MR. NORINSBERG: Should we do it in the front of the

14   jury, Your Honor or no?

15         THE COURT: No.

16         MS. CASTRO: Your Honor, at this point, the

17   defendants would like to make a motion pursuant to Rule 50 of

18   the Federal Rules of Civil Procedure.

19         With respect to the false arrest claim bought forth

20   by the plaintiff, it's our position that they have not met the

21   standard to prove their claim.

22         Specifically, they failed to show that there was a

23   lack of probable cause. In fact, the officer's testimony this

24   morning has established that there was probable cause for the

25   arrest. There was testimony that they observed the plaintiff

216
CROSS - J. MARSHALL

1   remove the handgun from his waistband and throw it out into

2   the street.  This was observed by Office Burbridge, who gave

3   such testimony.  And further, Officer Randall corroborates

4   that testimony.  Plaintiff has not established that that is

5   not what the officers observed.

6        With respect to the malicious prosecution claim,

7   defendants submit that, again, there was probable cause for

8   the prosecution.  While Officer Randall was the officer who

9   provided the District Attorney's office with the information

10  to commence the proceedings against the plaintiff and

11  plaintiff was, in fact, indicted by this grand jury, that

12  indictment creates presumption of probable cause.  Plaintiff

13  has not refuted that presumption.

14       For that reason, Your Honor, we ask that you dismiss

15  the claims.

16       THE COURT:  Motion is denied.  It's strictly a

17  question of credibility.

18       MS. CASTRO:  Your Honor, we also add that the

19  officers are entitled to qualified immunity.  If the jury were

20  to believe the plaintiff's claim that it was Mr. Meade and not

21  him that threw the gun and they were mistaken in their

22  observation then, again, they would be entitled to qualified

23  immunity.  It was simply a mistake.

24       THE COURT:  Denied, under the circumstances of this

25  case; However, you may brief it and I'll have you brief an

LISA SCHMID, CCR, RMR   UNITED STATES DISTRICT COURT   EASTERN
DISTRICT OF NEW YORK

217
CROSS - J. MARSHALL

1    argument at 930.

2              MS. CASTRO:   Thank you, Your Honor.

3              THE COURT:   The case presented would support a

4    verdict that the defendants deliberately lied.

5              Bring in the jury, please.

6              Get your next witness ready, please.

7              (Jury enters.)

8              THE COURT:   Now, sit down, please.   The plaintiff

9    has rested.   The defendant is now putting on a case.

10             Swear the witness, please.

11             (Witness sworn.)

12             THE CLERK:   Please state and spell your name for the

13   reporter.

14             THE WITNESS:   Kieran Fox, K-I-E-R-A-N, F-O-X.

15   BY MS. CASTRO:

16   Q    Good afternoon.

17   A    Hi.   Good afternoon.

18   Q    Can you please introduce yourself to the jury?

19   A    My name is Kieran Fox.   I'm a New York City Police

20   officer.

21   Q    How long have you been employed by the New York City

22   Police Department?

23   A    Twelve years.

24   Q    What is your current rank?

25   A    I'm a police officer.

218
CROSS - J. MARSHALL

1   Q    Where are you assigned?

2   A    I'm assigned at Brooklyn North Anticrime Unit?

3   Q    And how long have you been assigned there?

4   A    Seven years.

5   Q    Can you tell us what your duties and responsibilities are

6   as a police officer in the Anticrime Unit?

7   A    We are responsible for in-progress violent street crimes,

8   like robberies, burglaries, shootings, things of that nature.

9   Q    And specifically, where you are assigned, do you cover

10  certain neighborhoods?

11  A    Yes.

12  Q    What neighborhoods to you patrol?

13  A    We are responsible for Brownsville, East New York, Crown

14  Heights, Bed-Stuy, Greenpoint, Bushwick, Williamsburg, Fort

15  Greene, Brooklyn Heights and part of Carroll Gardens.

16  Q    Now, Officer, how many arrests have you made in the

17  course of your career?

18  A    I presently have 156 arrests.

19  Q    How many arrests have you been involved with?

20  A    A little over a thousand.

21  Q    And of those thousand arrests, approximately how many

22  have been for guns?

23  A    About 200.

24  Q    Officer Fox, I want to direct your attention to May 15th,

25  2008.  Were you working that night?

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

```
                                                                    219
                    CROSS - J. MARSHALL

 1   A    Yes, I was.

 2   Q    What tour were you working?

 3   A    It's called the fourth platoon.  It's 5:30 at night to

 4   2:05 in the morning.

 5   Q    And what was your assignment that day?

 6   A    Anticrime.

 7   Q    Were working with anyone?

 8   A    Yes.

 9   Q    Who were you working?

10   A    I was working with Police Officer Michael Burbridge and

11   Police Officer Salim Randall.

12   Q    How were you dressed that day?

13   A    In plain clothes.

14   Q    What about the other two officers?

15   A    Plain clothes, as well.

16   Q    Did you have anything that would identify you as a New

17   York City Police Officer?

18   A    I had my shield around my neck.

19   Q    Did the other officers have shields, as well?

20   A    Yes.

21   Q    Now, on that night, were you on foot or in a car?

22   A    I was in an unmarked police car.

23   Q    What type of car was it?

24   A    I believe it was a Chevy Impala.

25   Q    Where were you positioned in the car?
```

220
CROSS - J. MARSHALL

1   A    I was the driver.

2   Q    Where were the other officers?

3   A    Officer Burbridge was sitting in the passenger seat and

4   Officer Randall was sitting behind me.

5   Q    Let me direct your attention to 12:40 a. m. on that

6   night.  Where were you?

7   A    I was on Park Avenue, approaching the intersection with

8   Broadway.

9   Q    What happened at that time?

10  A    At that time, as we approached the corner, I could see

11  two gentlemen walking on the opposite side of Broadway.

12  Q    Would you identify what those men looked like?

13  A    One was a tall male, black.  The other was a tall

14  Hispanic gentleman with a ponytail.

15  Q    Did you come to learn these individuals' names?

16  A    Yes.

17  Q    Who were they?

18  A    The male, black's name was Demetrius Meade, and the other

19  gentleman was Joshua Marshall.

20  Q    Officer, I want to show you what's been marked as

21  Defendant's Exhibit E for identification.  Can you tell us

22  what is depicted in this document (indicating)?

23  A    (Examines photograph.)  This is the corner of Broadway

24  and Park Street.  This is the opposite side of Broadway from

25  Park Avenue, where I -- the R & P, the police car was stopped

221
CROSS - J. MARSHALL

1   at the corner.

2            MS. CASTRO:  Your Honor, I ask that Defendants'

3   Exhibit E be moved into evidence.

4            THE COURT:  E, as in --

5            MS. CASTRO:  Elephant.

6            THE COURT:  As in "easy"?

7            MS. CASTRO:  Yes.

8            THE COURT:  Marked in evidence.

9            MS. CASTRO:  As well as Defendants' Exhibit E-1,

10  which is a blowup of that same document.

11           THE COURT:  Marked it as in evidence.

12  BY MS. CASTRO:

13  Q    Officer, could you tell me what the lighting conditions

14  were at that hour on that street corner?

15  A    It pretty well lit at that corner.  If you'd look at the

16  picture, there's a street light right at the corner.  It's got

17  a one-way sign on it.

18           And what a lot of people don't know -- always

19  realize, when you're under the elevated train like that, the

20  street lights are actually lowered to be underneath the train.

21  If you look in the picture, you can see two additional street

22  lights on the same side of Park and then there's another one

23  on the opposite side of the street.

24  Q    Officer, would you step forth in front of the photo and

25  point out these street?

222
CROSS - J. MARSHALL

1    A    (Complies.)

2    Q    Officer, could you circle the street lights that you see

3    in this photograph, Defendants Exhibit E-1?

4    A    There is a street light currently right here, which is --

5    this is the Park Street sign, the one I was speaking of, and

6    you notice here is the elevated train.  You have a lowered

7    street light here.  There's another one here.  There's one

8    pretty far down.  There's another one on the other side of the

9    street right here.  Plus, you have this street light.  The

10   street lights here.

11        And in this is a pretty well-lit area, where the

12   bodega signs and stuff at night kind of stay open.  The liquor

13   store light is on pretty much to like three or four in the

14   morning.  On top, that's a pretty good description.

15   Q    Let me show you what's been entered into evidence as

16   Defendant's Exhibit D-1.  Do you recognize what's depicted in

17   this photograph? (Indicating.)

18   A    (Examines photograph.) This is the opposite side, pretty

19   much where the other picture was taken from.  This is Park

20   Street.  (Indicating.) This is, of course, all the way right

21   about here.  This picture will take you from where you're

22   standing right there, but this is the corner of -- Broadway is

23   here this is Park Street. (Indicating.)

24   Q    Were there any street lights on Park Street?

25   A    There is a street light right here in the middle, on the

223
CROSS - J. MARSHALL

1   corner and the same down the block.

2   Q    You have identified where the street lights were.  Were

3   they turned on that night?

4   A    Yes, they were.

5           MS. CASTRO:  You can go back to your seat.

6           THE WITNESS:  (Complies.)

7   BY MS. CASTRO:

8   Q    Off icer, after you observed the individuals, what did

9   you do next?

10  A    As I observed the individuals, I noticed that they were

11  looking at the car.  They were on Broadway still.  Quickened

12  their pace a bit and made a quick to -- right-hand turn onto

13  Park Street, started heading towards the next block up, which

14  is Beaver.

15  Q    What did you do?

16  A    At that time, I started to turn off of Park Avenue where

17  I was, and started to make the turn onto Broadway, and as I

18  noticed, I looked back across at them and they started to

19  separate.

20  Q    When you went down that street, is that a one-way street?

21  A    Yes, it is.

22  Q    How far down did you go?

23  A    Just off the corner.

24  Q    Was there any other traffic in the area at that time?

25  A    No.

224

CROSS - J. MARSHALL

1   Q    Were there any other individuals walking down the street

2   besides Mr. Meade and Mr. Marshall?

3   A    No.

4   Q    What happened next?

5   A    At that time, as I pulled up to the -- made the turn,

6   Officer Burbridge was looking out the passenger window and at

7   that time, he said, "Police department.  How are you tonight?"

8   Q    Was there a response?

9   A    At that time, Mr. Meade stopped where he was and he

10  quickly turned.  He look over his shoulder.  Mr. Marshall was

11  walking him behind him.  Mr. Meade turned.  His head pulled

12  back around.  He lifted his hands up like this

13  (demonstrating), and just after he did that, I heard a metal

14  clang hit the ground.

15          THE COURT:  Who held up his hands?

16          THE WITNESS:  Mr. Demetrius Meade.

17          THE COURT:  All right.  Describe how he lifted his

18  hand.

19  BY MS. CASTRO:

20  Q    You're indicating that he had his palms up?

21  A    Yes.  He lifted his hands up and his palms.  He was

22  looking at the palms of his hands and he was looking directly

23  at the car.

24  Q    Just using the photograph that is Defendant's Exhibit

25  D-1, can you just identify where you observed the individuals?

225
CROSS - J. MARSHALL

1   A   (Complies.)

2   Q   Specifically, where you said that Mr. Meade stopped.

3   A   (Complies.)

4           THE COURT:   What color -- you're using what color?

5   Wait just a moment, please.   We have that color on already.

6   I'll give you another color.

7           MS. CASTRO:   Thank you.

8           THE COURT:   Here's a green pencil.   (Handing.)

9   BY MS. CASTRO:

10  Q   Sir, using this green pencil, can you identify where you

11  observed Mr. Meade stop and put his hand up?

12  A   Right around here.   (Indicating.)

13          THE COURT:   Put your initials next to that, please,

14  and have an X.

15          THE WITNESS:   (Complies.)

16  BY MS. CASTRO:

17  Q   Where did you observe Mr. Marshall?

18  A   Mr. Marshall was walking back here.   (Indicating.)

19          THE COURT:   Put an M in green, please.

20          THE WITNESS:   Excuse me, sir?

21          THE COURT:   M in green, please.

22          THE WITNESS:   Yes, sir.

23  BY MS. CASTRO:

24  Q   And put your initials next to that.

25  A   (Complies.)

226
CROSS - J. MARSHALL

1   Q   Where was the car?

2   A   The car was parked over in this area here. (Indicating.)

3           THE COURT:  Put a C there for car, please.

4           THE WITNESS:  (Complies.)

5   BY MS. CASTRO:

6   Q   Approximately how far away would you estimate the car was

7   from the sidewalk?

8   A   Maybe eight, nine feet.

9   Q   The length of a car?

10  A   The length of a car, plus, you know, if I stopped -- if I

11  stopped, the car was making enough room, if the door had

12  opened or somebody had to get out, he wouldn't be pinned in

13  against the car.

14  Q   So what happened after Mr. Meade put his hands up?

15  A   I heard -- he was like this (demonstrating), and then I

16  heard a large bang, like a metal bang hit the grounds.

17  Q   What happened next?

18  A   At that time --

19          MS. CASTRO:  You can sit down.

20          THE WITNESS:  (Complies.)

21  A   I, at that time, we exited the vehicle, went through the

22  cars, the parked cars there.  Mr. Marshall had turned and

23  started to walk back to Broadway.  Officer Randall, I saw him

24  out of the corner of my eye go towards Mr. Marshall.

25          I approached Mr. Meade.  He started to back up.  And

227
CROSS - J. MARSHALL

1   I said, "Police Department.  Don't move.  Don't move."  And I

2   put my hand on him.  He back up.  So at that point, I just

3   pushed him to the ground and handcuffed him.

4       I did see the gun laying on the ground off to my

5   left.  And from there, I picked Mr. Marshall (sic) up.  I

6   looked over my shoulder.  Officer Randall had had Mr. Marshall

7   against that roll-down gate you could see in the picture, and

8   he was handcuffing him there, as well.

9   Q    What type of firearm did you see?

10  A    It was a silver -- metal silver .38 caliber.  It was a

11  revolver.

12  Q    And happened after you put Mr. Meade in handcuffs?

13  A    I explained to him, you know, "I saw you pick up your

14  hands.  I know you didn't have that gun.  I know it was the

15  other guy's gun and just calm down and then I'm going to let

16  you go.  I'm going to take your information and you'll be on

17  your way."

18  Q    Before you got out of the car and eventually when you did

19  get out the car to approach Mr. Meade, did you ever take your

20  eyes off of him?

21  A    No.

22  Q    And how long in total would you say that this entire

23  incident occurred?

24  A    Less than a minute.

25  Q    At any point when you got out of the car and heard the

                                                                    228
                              CROSS - J. MARSHALL

1   sound of the metal, did anybody ever ask, whose gun is it?

2   A    No.

3   Q    Did you ever ask whose gun it is?

4   A    No, I didn't have to.

5   Q    Why not?

6   A    I knew it was Mr. Marshall's, because Mr. Meade never

7   moved.

8   Q    Following the handcuffing of Mr. Marshall, what happened

9   next?

10  A    Officer Burbridge recovered the firearm.  I explained to

11  Mr. Meade, I took his information, I got any information.  I

12  filled out a form.  And I, you know, it's called a UF-250

13  form.  I filled that out, sent him only his way.  Mr. Marshall

14  was put in the back of the unmarked car, and him and the

15  firearm were taken to the 83 Precinct.

16  Q    Where is the 83 Precinct located?

17  A    It's in Bushwick.  It's at the corner of Knickerbocker

18  and Bleecher Street.  It's 480 Knickerbocker Avenue is the

19  address.

20  Q    Once at the precinct, what occurred?

21  A    At that time, arrest processing, fingerprinting, firearm

22  was vouchered and it gets sent to the balistics lab for

23  testing.

24  Q    Now, at any point in time, did you ever speak to the

25  District Attorney's Office about this case?

229
CROSS - J. MARSHALL

1   A   No.

2   Q   Did you ever testify at the grand jury?

3   A   No, I did not.

4           MS. CASTRO:  Thank you.  I have nothing further.

5           THE WITNESS:  Thank you.

6   BY MR. NORINSBERG:

7   Q   Good afternoon, Officer Fox.

8   A   Hello.  How are you, sir?

9   Q   This incident took place in May of 2008, is that correct?

10  A   I thought it was March.  What's the date?

11  Q   May 2008, approximately four years ago, correct?

12  A   That's correct.

13  Q   Now, this is the first time, four years later that you

14  are giving any testimony about what you actually saw that

15  night, right?

16  A   That's correct, sir.

17  Q   You didn't testify at the grand jury, correct?

18  A   That's correct.

19  Q   You didn't give any testimony in this civil deposition,

20  right?

21  A   That's correct.

22  Q   This is the first time you're telling what you actually

23  saw that night, right?

24  A   That's correct.

25  Q   Did you meet with defense counsel before coming here?

```
                                                                  230
                          CROSS - OFFICER FOX

 1   A    Yes.

 2   Q    When was the first time you met with them?

 3   A    About a week ago.

 4   Q    So the first time you met with anybody, any defense

 5   lawyer for the defendants in the case was almost four years

 6   after this incident, right?

 7            MS. CASTRO:  Objection.

 8            THE COURT:  Overruled.

 9   BY MR. NORINSBERG:

10   Q    Is that correct?

11   A    That's correct.

12   Q    So just last week ago, you were called down and they

13   wanted to find out what you knew, right?

14   A    Yes, sir.

15   Q    And you went over what you were going to testify to today

16   in front of the jury, right?

17   A    Yes, sir.

18   Q    Now, you testified earlier that when you first saw these

19   two men, they were looking at your car, right?

20   A    When I first saw them, they were walking on Broadway

21   and --

22   Q    Then you testified --

23            THE COURT:  Excuse me.

24            MS. CASTRO:  Objection.

25            THE COURT:  He hasn't finished his answer.
```

```
                                                           231
                    CROSS - OFFICER FOX
```

1          MR. NORINSBERG:  I'm sorry.

2     A    I said they were walking on Broadway, and then they

3     looked at the car.

4     BY MR. NORINSBERG:

5     Q    Okay.  So when you said "they," you were referring to

6     Mr. Marshall and Mr. Meade, right?

7     A    That's right.

8     Q    And then you said they quickened their pace, correct?

9     A    Yes.

10    Q    That would include Mr. Meade, right?

11    A    Yes.

12    Q    And when you got to that scene, you handcuffed both of

13    them, didn't you?

14    A    Yes, sir.

15    Q    And the reason why you handcuffed both of them is because

16    you never saw who threw that gun, true?

17    A    Well, I didn't see who threw the gun, but I knew

18    Mr. Meade didn't throw the gun.

19    Q    So you were driving down the wrong way on a one-way

20    street, correct?

21    A    That's correct.

22    Q    It was dark at night, correct?

23    A    No, not -- that corner is very well lit.

24    Q    There's a 24-hour laundromat right at that street, isn't

25    there?

```
                                                        232
              CROSS - OFFICER FOX
```

1   A    Yes, there is.

2   Q    So you didn't know if there was any people -- if there

3   was going to be any people or any cars there, right?

4   A    That's correct.

5   Q    You had to careful when you proceeded down that street,

6   right?

7   A    I just turned off the corner from Broadway.

8   Q    When you were going down the street, you had to be

9   careful to make sure there were pedestrians and no cars,

10  correct?

11  A    That's correct.

12  Q    As the driver of that police vehicle, that was your

13  number one priority, right?

14  A    That's correct.

15  Q    You couldn't look over at what's happening on the

16  sidewalk and also drive at the same time down that street,

17  could you?

18  A    Like I said, I turned directly off the corner and

19  stopped.  So once I got to that corner, I looked down the

20  block and saw nobody coming or nobody walking, I made that

21  turn.

22  Q    Sir, it's a busy commercial area, isn't it?

23  A    No, it's not.

24  Q    Aren't there a lot of stores right on that street?

25  A    It's 12:40 in the morning.

233
CROSS - OFFICER FOX

1   Q    There's a twenty-four hour laundromat right at the

2   corner, isn't there?

3   A    Before I worked in the Brooklyn North --

4   Q    My question is -- I'm sorry.

5        MR. GOTTLIEB:  Objection, Your Honor.  The witness

6   --

7        MR. NORINSBERG:  It's nonresponsive.

8        THE COURT:  Yes, I'll allow it.

9        You can answer.

10  A    I worked in the 83 Precinct, which is where that area is

11  right there.  That area in question, if you don't live down

12  that block, you're really not driving down it.  Most of the

13  traffic that goes to that 24-hour laundromat is foot traffic,

14  and it's on the other side of the street.

15  BY MR. NORINSBERG:

16  Q    Do you know that Mr. Marshall was actually staying on

17  that street, at 17 Park Treat.  Do you know that?

18  A    No, sir.

19  Q    Do you know this his aunt lives at that address that he's

20  actually at, that house?  He was going back to her apartment

21  that night?

22       MS. CASTRO:  Objection.

23       THE COURT:  I'll allow it.

24  A    No, I did not.

25

234

CROSS - OFFICER FOX

1    BY MR. NORINSBERG:

2    Q    Now, you said that when -- at some point, you saw

3    Mr. Meade throw up his arms, is that right?

4    A    He put his hands up. He didn't throw them up. He just

5    lifted them up.

6    Q    So Mr. Meade, basically, did he turn around to do that?

7    A    He faced the car.

8    Q    He turned around to show you, look, it's not me, right?

9    I've got nothing in my hands, right?

10   A    He didn't do -- make any movement like that. He just

11   stopped and picked his hands up very quickly like this

12   (demonstrating).

13   Q    That was after they already threw the gun, true?

14   A    No.

15   Q    He was trying to show you.

16           THE COURT:  Excuse me.  Excuse me.

17           Finish your answer.

18   A    He lifted his hands, looked at the car, and then the

19   metal object hit the ground.

20   BY MR. NORINSBERG:

21   Q    And you remember all that four years later, right,

22   Officer?

23   A    Yes, I do.

24   Q    And how many hundreds of arrests have you made in your

25   career?

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

```
                                                       235
                    CROSS - OFFICER FOX

 1   A    Over a thousand.

 2   Q    Over a thousand arrests in your career and you just

 3   happen to remember four years later all that detail, right?

 4   A    That's correct.

 5   Q    Did meeting with the attorneys for these two defendants

 6   help refresh your memory a little bit about what happened?

 7            MS. CASTRO:  Objection.

 8            THE COURT:  I'll allow it.

 9   A    No.

10   BY MR. NORINSBERG:

11   Q    Well, you do agree that you spoke to Officer Burbridge

12   one week before he gave his deposition testimony in this

13   trial -- in this civil action?  Isn't that true?

14            MS. CASTRO:  Objection.

15            THE COURT:  I'll allow it.

16   A    No, I don't understand the question.

17   BY MR. NORINSBERG:

18   Q    You had a conversation about this lawsuit with Officer

19   Burbridge just one week before he testified at his deposition

20   in this case, true?

21   A    I don't remember that.

22   Q    And if Mr. Officer Burbridge acknowledged in his

23   deposition that he spoke to you one week before that

24   deposition about this very lawsuit, would that surprise you?

25            MS. CASTRO:  Objection.
```

```
                                                         236
                  CROSS - OFFICER FOX

 1              THE COURT:  I'll allow it.

 2   A     No, it wouldn't be.

 3   BY MR. NORINSBERG:

 4   Q     Now, no one actually had to subpoena you to be here,

 5   right?

 6   A     Excuse me?

 7   Q     You're not here pursuant to a subpoena, right?

 8   A     No, sir.

 9              MS. CASTRO:  Objection.

10   BY MR. NORINSBERG:

11   Q     You came voluntarily to help out your former partner,

12   isn't that true?

13              MS. CASTRO:  Objection.

14              THE COURT:  I'll allow you to explain why you're

15   here.

16   A     I was notified by the New York City Police Department to

17   come here you.

18   BY MR. NORINSBERG:

19   Q     And you came here voluntarily, right?

20   A     Yeah.  I basically can't say no.  This is part of my job,

21   to testify in a courtroom.

22   Q     You understood that the allegations in the case were that

23   your former partner had made false statements to the District

24   Attorney's Office.  You understood that, right?

25              MS. CASTRO:  Objection.
```

237
                    CROSS - OFFICER FOX

1            THE COURT:  I'll allow it.

2    A    Yes.

3    BY MR. NORINSBERG:

4    Q    You understood that your role here was to help him out in

5    the case, true?

6            MS. CASTRO:  Objection.

7            THE COURT:  I'll allow it.

8    A    Yes.

9            MR. NORINSBERG:  Thank you.  Nothing further.

10   BY MS. CASTRO:

11   Q    Officer Fox, how fast were you going when you were

12   driving down that street?

13   A    I was crawling.

14   Q    Did you hit anything?

15   A    No.

16   Q    Was anyone walking across the street when you were

17   turning?

18   A    No.

19   Q    And turning to the interaction with Mr. Marshall, did he

20   ever at any point tell you that it wasn't his gun?

21   A    No.

22   Q    And did he volunteer information that he was going to his

23   aunt's house?

24           THE COURT:  I couldn't hear the question.

25

LISA SCHMID, CCR, RMR   UNITED STATES DISTRICT COURT   EASTERN
                    DISTRICT OF NEW YORK

238
REDIRECT - OFFICER FOX

1    BY MS. CASTRO:

2    Q    Did he voluntary that he was going to his aunt's house?

3         THE COURT:   Excuse me.  I instruct you again that

4    anybody stopped that way has a Constitutional right to remain

5    silent, and silence may not be used against him.  Do you

6    understand that?

7         JURORS:   (All answered affirmatively.)

8    BY MS. CASTRO:

9    Q    Officer Fox, did you see Mr. Meade throw that gun?

10   A    No, he didn't.  He never moved.

11   Q    Was anyone else on that street?

12   A    No.

13   Q    Who else was there besides Mr. Meade?

14   A    Mr. Marshall.

15   Q    Did you see Officer Burbridge throw a gun?

16   A    No.

17   Q    Did you see Officer Randall throw a gun?

18   A    No.

19   Q    Did you throw a gun?

20   A    No.

21        MS. CASTRO:   Thank you.  Nothing further.

22        MR. NORINSBERG:   Two more questions?

23        THE COURT:   All right.  Stay where you are.   One

24   question.

25        MR. NORINSBERG:   Okay.

LISA SCHMID, CCR, RMR   UNITED STATES DISTRICT COURT   EASTERN
DISTRICT OF NEW YORK

239
RECROSS - OFFICER FOX

1    BY MR. NORINSBERG:

2    Q    You didn't see Mr. Meade throw the gun, but you also

3    didn't see Mr. Marshall throw the gun, true or not true?

4    A    That's correct.

5            MR. NORINSBERG:  Thank you.

6            THE COURT:  Thanks very much.  That will be all.

7            THE WITNESS:  Thank you.

8            THE COURT:  Next witness, please.

9            MS. CASTRO:  Your Honor, we have two more witnesses

10   that we have scheduled for tomorrow.  So at this point, we

11   don't have any others.  Those are our last two.

12           THE COURT:  All right.  I'll have to let you go

13   earlier.  I'm sorry.  Be here tomorrow promptly at ten.  Don't

14   discuss the case.  Don't do any research much.  Just come in

15   fresh.  Good night.

16           (Jury exits.)

17           THE COURT:  I'll see counsel at 9:30 tomorrow.

18   Final briefing on anything you want.  I want those two

19   witnesses here on time.  They should take very little time.

20   And your summations will begin tomorrow.

21           How long will the plaintiff take?

22           MR. NORINSBERG:  Your Honor, I'm going estimate

23   around 45 minutes, and I ask for a little latitude, if

24   possible.

25           THE COURT:  Yes, you can have it.

LISA SCHMID, CCR, RMR  UNITED STATES DISTRICT COURT  EASTERN
DISTRICT OF NEW YORK

240
RECROSS - OFFICER FOX

1        MR. NORINSBERG: And I would like to have the

2   rebuttal, at least to have a very brief rebuttal.

3        THE COURT: What?

4        MR. NORINSBERG: My understanding of the general

5   rule in the Eastern District is I would go first --

6        THE COURT: Oh, you mean on the summations?

7        MR. NORINSBERG: Yes.

8        THE COURT: Yes. Forty-five minutes.

9        Defendants, how long?

10        MS. CASTRO: We estimate about the same amount of

11   time, half-hour to 45 minutes.

12        THE COURT: And then you want ten minutes for

13   rebuttal/

14        MR. NORINSBERG: Yes, please, Your Honor.

15        THE COURT: Okay. Yes. Nothing else? See you in

16   the morning. Thank you.

17        (Trial continued to April 25, 2012, at 9:30 a. m.)

18

19

20

21

22

23

24

25

LISA SCHMID, CCR, RMR   UNITED STATES DISTRICT COURT   EASTERN
DISTRICT OF NEW YORK

241

1            INDEX

2    WITNESS                                    PAGE

3    Officer Randall

4    Direct/Redirect                         39/113

5    Cross                                      97

6

7    Officer Burbridge

8    Direct/Redirect                        119/168

9    Cross                                     158

10

11   Joshua Marshall

12   Direct/Redirect                          176

13   Cross                                     202

14

15   Officer Fox

16   Direct/Redirect                        217/237

17   Cross/Recross                          229/239

18

19

20

21

22

23

24

25

A1187

<u>TRIAL TRANSCRIPT, DATED APRIL 25, 2012</u>
(pp. A1187-A1244)

REPRODUCED FOLLOWING

## A1188

---

| | 1 | | PROCEEDINGS 2 |
|---|---|---|---|

**Page 1**

1  UNITED STATES DISTRICT COURT
2  EASTERN DISTRICT OF NEW YORK
   -----------------------------x
3  JOSHUA MARSHALL,
        Plaintiff,
4
        versus                  10-CV-02714 (JBW)
5  THE CITY OF NEW YORK,
        Defendant.        United States Courthouse
6                          Brooklyn, New York
   -----------------------------x
7
8                    April 25, 2012
                     9:30 A.M.
9           ***VOLUME II**
10      CONTINUED TRANSCRIPT OF TRIAL
11  Before: HON. JACK B. WEINSTEIN,
    UNITED STATES DISTRICT JUDGE
12
13             A P P E A R A N C E S:
14  FOR THE PLAINTIFF:
15              COHEN & FITCH, LLP
                Attorneys for the Plaintiff
16              Woolworth Building
                233 Broadway - Suite 1800
17              New York, New York 10279
18              BY: GERALD M. COHEN, ESQ.
                    JON NORINSBERG, ESQ.
19
20
21  For the Defendants:
22              NEW YORK CITY LAW DEPARTMENT
                Attorney for the Defendant
23              100 Church Street
                New York, New York 10007
24
                BY: FELICIA GROSS, ESQ.
25                  JOHANA CASTRO, ESQ.
                    FRANCES SANDS, ESQ.

JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

**Page 2**

1  Court Reporter: Judi Johnson, RPR, CRR, CLR
   Official Court Reporter
2  Telephone: (718) 613-2582
   Facsimile: (718) 613-2480
3  E-mail: Judi_Johnson@nyed.uscourts.gov
4
5  Proceedings recorded by computerized stenography. Transcript
   produced by Computer-aided Transcription.

JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

---

| | PROCEEDINGS 3 | | PROCEEDINGS 4 |
|---|---|---|---|

**Page 3**

1   (In open court.)
2        COURTROOM DEPUTY:  All rise. The United States
3   District Court for the Eastern District of New York is in
4   session. The Honorable JACK B. WEINSTEIN is now presiding.
5        (Honorable JACK B. WEINSTEIN takes the bench.)
6        COURTROOM DEPUTY:  Calling civil trial proceedings
7   in Docket no. 10-CV-2714, Joshua Marshall against The City of
8   New York.
9        THE COURT:  Marshall v. Randall and Burbridge.
10       I have the defendants' brief in support of multiple
11  trial motions.
12       MR. COHEN:  Your Honor, may I step outside just to
13  get my co-counsel?
14       THE COURT:  If he's here.
15       MR. COHEN:  He's here.
16       MS. CASTRO:  Your Honor, I will step out and get my
17  co-counsel as well.
18       (A brief pause.)
19       THE COURT:  I've gone over this brief in support of
20  the defendants' multiple trial motions. Thank you very much
21  for getting this in early. It was helpful to be able to read
22  it early this morning.
23       I'll briefly summarize the conclusions I have and
24  changes I'm making, and then if it's necessary, we can have
25  further argument.

JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

**Page 4**

1        Defendants asked to be permitted to cross-examine
2   the plaintiff as to his criminal history now that he has
3   opened the door to such testimony. I don't think he's opened
4   the door. That is denied.
5        Second, plaintiff has improperly made an issue of
6   the legal validity of the officers' initial approach in
7   contravention of the Court's prior order. Defendants request
8   a curative instruction and, in the alternative, a mistrial.
9   As I explained yesterday, there was no contravention of the
10  Court's prior order. The testimony was properly limited to
11  the period from which the defendants had first observed the
12  plaintiff to the time of arrest.
13       Defendants asked for a mistrial, which is denied on
14  the merits.
15       Third, defendants should be permitted to
16  cross-examine plaintiff as to his emotional and psychological
17  injuries. He's not seeking damages. And I'll modify the
18  charge, as I'll explain in a moment, to make that clear.
19       Fourth, defendants should be permitted to mention in
20  closing that the criminal case was dismissed on Speedy Trial
21  rules. I've already dealt with that, and I see no reason to
22  reopen that. It's been discussed repeatedly.
23       Defendants request a curative instruction as to the
24  import of the grand jury's indictment. That's five, and it's
25  combined really with six. Instruction of a presumption of

JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

PROCEEDINGS 5

1  probable cause. I'll deal with that in a moment in my
2  proposed change to the instructions.
3      And defendants move to dismiss the malicious
4  prosecution and fair trial claims in the light of the United
5  States Supreme Court's recent decision in Rehberg,
6  R-E-H-B-E-R-G. I dealt with that, and the answer is no. I'm
7  not going to reconsider that.
8      Now, as I understand it, the plaintiff is not going
9  to try to impugn the legal validity of the initial approach in
10 closing; is that correct?
11      MR. NORINSBERG: That's correct. The only
12 references will be made to that with respect to credibility,
13 that he said one thing and then it's another. We're not
14 challenging the stop in closing.
15      THE COURT: All right. That's sufficient. I think
16 the transcript indicates that that is appropriate.
17      There was no request for a limiting instruction as
18 to time. I think that a limiting instruction at this time
19 would be more confusing than helpful.
20      So much for the brief. Now, if you'll turn to the
21 proposed jury charge. The first change I propose to make is
22 on Page 8.
23      And before I get to that, do you want to put in that
24 you're suing -- this is the first page -- these officers in
25 their individual and official capacity? I think that's just

PROCEEDINGS 6

1  confusing? Why don't you just put their names in, okay?
2      MS. GROSS: Yes.
3      MS. SANDS: Yes.
4      THE COURT: So it's against PO Salim Randall -- we
5  don't need the shield number -- and Michael Burbridge, that's
6  all. We'll take out the PO. Salim Randall and Michael
7  Burbridge.
8      Now, if you turn to Page 8, just before the final
9  paragraph, I propose to put in this paragraph, which I believe
10 is required by Second Circuit cases, although I believe those
11 Second Circuit cases are misguided and that this is confusing,
12 but I'll put it in.
13      "A grand jury's indictment creates a presumption
14 that probable cause for prosecution existed. You may find the
15 presumption rebutted, that is overcome, and that no probable
16 cause for prosecution existed, based on all the evidence."
17      We can discuss that after I finish giving you all
18 the changes.
19      On Page 9, just above D, proximate cause, at the end
20 of the page, the last sentence should read: "If a defendant
21 presented accurate evidence to the prosecutor or presented
22 false evidence, thinking it was true, then you must find for
23 the defendant."
24      Page 10, three paragraphs up from the bottom,
25 beginning "plaintiff claims," add: "He is not seeking a

PROCEEDINGS 7

1  recovery for any emotional or psychological injuries. He is
2  not seeking loss of earnings."
3      Then on page 14, it says "if you answer all of the
4  above questions in the negative." Cross out "in the negative"
5  and say is "no." And then in place of "in the affirmative,"
6  put "yes."
7      And then under compensatory damages, leave that as
8  it is. That's 4A and 4B.
9      And under 5A, add: "Punitive damages from Officer
10 Randall, what amount of punitive damages is awarded." And
11 then the same change on 5B, just for clarification.
12      Now, what is the further request of the defendants
13 and objections?
14      MS. GROSS: Your Honor, if I might be heard briefly.
15 The defendants would like the record to note our
16 objection to Your Honor's rulings with respect to the points
17 1, 2, 4, 5 and 6 of the brief.
18      And with respect to point 2 of the brief,
19 defendants' position is that plaintiffs improperly opened the
20 door and have improperly referenced the initial approach. And
21 Your Honor correctly identifies that they have focused on the
22 time from which defendants first observed plaintiff until the
23 time of the arrest. That includes the time of the initial
24 approach. Your Honor's pretrial ruling was that the initial
25 approach was not at issue. That defendants had the legal

PROCEEDINGS 8

1  right to pull alongside plaintiff and ask where are you going,
2  what are you doing is not at issue in this case.
3      Plaintiffs have repeatedly during the course of
4  their direct and cross-examinations of the officers asked
5  questions impugning the validity of the initial approach,
6  including whether the officers saw furtive movements, what the
7  officers saw that led them to initially approach the
8  plaintiff. That, from defendants' perspective, so infects the
9  testimony in this case that it requires a curative instruction
10 or, in the alternative, a mistrial. They have focused on it
11 extensively in their testimony. I think the jury now
12 reasonably believes that there is some issue as to the
13 validity, the legal basis upon which the officers relied in
14 initially approaching.
15      THE COURT: Where would it go? I can say that the
16 stop was -- is not challenged.
17      MS. GROSS: That's what we'd be asking for.
18      Might I just have a moment?
19      THE COURT: Where do you want that? The validity of
20 the stop is not challenged. Where do you want that?
21      MS. GROSS: Page 7, very beginning. I believe the
22 paragraph starts with "the issue for you."
23      THE COURT: Which paragraph?
24      MS. GROSS: Sorry. The first paragraph on Page 7 of
25 the April 24 draft I believe reads "the issue for you." It's

PROCEEDINGS 9

1  the first paragraph. We would suggest that right before that
2  paragraph, the instruction Your Honor has just proposed be
3  given.
4  　　　　MR. NORINSBERG: We would -- if we could be heard on
5  that, Your Honor.
6  　　　　THE COURT: Yes. I'm just putting it in.
7  　　　　Is there anything else you want?
8  　　　　MS. SANDS: Just one more thing, Your Honor.
9  　　　　THE COURT: Yes.
10 　　　　MS. SANDS: On that same page, Page 7, the second
11 full paragraph -- I'm sorry, the third full paragraph, where
12 it says "the existence of probable cause is measured at the
13 moment of arrest."
14 　　　　THE COURT: Yes.
15 　　　　MS. SANDS: I would ask that there be an explanation
16 as to -- I know there's explanations throughout the charge,
17 but right there, at the end of that sentence, that something
18 to the effect that probable cause exists when an examination
19 of all the facts and circumstances known to the officer
20 that it is reasonable for the officer to believe that a crime
21 has been or is being committed. Because I think when we say
22 the existence of probable cause is measured at the moment of
23 arrest, right there, there isn't any explanation of what
24 probable cause is.
25 　　　　THE COURT: I think I'll deny that. I've
　　　JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

PROCEEDINGS 10

1  sufficiently explicated that point.
2  　　　　What is the plaintiff's view of what changes I've
3  proposed or not proposed?
4  　　　　MR. NORINSBERG: I just wanted to address the one
5  change relating to the additional language on the stop, and
6  then counsel will handle the rest of them, if we could.
7  　　　　THE COURT: Yes.
8  　　　　MR. NORINSBERG: I mean, we do object, Your Honor,
9  to even having any instruction on the lawfulness of the stop.
10 What we were doing through cross-examination was using it
11 strictly for impeachment and credibility.
12 　　　　THE COURT: Yes.
13 　　　　MR. NORINSBERG: And if the Court is inclined to add
14 the charge that defendants have requested, we would also
15 request in that same sentence that the court say that
16 "However, to the extent there has been testimony relating to
17 the stop, you may consider such testimony as it relates to the
18 credibility of the defendants."
19 　　　　MS. GROSS: We would object to that language, the
20 addition of that language, Your Honor.
21 　　　　THE COURT: It's going to read as follows: "The
22 initial stop was lawful. Evidence relating to observations
23 and acts surrounding the stop may be considered in deciding
24 credibility."
25 　　　　What else do you want?
　　　JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

PROCEEDINGS 11

1  　　　　MR. COHEN: Your Honor, I want to direct your
2  attention to Page 8. With respect to the paragraph, actually,
3  plaintiff suggested yesterday just to make sure that we have
4  no issues with Rehberg. My understanding of the language that
5  was going to be put in was "may be liable for what he said to
6  prosecutors."
7  　　　　THE COURT: What are you referring to?
8  　　　　MR. COHEN: The second paragraph on Page 8 under
9  malicious prosecution. The second clause.
10 　　　　THE COURT: Yes.
11 　　　　MR. COHEN: Yesterday, when we discussed this, Your
12 Honor suggested that you, know, the first sentence and then
13 the second sentence was going to end where it says
14 "prosecutor." "He may be held liable for what he said to the
15 prosecutor."
16 　　　　This additional clause was not discussed yesterday,
17 if his statement was not in preparation for his grand jury
18 testimony. That's not what Rehberg says. It's just said
19 what's said in the grand jury is not subject to 1983. In
20 fact, it says the opposite in a footnote. Anything said to
21 the prosecutor is presented to the grand jury --
22 　　　　THE COURT: Let's see the footnote.
23 　　　　MR. COHEN: I have it right here.
24 　　　　MS. GROSS: Which footnote?
25 　　　　MR. COHEN: There's only one footnote in the whole
　　　JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

PROCEEDINGS 12

1  case.
2  　　　　As you can see, Your Honor, this footnote clearly
3  states statements made to the prosecution, of course, are
4  still -- if they're made falsely, they are obviously still
5  actionable under 1983.
6  　　　　MS. GROSS: With due respect, Your Honor, defendants
7  don't believe that's what the footnote says, that that's what
8  it stands for.
9  　　　　THE COURT: Rehberg is certainly ambiguous on point.
10 　　　　MR. COHEN: The other thing, Your Honor, just the
11 way that the --
12 　　　　THE COURT: Excuse me. Let me just continue to read
13 this.
14 　　　　I think you made a text that supports what I've
15 written. "A grand jury witness" -- I'm quoting from the
16 opinion slip sheet, I guess it is, Page 12. "A grand jury
17 witness has absolute immunity for any Section 1983 claim based
18 on the witness's testimony. In addition, as the Court of
19 Appeals held, this rule may not be circumvented by claiming
20 that a grand jury witness conspired to present false testimony
21 or by using evidence of the witness's testimony to support any
22 other 1983 claim concerning the initiation or maintenance of a
23 prosecution. Were it otherwise called, a criminal defendant
24 turned civil plaintiff could simply reframe a claim to attack
25 the preparation instead of the absolutely immune actions
　　　JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

PROCEEDINGS 13

1  themselves." Citing Buckley, B-U-C-K-L-E-Y, and Deykes,
2  D-E-Y-K-E-S.
3       "In the vast majority of cases involving a claim
4  against a grand jury witness, the witness and the prosecutor
5  conducting the investigation engage in preparatory activity,
6  such as a preliminary discussion in which the witness relates
7  the substance of his intended testimony. We decline to
8  endorse a rule of absolute immunity that is so easily
9  frustrated."
10      And then it drops Footnote 1. And Footnote 1
11  suggests some limits to activity of the witness outside of the
12  grand jury room and shows a reluctance to grant absolute
13  immunity.
14      I think under the circumstances, that the charge as
15  I have it is accurate.
16      What else?
17      MR. COHEN: Your Honor, with respect to the addition
18  you just added at the bottom of Page 8, that a grand jury
19  indictment creates the presumption that probable cause
20  exists --
21      THE COURT: Yes.
22      MR. COHEN: -- the plaintiff agrees with Your Honor,
23  and especially in light of this decision. This whole
24  presumption no longer matters because what he said in the
25  grand jury is immune. So they can't have it both ways. They

JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

PROCEEDINGS 14

1  can't have it that the presumption is created and then now
2  plaintiffs not be able to challenge what actually was said in
3  the grand jury. This no longer is even applicable. All it's
4  going to do, as Your Honor stated correctly, is confuse the
5  jury, especially if what plaintiff is saying is correct,
6  the --
7       THE COURT: You're absolutely right, that as a
8  result of the decisions of the Second Circuit and the New York
9  court of Appeals and the Supreme Court of the United States,
10  I've given and I feel I'm compelled to give the jury an
11  instruction that a first-year student of criminal procedure
12  would have difficulty in following. But I can't simplify it
13  in light of the precedence. Here's Rothstein v. Carriere, 373
14  F.3d 275, Second Circuit, 2004, Page 282. "The District Court
15  disregarded the rule that a grand jury's indictment creates a
16  presumption that the criminal proceeding was supported by
17  probable cause."
18      MR. COHEN: So if I can ask the Court to just amend
19  the language proposed. At the very least, if Your Honor has
20  to put this language in, that the probable cause that's
21  presumed by the grand jury indictment, it can rebut it not as
22  Your Honor said, by all the evidence presented in this case,
23  but rather by the false testimony, if you believe false
24  testimony was given by the defendants in this action.
25      THE COURT: No, I don't think I'm going to do that.

JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

PROCEEDINGS 15

1  You can argue that that's important evidence. But I think I'm
2  going to have to do this.
3       What else?
4       MR. COHEN: Your Honor, again, with respect to
5  Page 9, Your Honor added language with respect to the mind set
6  of the defendants, thinking that it is true. The second
7  paragraph on Page 9. Saying that the officers either saw the
8  gun or thought they saw the gun. Again, we've been over this
9  with the facts in this case. There's never been wavering by
10  either of the defendants thinking that they saw something they
11  didn't see. They've had the opportunity many times to testify
12  that they may have been mistaken, but they painstakingly have
13  chosen to go the path that they were not mistaken. So giving
14  them this out, this, oh, well, we were mistaken, is -- just
15  goes against the facts of this case.
16      THE COURT: I don't think so. People often think
17  they've seen something and are very positive about it without
18  lying. I won't go into the full psychology of it, but I think
19  it's appropriate. You can argue it.
20      Anything else?
21      MR. COHEN: Yes. Finally, with the compensatory
22  damages, Your Honor. Your Honor has added this line about
23  plaintiff is not seeking emotional and psychological injury.
24  When I objected to defendants' cross-examination of my client
25  with respect to -- the way she phrased the question was

JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

PROCEEDINGS 16

1  psychological or emotional injury. He did not seek any
2  psychological treatment. That's my objection. He is seeking
3  emotional injuries with respect to having to face the charges
4  that he didn't commit, just the general emotional injury that
5  comes with being accused of a crime that he did not commit.
6  But specifically did he seek medical treatment? No.
7       THE COURT: All right. You can argue that to the
8  jury. This is the way I'm going to charge because that's what
9  the evidence shows.
10      Anything else?
11      And the claim is clear.
12      MR. NORINSBERG: I just would like to raise some
13  issues with respect to the summation very briefly.
14      THE COURT: Yes.
15      MR. NORINSBERG: The Court yesterday repeatedly had
16  to admonish defense counsel that my client had no obligation
17  to make statements to law enforcement officers. I would just
18  ask the Court to make a ruling now that they cannot make that
19  argument during their summation.
20      THE COURT: They don't plan to.
21      Do you?
22      MS. CASTRO: No, Your Honor.
23      MR. NORINSBERG: The second thing is, just in my
24  experience in having cases with the city, I plan during the
25  punitive damages section of my closing argument to use the

JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

# A1192

|  | PROCEEDINGS          17 |
|---|---|
| 1 | language that the verdict should send a message, and that |
| 2 | language, I know from past experience the city repeatedly |
| 3 | objects to. But I feel it's entirely appropriate in the |
| 4 | context of punitive damages, and I don't want to be |
| 5 | interrupted when I'm making that. So I just wanted to ask the |
| 6 | Court to make that ruling. |
| 7 | THE COURT: They have a right to interrupt. I don't |
| 8 | think it's helpful. I think the charge is right. I'm not |
| 9 | going to change or instruct. |
| 10 | Anything else? |
| 11 | MR. NORINSBERG: Well, I'm not talking about the |
| 12 | charge. I'm just talking about me being able to argue that |
| 13 | point to the jury. |
| 14 | MR. COHEN: I'll permit you to argue. If they |
| 15 | object, I'll overrule it. |
| 16 | MS. CASTRO: Your Honor, we will note our objection |
| 17 | now and during plaintiff's closing to any attempts of sending |
| 18 | a message to anyone. |
| 19 | THE COURT: Well, that's what deterrence is, isn't |
| 20 | it? |
| 21 | MS. CASTRO: We would note our objection to it. |
| 22 | MS. SANDS: Your Honor, one more thing as to the |
| 23 | verdict sheet. After -- on Page 14, when the second question |
| 24 | is "If you answer all of the questions no, do not continue the |
| 25 | following question," shouldn't there be a sentence that you |

JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

|  | PROCEEDINGS          18 |
|---|---|
| 1 | have your verdict. |
| 2 | THE COURT: What? |
| 3 | MS. SANDS: Shouldn't there be a sentence there that |
| 4 | you then you have a verdict? There should be some instruction |
| 5 | that directs the jury at the time they reach the verdict to |
| 6 | sign off. |
| 7 | THE COURT: No, I don't think I need that. |
| 8 | All right. Then I'm going to have this typed up for |
| 9 | distribution to the jury when I read my charge. |
| 10 | MR. COHEN: Your Honor, there's one more thing. |
| 11 | THE COURT: Yes. |
| 12 | MR. COHEN: Not with respect to the charge. Your |
| 13 | Honor -- we requested a Daubert hearing in this case. |
| 14 | THE COURT: Yes. |
| 15 | MR. COHEN: And I've done some research on the |
| 16 | matter. And Daubert requires that when making the opinion, |
| 17 | the expert in the case has to rely on scientific evidence, |
| 18 | empirical or testing or some theory or technique that has an |
| 19 | error rate or has some sort of scientific control. The |
| 20 | opinion expressed in this report is: "In my experience at the |
| 21 | Chief Medical Examiner's office, analysts often yield |
| 22 | insufficient amounts of DNA when swabbing firearms." |
| 23 | It's an opinion without any basis. I would like to |
| 24 | explore with this expert what she's basing that opinion on. |
| 25 | In fact, I found more information on the Chief Medical |

JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

|  | PROCEEDINGS          19 |
|---|---|
| 1 | Examiner's website which contradicts what this says. |
| 2 | THE COURT: You can do that on cross-examination and |
| 3 | then move to strike. I'm not going to waste my time with a |
| 4 | Daubert hearing. I want to close the case. The long |
| 5 | experience of a scientific observer is entitled to great |
| 6 | weight. |
| 7 | MR. COHEN: Your Honor, may I at least speak to the |
| 8 | witness before she takes the stand? Can I have a few minutes |
| 9 | to speak to her? |
| 10 | THE COURT: Where is the witness? |
| 11 | MS. CASTRO: She's outside. |
| 12 | THE COURT: Take five minutes. |
| 13 | MR. COHEN: Can I have 10 minutes? |
| 14 | THE COURT: Ten minutes. |
| 15 | MR. COHEN: I'm sorry, Your Honor. I just want to |
| 16 | make -- I haven't deposed this witness. |
| 17 | THE COURT: I don't want to impede you in your |
| 18 | duties in any way. |
| 19 | Then you'll have your witness ready to testify |
| 20 | immediately. |
| 21 | MS. CASTRO: We will, Your Honor. But we also note |
| 22 | our object to plaintiff's request to speak with the witness. |
| 23 | THE COURT: You object to what? |
| 24 | MS. CASTRO: Plaintiff's request to speak to the |
| 25 | witness? |

JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

|  | PROCEEDINGS          20 |
|---|---|
| 1 | THE COURT: He's entitled to speak to the witness. |
| 2 | Overruled. |
| 3 | MS. CASTRO: May we be present for that meeting? |
| 4 | THE COURT: Pardon me? |
| 5 | MR. COHEN: May we be present for the meeting? |
| 6 | THE COURT: I don't think it's necessary. |
| 7 | MS. SANDS: Your Honor, we would be present at a |
| 8 | deposition if that's what would have happened. |
| 9 | THE COURT: You can tell your witness if he doesn't |
| 10 | want to talk to him, he doesn't have to. He's entitled to a |
| 11 | private discussion. |
| 12 | (Recess.) |
| 13 | THE COURT: Be seated. |
| 14 | Good morning, everyone. |
| 15 | THE JURY: Good morning, Your Honor. |
| 16 | THE COURT: Some of you have trouble hearing me. Do |
| 17 | you hear me now? |
| 18 | THE JURY: (Affirmative nod.) |
| 19 | THE COURT: Call your witness, please. |
| 20 | MS. GROSS: Defendants call Police Officer Joseph |
| 21 | Sena. |
| 22 | THE COURT: Swear the witness. |
| 23 | JOSEPH SENA, having first been duly sworn, was examined and |
| 24 | testified as follows: |
| 25 | THE CLERK: Please be seated and state and spell |

JUDI JOHNSON, RPR, CRR, CLR - Official Court Reporter

# A1193

|   | PROCEEDINGS 21 |
|---|---|
| 1 | your name for the court reporter. |
| 2 | THE WITNESS:  Name is Police Officer Joseph Sena, |
| 3 | J-O-S-E-P-H, last name Sena, S-E-N-A. |
| 4 | DIRECT EXAMINATION |
| 5 | BY MS. GROSS: |
| 6 | Q    Good morning, Officer Sena. |
| 7 | A    Good morning. |
| 8 | Q    Could you please tell your current title to the jury? |
| 9 | A    I am currently a police officer with the New York City |
| 10 | Police Department. |
| 11 | Q    Which unit are you assigned to? |
| 12 | A    I'm assigned to the Brooklyn North evidence collection |
| 13 | team. |
| 14 | Q    Where is the evidence collection team based? |
| 15 | A    84th Precinct, downtown Brooklyn. |
| 16 | Q    What are your responsibilities with the evidence |
| 17 | collection team? |
| 18 | A    We respond to scenes, such as burglaries, criminal |
| 19 | possession of weapons, non-fatal shootings, robberies; and |
| 20 | when we get to the scenes, we collect evidence, such as DNA, |
| 21 | fingerprints.  We take photographs. |
| 22 | Q    Approximately how many cases do you handle per year? |
| 23 | A    Per year, I would say somewhere around 240, 250 cases. |
| 24 | Q    Approximately how many times have you performed |
| 25 | fingerprint analysis? |

|   | PROCEEDINGS 22 |
|---|---|
| 1 | A    Just about every job I go on. |
| 2 | Q    Can you give the Court an approximation? |
| 3 | A    240, 250. |
| 4 | Q    That's per year? |
| 5 | A    Per year. |
| 6 | Q    Approximately how many times during the course of your |
| 7 | seven years would you say you have performed these analyses? |
| 8 | A    I would say roughly around 1,500 times. |
| 9 | Q    And with respect to DNA collection? |
| 10 | A    DNA collection, probably half of that many times. |
| 11 | Q    What sort of training have you had in fingerprint testing |
| 12 | and DNA collection? |
| 13 | A    Well, we had a four-day course conducted at the crime |
| 14 | scene lab, conducted by crime scene detectives, and just, you |
| 15 | know, everyday training, on-the-job training. |
| 16 | Q    What did you do prior to your employment with the |
| 17 | evidence collection team? |
| 18 | A    I was a patrolman in the 84th Precinct. |
| 19 | Q    For how long? |
| 20 | A    Thirteen years doing that. |
| 21 | Q    I'd like to turn your attention to your involvement with |
| 22 | the gun recovered on May 15th, 2008 in this case.  How did you |
| 23 | come to be involved? |
| 24 | A    We received a call to process a firearm. |
| 25 | Q    Where did you go to get the gun? |

|   | PROCEEDINGS 23 |
|---|---|
| 1 | A    The firearm was at the 77 annex, which is a satellite for |
| 2 | the 77 precinct. |
| 3 | Q    Why the 77 annex?  Why did you go there? |
| 4 | A    It was my understanding that that's where the anti-crime |
| 5 | team is based out of, that building. |
| 6 | Q    For what purpose did you go? |
| 7 | A    We went to process the firearm. |
| 8 | Q    Who gave you the firearm? |
| 9 | A    Police Officer Randall. |
| 10 | Q    Was Officer Randall known to you personally? |
| 11 | A    No. |
| 12 | Q    What type of gun was it? |
| 13 | A    It was a .38 Smith & Wesson revolver. |
| 14 | Q    Officer Sena, did there come a time when you took a |
| 15 | photograph or photographs of the gun? |
| 16 | A    Yes, I did. |
| 17 | MS. GROSS:  Your Honor, may I approach the witness? |
| 18 | THE COURT:  Yes. |
| 19 | MS. GROSS:  Your Honor, I'm showing the witness |
| 20 | Defendant's Exhibit C1. |
| 21 | BY MS. GROSS: |
| 22 | Q    Officer Sena, is this an enlarged picture of the |
| 23 | photograph you took? |
| 24 | A    Yes, it is. |
| 25 | Q    Officer Sena, please explain to the jury what they're |

|   | PROCEEDINGS 24 |
|---|---|
| 1 | looking at. |
| 2 | A    That is the firearm that I processed at the scene with |
| 3 | the cartridges right above it. |
| 4 | Q    How many cartridges or bullets were recovered? |
| 5 | A    Six. |
| 6 | Q    What type of handle does the gun have? |
| 7 | A    A black rubber handle. |
| 8 | Q    Approximately how long is the gun? |
| 9 | A    I would say somewhere around 9 to 10 inches. |
| 10 | Q    Officer Sena, do you note that the photograph you took |
| 11 | has a date stamp? |
| 12 | A    Yes, it does. |
| 13 | Q    That's the wrong date, isn't it? |
| 14 | A    Yes, it is. |
| 15 | Q    How did it come to have the wrong date? |
| 16 | A    The date on the camera, I do not know how to work that |
| 17 | function, and that's the way the camera was at that time. |
| 18 | Q    Did you take the photo that was the basis of this |
| 19 | enlargement? |
| 20 | A    Yes. |
| 21 | Q    Did you take more than one photo? |
| 22 | A    Yes, I did. |
| 23 | Q    Okay.  Where were the photos kept? |
| 24 | A    The photos are kept at my base with my paperwork. |
| 25 | Q    And that's where they've been for the last four years? |

# A1194

## PROCEEDINGS 25

1  A   Yes.

2  Q   Once you arrived at the 77 annex to collect the gun, how

3  did you collect it from Officer Randall?

4  A   I used latex gloves.

5  Q   Let's turn to the test. Please explain to the jury the

6  fingerprint testing you did on the gun.

7  A   Well, the fingerprint testing I did was a fuming process

8  and that process is like maybe like a 2-foot-high tent-like

9  structure that we use; and on top of that, inside the

10  structure, is a clasp that we use to attach the item, in this

11  case, the firearm. And on the bottom we heat up some super

12  glue and the super glue fumes, and the fumes rise to the top,

13  where the item is being held, and it adheres to the item,

14  hopefully in the -- to show fingerprints on the item.

15  Q   What were the results in the fume test that you

16  performed?

17  A   Negative results.

18  Q   What does that mean?

19  A   There was no fingerprints to make a positive

20  identification.

21  Q   In your experience, it is -- is it unusual for the tests

22  to yield either no prints or not enough print material to

23  test?

24        MR. COHEN:   Objection.

25        THE COURT:   I'll allow it. Based on your

## PROCEEDINGS 26

1  experience.

2  A   Based on my experience, firearms do not produce

3  fingerprints. They are unlikely to.

4  Q   Why is that?

5  A   Just the texture of the gun is grainy, bumpy. It's not

6  conducive to fingerprints.

7  Q   How would you describe the texture of the 38 Smith &

8  Wesson revolver in this case?

9  A   Well, the handle has bump grains to it and, you know,

10  will not hold -- in my experience, is not conducive to holding

11  fingerprints.

12  Q   How many firearms have you fume tested during your

13  experience with the evidence collection team?

14  A   Between fuming and dusting, I do approximately two every

15  month, and, you know, times that every year, 24 -- 24 times

16  six. I'd say hundreds. You know, about a hundred and change,

17  at least.

18  Q   How many positive results have you had?

19  A   Zero, none.

20  Q   So you've never recovered fingerprints from a gun?

21  A   Never recovered a fingerprint from a firearm.

22  Q   You testified earlier that there were six cartridges or

23  bullets found.

24  A   Yes.

25  Q   Did you test those cartridges?

## PROCEEDINGS 27

1  A   No.

2  Q   Why not?

3  A   This is a case of criminal possession of a weapon, and

4  we're trying to find out who possessed the weapon and not

5  loaded the weapon. So it's not our practice to test the

6  cartridges.

7  Q   In your experience, are cartridges amenable to testing,

8  given their surface and size?

9  A   They're small in size, so the positive result of getting

10  a fingerprint off of that would probably not be conducive as

11  well.

12  Q   Please explain to the jury the DNA evidence that you

13  collected from the gun.

14  A   The DNA evidence I collected is just kind of swabs that

15  we use, and we go over the frequently touched areas of the gun

16  to extract some skin cell DNA.

17  Q   Which areas of this gun were tested?

18  A   Three areas. The trigger, trigger guard is one. The

19  handle, the back strap grips. And it's a revolver; it has a

20  hammer and cylinder release, so those areas.

21  Q   What was done with the cotton swab test samples that you

22  collected?

23  A   After I swabbed the gun, I packaged them and send out the

24  packages to the police lab to be analyzed.

25  Q   If you know, what were the results of the DNA analysis in

## PROCEEDINGS 28

1  this case?

2  A   I learned that it was an insignificant amount of DNA to

3  make a positive identification.

4  Q   Was that the end of your involvement with the testing of

5  the gun?

6  A   Yes, that was it.

7  Q   Finally, Officer Sena, have you ever worked with or

8  encountered the officers involved in this arrest, Officer

9  Randall, Officer Burbridge or Officer Fox?

10  A   No.

11        MS. GROSS:   Thank you, I have no further questions.

12  CROSS-EXAMINATION

13  BY MR. COHEN:

14  Q   Good morning, Officer Sena.

15  A   Good morning.

16  Q   How are you?

17  A   Good.

18  Q   You didn't testify in the grand jury in this matter,

19  correct?

20  A   I believe I did not.

21  Q   And you didn't testify at the deposition in this civil

22  action, correct?

23  A   I believe I did not, no.

24  Q   When were you made aware of when -- that the civil action

25  even existed?

PROCEEDINGS                                    29

1   A    Last week maybe.
2   Q    So, quite frankly, you were not even aware for the last
3   four years that Mr. Marshall has been suing Officer Randal
4   and Officer Burbridge until last week; is that correct?
5   A    That's correct.
6           (Continued on the next page.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

PROCEEDINGS                                    30

2   Q    And in the last four years from when you did this test,
3   you haven't thought about this case, have you?
4   A    No.
5   Q    You had no reason to, correct?
6   A    That's correct.
7   Q    And moments ago I saw you outside in the hallway, you
8   were refreshing your memory, right, looking at your notes?
9   A    Yes.
10  Q    Because you don't have any specific independent
11  recollection of what you did on May 15, 2008, correct?
12  A    Specific recollection?  I mean, I remember fuming the
13  gun, I do remember swabbing the gun.
14  Q    But you've done hundreds of these, right?
15          THE COURT:  Excuse me.  Do not interrupt the
16  witness, please.  You can finish your answer, sir.
17          THE WITNESS:  Okay.  Thank you.
18  A    I remember fuming and swabbing it for DNA, yes.
19  Q    Do you remember this specific gun that you fumed?
20  A    This specific gun, I remember fuming it, yes.
21  Q    Now, Officer Sena, you just testified that you are a part
22  of a unit called the evidence collection team in the NYPD,
23  correct?
24  A    Yes.
25  Q    And your unit is called that because you are usually

---

CROSS - OFFICER SENA                           31

1   called to scenes to collect evidence, right?
2   A    Yes.
3   Q    And you just testified actually on direct that that's
4   what you generally do, you are called to scenes, I believe you
5   said to violent crime scenes robberies and burglaries and
6   criminal possessions of weapon scenes, correct?
7   A    That's correct.
8   Q    And, in fact, you just also mentioned on direct that you
9   get this special training on how to collect the evidence at
10  the scene, correct?
11          MS. GROSS:  Objection, your Honor.  Objection.  I
12  don't believe that was the testimony.
13          THE COURT:  You may inquire.
14  Q    Was that the case, you get the training on how to collect
15  evidence?
16  A    Yes.
17  Q    So as not to contaminate the evidence?
18  A    Yes.
19  Q    You want to make sure -- and when you take something, you
20  mentioned a minute ago you put on gloves when Officer Randall
21  gave you the gun, right?
22  A    Yes.
23  Q    You don't want to put your own fingerprints on the gun?
24  A    That's right.
25  Q    And you don't want to put your own DNA on the gun?

---

CROSS - OFFICER SENA                           32

1   A    Right.
2   Q    And you did training to make sure that that doesn't
3   happen?
4   A    Yes.
5   Q    And when you were a patrol officer for 13 years you
6   didn't get that training, right?
7   A    No.
8   Q    You got that because you're part of this specialized
9   team, correct?
10  A    Right.
11  Q    And this is done so that the NYPD can use science as a
12  way to make -- to find out what actually happened at a crime
13  scene, correct?
14  A    Yes.
15  Q    The whole point is that often in crime scenes there's a
16  dispute; one side is saying I threw a gun, like in this case,
17  and one side is saying, I didn't throw a gun -- or I didn't
18  see somebody throw a gun, correct?
19          THE COURT:  Don't answer.
20  Q    You are familiar with the facts of this case, right,
21  Officer Sena?
22  A    Yes.
23  Q    And you're aware that Plaintiff Joshua Marshall is suing
24  Officer Burbridge and Randall because he is claiming they
25  didn't see who threw this gun, right?

CROSS - OFFICER SENA                    33

1    THE COURT: Don't answer.
2    Q   In this particular case though you weren't actually
3    called to the scene, right?
4    A   No.
5    Q   You weren't actually called until approximately five
6    hours and 15 minutes after this arrest happened; is that
7    correct?
8    A   I don't know the approximate time. I know when I
9    responded to the 77 annex to process the firearm.
10   Q   And -- well, is there anything that could refresh your
11   recollection as to --
12   A   Well, my tour starts at 7 in the morning and I got to the
13   77 annex approximately around 8:30, so an hour and a half
14   after my tour started, so...
15   Q   But would there --
16   A   So anything before that, I don't know.
17   Q   Are you the only person on the evidence collection team?
18   A   No.
19   Q   There are other members of the evidence collection team?
20   A   Yes.
21   Q   And are there members of the evidence collection team
22   that work at night?
23   A   No. There is no midnight tour of the evidence collection
24   team.
25   Q   There is no midnight tour?

MARY AGNES DRURY, RPR - Official Court Reporter

CROSS - OFFICER SENA                    34

1    A   No, there is not.
2    Q   So when crimes happen at night --
3    A   There's an answering machine. And if there is a crime
4    that happens, usually they'll call up and there will be a
5    message on the answering machine.
6    Q   But there are special protocols with respect to the NYPD
7    on what they're supposed to do when there is evidence to be
8    collected at the scene, correct?
9    A   Yeah.
10   Q   They are supposed to safeguard that evidence to make sure
11   that no one -- let me just finish the question, sir. Sorry.
12   Safeguard the evidence to make sure no one
13   contaminates the evidence, waiting for the evidence collection
14   team to come and collect the evidence?
15   A   Well, if it's possible they have it safeguarded at the
16   scene, yes, if it's feasible do that.
17   Q   So you tested this at the 77 precinct annex, correct?
18   A   That's right.
19   Q   But when you normally get called to the scene, do you
20   often test the gun at the scene?
21   A   Yes.
22   Q   You didn't do that in this case as well, correct?
23   A   No, I did not.
24   Q   And you arrived at the 77 annex at approximately
25   8:30 a.m.?

MARY AGNES DRURY, RPR - Official Court Reporter

CROSS - OFFICER SENA                    35

1    A   Yes.
2    Q   And you prepared a report with respect to this, your
3    involvement in this matter, correct?
4    A   Yes.
5    Q   And you prepared that in the regular course of your
6    business; is that right?
7    A   Yes.
8    Q   I'm going to show the witness what's been marked as
9    Plaintiff's Exhibit 3. Do you recognize that document, sir?
10   A   Yes.
11   Q   What do you recognize it to be?
12   A   This is the evidence collection team report that we fill
13   out at each job that we respond to.
14   Q   And is this the evidence collection report you filled out
15   with respect to this case?
16   A   My partner filled this out, yes.
17   Q   Is your signature at the bottom of it?
18   A   Yes, my signature is at the bottom.
19   Q   So you adopted the information that is included in that
20   document?
21   A   Yes.
22   MR. COHEN: I ask that this evidence -- this
23   document be moved into evidence as Plaintiff's Exhibit 3.
24   MS. GROSS: Objection, your Honor.
25   THE COURT: On what grounds?

MARY AGNES DRURY, RPR - Official Court Reporter

CROSS - OFFICER SENA                    36

1    MS. GROSS: It contains a statement in here that was
2    the subject your Honor's motion in limine.
3    THE COURT: May I see it, please?
4    MR. COHEN: Yes, your Honor. With respect to that
5    objection, the plaintiff has no objection to redact that
6    statement.
7    MS. GROSS: The defense counsel would renew that
8    redaction.
9    THE COURT: What do you want redact on this?
10   MR. COHEN: It's what they want to redact.
11   MS. GROSS: Yes, your Honor.
12   THE COURT: Let me see it redacted, please. All
13   right. Any objection to that redaction?
14   MR. COHEN: No, your Honor.
15   THE COURT: All right. It's in evidence.
16   (Plaintiff's Exhibit 3 was received into evidence.)
17   Q   You've had an opportunity to review it, officer?
18   A   Yeah.
19   Q   Now, Officer Sena, this document has several different
20   boxes on it; is that correct?
21   A   Yes.
22   Q   And some of these boxes indicate what transpired on
23   May 15, 2008, at least from your end; is that correct?
24   A   Right.
25   Q   With respect to the box -- I'm going to approach the

MARY AGNES DRURY, RPR - Official Court Reporter

CROSS - OFFICER SENA                    37

1  witness. Can you -- where it says "time response requested"
2  do you see that?
3  A   Yes.
4  Q   What time was that?
5  A   It says 6 a.m.
6  Q   Given that information, is that the time that the request
7  from ECT to come and analyze this firearm was given?
8  A   Can I explain what this is?
9  Q   Yes, please.
10 A   My partner, Julio Acevedo, Police Officer Acevedo, his
11 tour starts at 6. He's the only person in the ECT unit that
12 has a tour at start at 6 in the morning and ends at 14 --
13 well, 2:35. Our tour, everybody else's tour starts at 7. So
14 he comes in at 6, I guess checks the answering machine, I
15 don't know how he got the information, I'm assuming of course
16 because I wasn't there, he received the information from the
17 answering machine when he walked into the office at 6 in the
18 morning. So according to him, he received the information at
19 6 in the morning, because that's when his tour started, and
20 that's why it says requested at 6 in the morning.
21 Q   Right. It doesn't -- but does your answering machine ask
22 the officers to leave a time once a request is made?
23 A   I do not know. I do not use the answering machine in the
24 office.
25 Q   Does the answering machine have a time stamp as to when

CROSS - OFFICER SENA                    38

1  A   Again, I don't use the answering machine, so I don't
2  know.
3  Q   But that specific box asks at what time was the response
4  requested; is that correct?
5  A   Right. Right.
6  Q   And it's at 6 a.m.?
7  A   Yes, it does.
8  Q   Okay. You can keep the document. There is another box
9  there, right?
10 A   Yes.
11 Q   In the top right-hand corner regarding time arrived at
12 scene; is that right?
13 A   Yes.
14 Q   That's what it says, right?
15 A   Yes.
16 Q   And what's noted in that box?
17 A   0839.
18 Q   And can you tell the members of the jury what that time
19 -- what that means, what time is that?
20 A   8:39 in the morning.
21 Q   And that's the time that you arrived at the scene?
22 A   In this case it's already -- these reports are already
23 filled out specifically with certain questions that we don't
24 write down, it's just done that way. In this case, the scene,
25 to us, is the scene where we have to go and swab or process

CROSS - OFFICER SENA                    39

1  the firearm, so the scene will be the 77 annex for us.
2  Q   Right.
3  A   Right.
4  Q   But the form is filled out with these predetermined
5  markers, "time arrived at the scene," because that's what ECT
6  is supposed to do is go to the scene, correct?
7  A   If feasible, yes.
8  Q   And isn't it also a fact that there is no box here that
9  says time arrived at the precinct?
10 A   No, there is not.
11 Q   There is one more box that I want to direct your
12 attention to, Officer Sena. The top, the middle of the top it
13 says -- also one of these prefab boxes where it says,
14 "evidence collected." Do you see that?
15 A   I'm looking. Hold on.
16 Q   Toward the left?
17 A   Okay. Yes.
18 Q   And also, that's prewritten on the form, correct?
19 A   Yes.
20 Q   And there's two boxes where it says "evidence collected,"
21 right?
22 A   Yes.
23 Q   And it says --
24 A   Yes or no.
25 Q   -- yes or no?

CROSS - OFFICER SENA                    40

1  A   Right.
2  Q   And you checked yes?
3  A   Yes.
4  Q   Is that correct?
5  A   Yes.
6  Q   Did you collect the evidence?
7  A   The evidence in this case is the DNA swabs.
8  Q   Okay. So you weren't referring to the firearm evidence?
9  A   No.
10 Q   So that's the evidence you are referring to?
11 A   Yes.
12 Q   Thank you.
13 A   Okay.
14 Q   Now, Officer Sena, also included on this report is that
15 you conferred with Officer Randall at the 7th precinct annex?
16 A   Right.
17 Q   You conferred with him?
18 A   Yes.
19 Q   You spoke to him about this case?
20 A   Yeah. I'm sure I did. I don't remember. I saw it on
21 the paperwork, so I'm sure I conferred with him.
22 Q   Well, did he tell you that Burbridge collected this gun
23 from the scene?
24 A   Can I see the paperwork?
25 Q   Yeah.

CROSS - OFFICER SENA 41

1 A Sorry. To refresh my recollection. Thank you. It
2 doesn't state who collected the firearm.
3 Q Right. Would that have been important information,
4 Officer Sena?
5 A Would it be? Yes.
6 Q It would be important information, right?
7 A Yeah.
8 Q Because the collection process is important, correct?
9 A Yes.
10 Q Especially when you're trying to extract forensic
11 evidence from it, correct?
12 A Yes.
13 Q So did he also tell you that Burbridge took no steps
14 whatsoever to reserve the forensic evidence on the gun?
15 A Again, I don't recall having a conversation about the
16 collection of the firearm, so I don't know.
17 Q But you just mentioned a minute ago it would be important
18 information, right?
19 A Who collected it? Yes. I failed to write it in, in my
20 paperwork.
21 Q Who collected it, how it was collected, right, that's
22 important, right?
23 A Yeah.
24 Q Did he tell you that Officer Burbridge just picked it up
25 off the floor with his hand?

MARY AGNES DRURY, RPR - Official Court Reporter

CROSS - OFFICER SENA 42

1 MS. GROSS: Objection, your Honor, asked and
2 answered. The witness already told us he had no statements as
3 to what Officer Burbridge said.
4 THE COURT: You may answer if you can.
5 THE WITNESS: Yeah. Again, I have no recollection
6 of how it was collected.
7 Q And he didn't tell you that he used no gloves to pick the
8 gun off the floor? He didn't tell that you either, right?
9 A Again, I have no recollection of the collection of the
10 firearm at the scene.
11 Q Did you find unusual that this gun was collected from the
12 scene by the arresting officers and not by ECT, by the
13 evidence collection team?
14 A No.
15 Q You didn't find that unusual?
16 A No, I did not.
17 Q You thought that was perfectly fine, that's within the
18 NYPD protocols?
19 A It happens, yes.
20 Q It happens, but is it what's preferred?
21 A What's preferred is that it's left there, if it's
22 feasible, leave it there. Under the circumstances, I'm not on
23 the scene, so I don't know what's going on at the scene, what
24 time of day it is, if we're even available at that time to go
25 to the scene to collect it ourselves, because we have a lot of

MARY AGNES DRURY, RPR - Official Court Reporter

CROSS - OFFICER SENA 43

1 jobs that we're doing ourselves. Or, again, we don't have a
2 midnight shift, so if this happens roughly late or early in
3 the morning, we won't be available. So could it be left
4 there, you know, for hours and hours until we arrive. So
5 there is a lot of circumstances that take effect if, you know,
6 we could go out there and collect the evidence ourselves or
7 not.
8 Q But possession of a weapon is a very serious crime. I
9 mean, you'd agree, right, Officer Sena?
10 A I would agree.
11 Q That's a serious crime?
12 A Yes.
13 Q And it's one where it's important to get it right, isn't
14 that correct, Officer Sena?
15 MS. SANDS: Objection.
16 THE COURT: I'll allow it.
17 A Again, you know, if it's feasible, leave it on the scene.
18 It would be preferred to leave it on the scene.
19 Q There are several units working --
20 A I don't know that.
21 Q -- in Brooklyn at nighttime, aren't there?
22 A I wouldn't know.
23 Q You were a patrol officer for 13 years, right?
24 MS. SANDS: Objection.
25 THE COURT: Sustained.

MARY AGNES DRURY, RPR - Official Court Reporter

CROSS - OFFICER SENA 44

1 Q You don't believe it was feasible to have officers guard
2 that gun to wait for evidence collection to come pick it up,
3 Officer Sena?
4 MS. SANDS: Objection.
5 THE COURT: Sustained.
6 Q During this conversing with Officer Randall, did he
7 happen to mention that there was another individual with
8 Joshua Marshall, who Joshua Marshall claims he threw the gun?
9 THE COURT: Sustained.
10 Q Now, you swabbed this gun in an attempt to obtain contact
11 DNA, correct, Officer Sena?
12 A Yes.
13 Q And you swabbed several areas on the gun, correct?
14 A Yes.
15 Q You swabbed the handle? You swabbed the barrel?
16 A Not the barrel.
17 Q You didn't swab the barrel?
18 A No.
19 Q You swabbed the trigger?
20 A Yes.
21 Q And you swabbed the -- you called them the ejector rods
22 on your report?
23 A I swabbed, I believe, the cylinder release and the
24 hammer, and I don't know if I swabbed the ejector rods or not.
25 I'd have to refresh my recollection by looking at my

MARY AGNES DRURY, RPR - Official Court Reporter

**A1199**

CROSS - OFFICER SENA                    45

1  paperwork.
2  Q   You prepared a property voucher in connection with this;
3  is that correct?
4  A   Yes.
5  Q   And if you saw the property voucher, would that refresh
6  your recollection as to what you swabbed?
7  A   Yes.
8           MR. COHEN:  Your Honor, should I have this marked
9  Plaintiff's 19 for identification?
10          THE COURT:  Yes.
11          MS. GROSS:  Could counsel provide a Bates number?
12          MS. SANDS:  Your Honor.
13          THE COURT:  All right.
14          MS. SANDS:  Your Honor, we don't have a copy of it.
15 We don't have a copy of it.
16          MR. COHEN:  You provided it to us.
17          MS. SANDS:  But we don't have it in the exhibit
18 book.
19          THE COURT:  All right. Excuse me. Proceed.
20          MR. COHEN:  It's just for identification.
21 Q   Do you recognize this document, Officer Sena?
22 A   Yes.
23 Q   Do you recognize it as -- what do you recognize this to
24 be?
25 A   This is the property voucher vouchering the swabs of the

MARY AGNES DRURY, RPR - Official Court Reporter

CROSS - OFFICER SENA                    46

1  firearm.
2  Q   Okay. Can you just take a moment to review the property
3  voucher?
4  A   Yeah.
5  Q   Now that you've reviewed it, can you tell the members of
6  the jury what you swabbed, what part of the gun?
7  A   Yes. I swabbed the back strap and the grips, which is
8  the handle area, the handle of the gun.
9  Q   Can you actually stand up and point to where you swabbed,
10 please?
11 A   Sure. This is the back strap grips of the gun, right
12 there. Trigger of the firearm right there. The cylinder
13 release of the firearm, which is right here that releases the
14 cylinder and the ejector rod, which is right here, where the
15 cylinder comes out. That, you push down, and it releases the
16 cartridges or fires, you know, shell casings right here, the
17 ejector rod.
18 Q   Oh, that's the ejector rod?
19 A   Yes, right here. This little stem right there.
20 Q   You didn't swab the bullets in this case?
21 A   No. Do you want this back?
22 Q   Yes, please. Now, that gun is approximately 9 to
23 10-inches long?
24 A   Approximately.
25 Q   And how long would it take for sweat to build up or DNA

MARY AGNES DRURY, RPR - Official Court Reporter

CROSS - OFFICER SENA                    47

1  material to build up on that gun?
2           MS. SANDS:  Objection, your Honor.
3           THE COURT:  If you feel you can answer it, answer
4  it; otherwise, do not.
5           THE WITNESS:  I wouldn't know.
6  Q   You have no idea?
7  A   (Witness shakes his head no.)
8  Q   You were instructed to, at some point in your career, to
9  take swabs of all guns; is that correct?
10 A   Yes.
11 Q   And in your training and experience, Officer Sena, if
12 multiple people handle the gun, would that effect the DNA
13 results?
14 A   I'm sure it would. I really wouldn't know.
15 Q   You are not --
16 A   I just swab them. I don't test the guns. I don't test
17 for the DNA, I just collect the DNA.
18 Q   But it's your understanding that when you test the DNA,
19 any item that you test the DNA, you're supposed to be very
20 careful so that you don't get your DNA mixed in; is that
21 correct?
22 A   Yes. It would be preferred if it's handled less
23 frequently.
24 Q   Now, you see there's an initial on this gun, do you see
25 that?

MARY AGNES DRURY, RPR - Official Court Reporter

CROSS - OFFICER SENA                    48

1  A   Yes, circled.
2  Q   It was circled, yes?
3  A   Yes.
4  Q   When you had -- when you were given this gun by Officer
5  Randall was that initial there?
6  A   I don't recall.
7  Q   It's possible that that initial was there?
8           MS. SANDS:  Objection, your Honor.
9           THE COURT:  Sustained.
10 Q   And you also testified that when Officer Randall gave you
11 the gun -- oh, sorry. Withdrawn.
12          You testified that Officer Randall gave you the gun,
13 correct?
14 A   Yes.
15 Q   And was he wearing gloves when he gave you the gun?
16 A   I don't remember.
17 Q   And were the bullets inside the gun when he gave you the
18 gun?
19 A   I don't remember.
20 Q   He didn't tell you that Officer Burbridge took the
21 bullets out of the gun, did he?
22 A   I don't recall.
23 Q   Now, Officer Sena, you just testified that you did
24 fingerprint testing on the gun?
25 A   Yes.

MARY AGNES DRURY, RPR - Official Court Reporter

CROSS - OFFICER SENA                    49

1  Q    And you do fingerprint testing on all guns that you are
2  called to process, as you called it?
3  A    Yes.
4  Q    And every single time that you ever fingerprint tested a
5  gun, you've never got a fingerprint result?
6  A    No.
7  Q    That's what you testified to?
8  A    Yes.
9  Q    That you continue to do the fingerprint test?
10 A    Yes.
11 Q    And then you also testified that you didn't bother to
12 fingerprint test the bullets; is that correct?
13 A    That's correct.
14 Q    Now, you would have to admit, Officer Sena, that in order
15 for the bullets to get inside the gun, someone has to touch
16 them, isn't that right?
17         MS. SANDS:  Objection, your Honor.
18         THE COURT:  I'll allow it.
19         THE WITNESS:  Yes.
20 Q    And if you found Joshua Marshall's prints on that gun,
21 that would suggest that he had handled the gun, isn't that
22 right, Officer Sena?
23         THE COURT:  Don't answer.
24 Q    But you didn't bother to take the fingerprints of the gun
25 -- of the bullets; is that correct?

MARY AGNES DRURY, RPR - Official Court Reporter

CROSS - OFFICER SENA                    50

1          MS. SANDS:  Objection, your Honor.
2          THE COURT:  Sustained.
3  Q    But you also testified on direct that in your experience
4  it is very unlikely to get fingerprints off bullets, right?
5  A    Yes.
6          THE COURT:  I don't think that was the exact
7  testimony.
8          MR. COHEN:  He testified that it was very unlikely
9  to get fingerprints off bullets.  Is that what you testified
10 to, Officer Sena?
11         THE COURT:  I think he referred to the smallness
12 without drawing the conclusion.
13         THE WITNESS:  Yes.
14         MR. COHEN:  Okay.
15 Q    But small objects like bullets, it's very difficult to
16 get fingerprint testing off of, correct?
17 A    Correct.
18 Q    How would you know that if you don't test the bullets?
19         THE COURT:  Do not answer.
20 Q    You testified that it's not your practice to test the
21 cartridges, isn't that right?
22 A    Yes.
23 Q    You also didn't swab the cartridges, isn't that right?
24 A    That's right.
25 Q    Officer Sena, the bottom line is on May 15, 2008 when you

MARY AGNES DRURY, RPR - Official Court Reporter

CROSS - OFFICER SENA                    51

1  were called to process this firearm, you didn't find any
2  fingerprints of Joshua Marshall's on there; is that correct?
3  A    I didn't find any fingerprints.
4          MR. COHEN:  Thank you.
5          THE COURT:  Any re-direct?
6          MS. GROSS:  None, your Honor.
7          THE COURT:  Thank you very much, sir.  Next witness,
8  please.
9  NANA LAMOUSE-SMITH, called by Defendants, having been first
10         Duly sworn, was examined and testified as
11         follows:
12         LAW CLERK:  Please being seated and state and spell
13 your name for the court reporter.
14         THE WITNESS:  Nana Lamouse-Smith, N-A-N-A.
15 L-A-M-O-U-S-E-S-M-I-T-H.
16 DIRECT EXAMINATION
17 BY MS. CASTRO:
18 Q    Good morning, Ms. Lamouse-Smith, how are you?
19 A    Good morning.  Fine.  Thanks.
20 Q    Are you currently employed?
21 A    Yes.
22 Q    By whom?
23 A    I work at the Office of the Chief Medical Examiner in the
24 department of the forensic biology.
25 Q    What is your position at the Office of the Chief Medical

MARY AGNES DRURY, RPR - Official Court Reporter

DIRECT - MS. LAMOUSE-SMITH            52

1  Examiner?
2  A    I am a criminalist, level four.
3  Q    What does criminalist level four mean?
4  A    I'm a supervisor in a laboratory, so I supervise
5  criminalists one through three.  In addition, I perform DNA
6  analysis, I review case files that have DNA tests, and in
7  addition, I write reports and testify as needed.
8  Q    Are you appearing here in your capacity as an employee of
9  the Office of the Chief Medical Examiner?
10 A    Yes.
11 Q    And how many times have you appeared in court in that
12 capacity?
13 A    Approximately 50 times.
14 Q    In what types of cases?
15 A    I have testified in criminal cases.  So, for example, for
16 homicides, sexual assaults, property crimes, and weapons cases
17 in both grand jury and Supreme Court within all five boroughs
18 of New York City.  In addition, I testified in federal court
19 and Baltimore City Criminal Court.
20 Q    How long have you worked at the Office of the Chief
21 Medical Examiner?
22 A    I've been there approximately seven and a half years.
23 Q    And prior to work there where did you work?
24 A    I began my career at the Bode Technology Group as a DNA
25 analyst for a year and a half before going to BRT Laboratories

MARY AGNES DRURY, RPR - Official Court Reporter

# A1201

1  in Baltimore for another two and a half years as a forensic
2  examiner.
3  Q     Can you tell us what your formal education is, please?
4  A     I have a Bachelor's in biology from Vassar College, and a
5  Master's of Science in forensic science from the University of
6  Illinois at Chicago.
7  Q     What training have you received to become a criminalist?
8  A     I've received training at each laboratory in which I've
9  worked basically in their policies and procedures and the
10 techniques that they use within that laboratory.  In addition,
11 I have taken the required coursework to be a DNA analyst,
12 which includes genetic biochemistry, molecular biology and
13 statistics.
14 Q     Have you given lectures in your field?
15 A     Yes, I have given lectures to the Assistant United States
16 Attorney's of both Eastern and Southern District of New York
17 regarding DNA testing at our laboratory.
18        I have also given a lecture on the same subject to
19 the Bronx County District Attorney's, as well as lectures at
20 my alma matter and St. John's College.
21 Q     Are you a member of any professional associations?
22 A     I'm an associate member of the American Academy of
23 Forensic Sciences.
24 Q     Can you tell us is the Office of the Chief Medical
25 Examiner an accredited laboratory?

1  A     Yes.
2  Q     So what does that mean?
3  A     It means that we are following the guidelines regarding
4  DNA testing that have been set forth by the FBI.  So we state
5  how we're going to follow those guidelines, and people from an
6  outside agency usually another laboratory will come in and
7  audit us to make sure that we are in fact following the
8  guidelines.
9  Q     And how many cases a year do you handle?
10 Q     Me personally?
11 Q     Yes.
12 A     Well into the hundreds.
13 Q     And how many cases do you supervise?
14 A     Probably thousands.
15 Q     Have you ever performed DNA analysis and testing in any
16 of these cases?
17 A     Yes, in a few.
18 Q     And what is DNA analysis?
19 A     DNA analysis would be the culmination of the entire DNA
20 testing process where an analyst is interpreting the results.
21 Q     And have you received any training in order to conduct
22 DNA analysis?
23 A     Yes.
24 Q     What training did you receive?
25 A     I've received training that dates back to my Master's

1  program in how DNA that analysis is performed, the specific
2  test.  But then at each company that I worked at, I've been
3  trained in their procedures and protocols regarding DNA
4  analysis.
5  Q     And approximately how many times have you performed DNA
6  analysis?
7  A     Thousands of times.
8  Q     Have you ever been accepted as an expert in the field of
9  DNA analysis?
10 A     Yes.
11 Q     How many times?
12 A     Approximately 50 times.
13 Q     And by what courts?
14 A     In the grand juries and Supreme Courts in all of the
15 boroughs of New York City; in addition, federal court for the
16 Southern District and Baltimore City Criminal Court.
17        MS. CASTRO:  Your Honor, at this time I'd like to
18 offer Ms. Lamouse-Smith as an expert in the field of DNA
19 analysis.
20        THE COURT:  She may give her opinion.
21 Q     I want to direct your attention to May of 2008.  Did your
22 office receive a request from the NYPD to conduct DNA analysis
23 of a 38 caliber Smith and Wesson firearm?
24 A     Yes.
25 Q     And did you conduct that examination?

1  A     I personally did not conduct the examination on the
2  evidence.
3  Q     Who did?
4  A     The examination was conducted by a person I supervised at
5  the time named Joe Ross.
6  Q     And what did Mr. Ross' examination consist of?
7  A     He took the items out of evidence storage, signed the
8  items into his possession and began examining the items, which
9  in this case were swabs.
10        So that entailed taking notes on the packaging in
11 which the swabs were received, taking notes on the swabs
12 themselves, their appearance, and then taking a sampling from
13 the swabs for DNA testing.
14 Q     And what were the findings of that examination?
15 A     There was an insufficient amount of DNA.
16 Q     Does that mean that -- well, what does that mean,
17 insufficient amount?
18 A     It means there was not enough DNA for us to go forward
19 with our standard DNA testing.
20 Q     Were there any other types of tests that could have been
21 performed?
22 A     In our laboratory we also perform what's called high
23 sensitivity DNA testing.  And this type of testing is
24 performed on samples which have less than our standard amount
25 of DNA or the sort of normal testing.  It's a more rigorous

# A1202

DIRECT - MS. LAMOUSE-SMITH    57

1  testing. It involves a little more time and energy, so it's
2  usually reserved for cases like homicides or very serious
3  assaults.
4  Q    Were these findings written down in a report?
5  A    Yes.
6  Q    What was the date of that report?
7        THE WITNESS:  Your Honor, may I refer to my file?
8        THE COURT:  You may.
9  A    The report date was June 10, 2008.
10 Q    And who wrote that report?
11 A    I signed the report.
12 Q    Did you review the report prior to signing?
13 A    Yes.
14 Q    Prior to review of this particular case had you ever
15 encountered a case where there was insufficient DNA?
16 A    Yes.
17 Q    Is that something that has occurred typically in your
18 experience?
19 A    It has occurred.  I don't know if I would say "typically"
20 but it's not a surprise if a case is insufficient, it does
21 sometimes happen.
22 Q    What are some factors that could contribute to that
23 happening?
24 A    It could be that no DNA was deposited on the item.  It
25 could be the DNA that was deposited on the item has since been

MARY AGNES DRURY, RPR - Official Court Reporter

DIRECT - MS. LAMOUSE-SMITH    58

1  degraded or destroyed due to environmental factors, such as
2  extreme heat or cold or dampness.
3  Q    Ms. Lamouse-Smith, if someone was observed pulling a gun
4  from their waistband of his pants, would you expect to find
5  DNA on that item?
6  A    It's possible.  In my opinion it's -- sort of the way I
7  imagine it, it would be similar to wiping an item off.  It's
8  the -- what has been deposited on the one item, the weapon is
9  now being rubbed against something else, so matter is being
10 exchanged between the two items, so it's possible that the DNA
11 was that originally deposited on the weapon is no longer
12 there.
13        MS. CASTRO:  Thank you.  I have nothing further at
14 this time.
15        THE COURT:  Cross.
16 CROSS-EXAMINATION
17 BY MR. COHEN:
18 Q    Good morning, Ms. Lamouse-Smith.
19 A    Good morning.
20 Q    This is the first time you've been called to testify on
21 this particular case; is that correct?
22 A    Yes, that's correct.
23 Q    You didn't testify in the grand jury in this matter?
24 A    No, I did not.
25 Q    You didn't testify at all throughout the criminal case

MARY AGNES DRURY, RPR - Official Court Reporter

CROSS - MS. LAMOUSE-SMITH    59

1  that's the underlying reason for this matter?
2  A    No, I did not.
3  Q    And you were not called for a deposition in the cause of
4  action that we are here for today; is that correct?
5  A    No, I was not.
6  Q    In fact, you were not called for -- your attention wasn't
7  drawn to this case until last week, isn't that right?
8  A    It was either last week or the week before, I think.
9  Q    Okay.  So within the last month?
10 A    Yes.
11 Q    The last four years you have not even thought about this
12 case; is that correct?
13 A    Correct.
14 Q    In fact, you actually didn't do the testing on this case,
15 you were simply the supervisor, right?
16 A    I was the supervisor, but I also did sign the report.
17 Q    But you were familiar at the time that the testing was
18 going on with respect to this matter, right?
19 A    We do testing on thousands of cases in the laboratory, so
20 specifically this case, I mean, I can't say that I was aware
21 of that.
22 Q    Okay.
23 A    It's just one of many.
24 Q    Now, in connection with being called by defense counsel
25 today, you also submitted a report, isn't that correct?

MARY AGNES DRURY, RPR - Official Court Reporter

CROSS - MS. LAMOUSE-SMITH    60

1  A    Correct.
2  Q    And in that -- you submitted that report actually this
3  week?
4  A    Yes.
5  Q    And it was prepared this week?
6  A    Yes.
7  Q    In advance of this trial?
8  A    Yes.
9  Q    Do you have a copy of that report in front of you?
10 A    I did bring a copy with me.
11 Q    Now, one of the things you alleged in this report is that
12 often times DNA is not found on firearms; is that correct?
13 A    Can you tell me what page are you looking at?
14 Q    Yeah.  If you look at the second page, I'm not quoting
15 exactly from the report.
16 A    Okay.
17 Q    But the second page, the third to last paragraph.
18 A    Yes.
19 Q    So it's your testimony that it's often the case that
20 insufficient amounts of DNA are yielded from firearms,
21 correct?
22 A    Yes.  In my experience a large number of the weapons
23 cases submitted to the laboratory have been insufficient for
24 further DNA testing.
25 Q    For all further DNA testing?

MARY AGNES DRURY, RPR - Official Court Reporter

## A1203

CROSS - MS. LAMOUSE-SMITH          61

1  A   No.
2  Q   Your office actually in recent years starting in 2008
3  started -- well, 2006 actually, started doing high sensitive
4  DNA testing, correct?
5  A   Correct.
6  Q   And you testified to that in direct examination?
7  A   Yes.
8  Q   And this advance of technology that's been around that
9  predates this case could find DNA on firearms, isn't that
10 right?
11 A   If enough DNA was present, potentially a DNA profile
12 could be yielded.
13 Q   Right. And in fact, your office maintains a website that
14 boasts about the great innovations of science and specifically
15 states that items that used to be difficult to get DNA now can
16 have DNA on them, isn't that correct?
17 A   I am not entirely familiar with what our website says.
18       THE COURT: That's enough. Excuse me. That's
19 enough. Ask your next question.
20       MR. COHEN: Yeah.
21 Q   I'm sorry, I didn't mean to interrupt you.
22 A   That was it. Go ahead.
23       THE COURT: That's enough of an answer. Ask your
24 next question.
25       MR. COHEN: Yes.

MARY AGNES DRURY, RPR - Official Court Reporter

CROSS - MS. LAMOUSE-SMITH          62

1  Q   I'm now showing you what I'd like to have as Plaintiff's
2  Exhibit 20 for identification.
3       THE COURT: Is that the website?
4       MR. COHEN: Yes.
5       THE COURT: I don't want any questions about it.
6       MR. COHEN: You don't want any questions about it?
7       THE COURT: That is correct. You are marking it as
8  what for identification?
9       MR. COHEN: For identification.
10      THE COURT: What?
11      MR. COHEN: It's 20, Plaintiff's Exhibit 20 for
12 identification. May I ask the witness if she recognizes this
13 website?
14      THE COURT: She already said she doesn't know what's
15 on the website.
16      MR. COHEN: She said she's familiar with it.
17      THE COURT: Do you know what's on the website? Did
18 you prepare the website.
19      THE WITNESS: No, I did not. I know that --
20      THE COURT: Did you approve the website?
21      THE WITNESS: No.
22      THE COURT: Don't ask anything about the website.
23 Q   So when you were called by defense counsel in this matter
24 you reviewed a file that you had -- your office had in this
25 case; is that correct?

MARY AGNES DRURY, RPR - Official Court Reporter

CROSS - MS. LAMOUSE-SMITH          63

1  A   Yes.
2  Q   And you reviewed it just as recently as about one to
3  two weeks ago; is that correct?
4  A   Yes.
5  Q   And in reviewing the information did it refresh your
6  recollection as to what was found with respect to the DNA
7  testing?
8  A   In terms of the results?
9  Q   Yes.
10 A   Yes.
11 Q   You testified on direct there were insufficient results,
12 isn't that right?
13 A   Yes, there was an insufficient amount of DNA.
14 Q   An insufficient amount of DNA for the regular testing; is
15 that right?
16 A   Correct.
17 Q   But there was a sufficient amount of DNA for the high
18 sensitivity testing, isn't that right?
19 A   Correct. One of the samples would have had enough for
20 high sensitivity testing.
21 Q   And, in fact, your office still maintains the extract for
22 that sample as of today, right?
23 A   Correct.
24 Q   So in the last four years you haven't been called by the
25 prosecutors, you haven't been called by the defense counsels

MARY AGNES DRURY, RPR - Official Court Reporter

CROSS - MS. LAMOUSE-SMITH          64

1  in this case, you haven't been called by anybody to test that
2  extract, correct?
3  A   Not to my knowledge, no.
4  Q   The mystery of this case could be completely wiped away
5  if you tested that DNA sample, isn't that right?
6       MS. CASTRO: Objection.
7       THE COURT: Don't answer.
8  Q   You could get a profile if you tested that DNA sample?
9       THE COURT: Don't answer.
10      MR. COHEN: The DNA sample of the profile.
11      THE COURT: Have you tested it?
12      THE WITNESS: No, we have not tested it.
13 Q   My question is if you did test it, you could potentially
14 get a DNA profile, isn't that correct?
15 A   It's possible.
16 Q   Isn't it also possible that other items -- let me
17 withdraw that. What were the items that your office received
18 that were swabbed?
19 A   The items we received were listed as being a swab of back
20 strap and grips, a swab of trigger, a swab of cylinder and a
21 swab of ejector rod.
22 Q   Correct. And there's no mention of the cartridges being
23 swabbed; is that correct?
24 A   No, I do not see that in the file.
25 Q   Now, if you were to know that there were cartridges

MARY AGNES DRURY, RPR - Official Court Reporter